Jeffrey I. Wasserman, Esq.
WASSERMAN LITTLE LLC
1200 Route 22 East, Suite 2000, #2238
Bridgewater, New Jersey 08807
jwasserman@wassermanlittle.com
(973) 486-4801

        &&

Thomas K. Richards, Esq.
SINGH, SINGH & TRAUBEN, LLP
400 South Beverly Drive, Suite 240
Beverly Hills, California 90212
trichards@sst.law
(310) 856-9705
(*pro hac vice* motion to be filed)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| GEGARD MOUSASI<br><br>        Plaintiff,<br><br>v.<br><br>BELLATOR SPORT WORLDWIDE, LLC, NEW BELLATOR, LLC (a Subsidiary of Professional Fighters League), PETER MURRAY, DONN DAVIS, RAY SEFO, MIKE KOGAN, JIM BRAMSON, GEORGE PINEDA and DOES 1 through 100,<br><br>        Defendants. | Civil Action No.:<br><br>**COMPLAINT** |

## COMPLAINT

Plaintiff, Gegard Mousasi ("**Gegard**"), by his attorneys, Wasserman Little LLC and Singh, Singh & Trauben, LLP, as and for his Complaint against Defendants Bellator Sport Worldwide, LLC ("**Bellator**"), New Bellator, LLC (a subsidiary of Professional Fighters League) ("**PFL**") (Bellator and PFL are collectively referred to as the "**Promoter Defendants**"), Peter Murray, Donn

Davis, Ray Sefo, Mike Kogan, Jim Bramson, and George Pineda (collectively, the "**Individual Defendants**"), sets forth the following allegations.

## I.    NATURE OF THE ACTION

1.    Gegard is a well-known and successful professional MMA (defined in Section V. below) fighter. The Promoter Defendants materially breached their contract and covenant of good faith and fair dealing with Gegard by failing to promote Gegard in Bouts (defined in Section V. below) and have been unjustly enriched.

2.    The Promoter Defendants have further engaged in an anti-competitive scheme to maintain and enhance their monopsony power in the market for MMA fighter services in violation of the Sherman Act, 15 U.S.C. § 2.

3.    All Defendants have also misclassified Gegard as an independent contractor when Gegard was in fact an employee and are liable under various misclassification-related labor and employment claims.

4.    Gegard accordingly brings claims for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, a claim for relief for Monopsonization under Section 2 of the Sherman Act, 15 U.S.C. § 2 (the "**Monopsony Claim**") and misclassification-related labor and employment claims (the "**Labor and Employment Claims**").

## II.    THE PARTIES

5.    Plaintiff Gegard Mousasi is an individual residing in The Netherlands.

6.    Defendant Bellator Sport Worldwide, LLC is a Delaware limited liability company with its principal place of business in Los Angeles, California.

7. Defendant New Bellator, LLC (a subsidiary of Professional Fighters League), is a Delaware limited liability company with its principal place of business in New York City, New York.

8. Defendant Peter Murray is the CEO of PFL and, upon information and belief, resides in the State of New York.

9. Defendant Donn Davis is the founder, chairman and co-owner of PFL and, upon information and belief, resides in Great Falls, Virginia.

10. Defendant Ray Sefo is President of MMA promotion for PFL and, upon information and belief, resides in Las Vegas, Nevada.

11. Defendant Mike Kogan is an executive of PFL and, upon information and belief, resides in Miami, Florida.

12. Defendant Jim Bramson is an Executive Vice President and General Counsel of PFL and, upon information and belief, resides in Washington D.C.

13. Defendant George Pineda is a Vice President and Deputy General Counsel of PFL and, upon information and belief, resides in Los Angeles, California.

### III.     JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction over this action by reason of diversity of citizenship pursuant to 28 U.S.C. § 1332.

15. The amount in controversy in this action exceeds $75,000.00, exclusive of attorneys' fees, interest, and costs.

16. Additionally, Plaintiff brings a claim under Section 2 of the Sherman Act, 15 U.S.C. § 2 as well as claims under Fair Labor Standards Act (the "**FLSA**") 29 U.S.C. §§ 201, *et seq*., and

this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a), and section 4 of the Clayton Act, 15 U.S.C. § 15(a)(2).

17.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(1), (b)(2), and (c)(2) because Defendants are subject to personal jurisdiction in this District. This District has personal jurisdiction because Defendants' conduct business in this District and a substantial part of the events giving rise to Plaintiff's claims took place in this District. Furthermore, Defendants transact business in this District and have engaged in activities in this District that subject them to the jurisdiction of this Court.

18.    In addition, the governing written agreement mandates that the courts located in New Jersey shall have sole and exclusive jurisdiction over this dispute.

## IV.    ALLEGATIONS COMMON TO ALL CLAIMS

19.    Gegard has been a professional MMA fighter since 2003.

20.    As is the case with virtually all professional MMA fighters, Gegard has fought throughout his career for MMA Promoters (defined in Section V. below) who plan and host Bouts and provide equipment and other services.

21.    Gegard first fought professionally for the MMA Promoter Pride Fighting, and then moved on to start fighting for the MMA Promoter Dream Fighting in Japan ("**Dream**"), becoming a multi-weight champion in Dream.

22.    Gegard also signed with the MMA Promoter Strikeforce in or around 2009, becoming its 205-pound champion.

23.    Gegard then began fighting for the MMA Promoter Ultimate Fighting Championship ("**UFC**") in 2013.

24.     Then, on July 9, 2017, Gegard signed with Bellator, and entered into a Fighter Promotional Agreement with Bellator on or about February 8, 2020 (the "**2020 Agreement**"), which was subsequently amended by an addendum entered into on or about October 3, 2023 (the "**Addendum**") (collectively, the 2020 Agreement and the Addendum are referred to as the "**Agreement**").

25.     Among other terms, the Agreement requires that Gegard's services as a professional MMA fighter be rendered exclusively to the Promoter Defendants: "Fighter [Gegard] hereby grants to Promoter the **_exclusive_** unrestricted, worldwide rights to secure, promote, arrange, present, coordinate, create and produce all MMA, martial arts, and unarmed contests (individually, a "Bout" and collectively, the "Bouts" to be engaged in by Fighter during the Term of this Agreement …"). [Emphasis supplied].

26.     Gegard is one of the most successful fighters in Bellator's history.

27.     Gegard's overall record is 49 wins and 9 losses with two different runs as a champion with Bellator.

28.     Indeed, in the 10 Bouts in which he participated for Bellator, Gegard was either competing for the title or defending the title in 7 of those Bouts.

29.     As of February 2022, ESPN was openly debating if Gegard was the best middleweight fighter in the World[1] and Khabib Nurmagomedov, widely considered one of the greatest MMA fighters of all time, called Gegard "the most underrated fighter in MMA today":[2]

---

[1] https://www.espn.com/mma/story/_/id/33342235/bellator-275-gegard-mousasi-bellator-overlooked-middleweight-champion-best-world

[2] https://x.com/teamkhabib/status/1497351500854480897?lang=en; https://www.espn.com/mma/story/_/id/34131182/why-khabib-nurmagomedov-calls-bellator-gegard-mousasi-most-underrated-bouter-mma



30.    At the time the Agreement was entered, Gegard was coming off a victory against Lyoto Machida and was in a position where he could have rejoined UFC as his promotional company (Gegard had previously fought for UFC before joining Bellator in 2017).

31.    However, Bellator induced Gegard to enter into the Agreement by raising his per bout compensation and further promising him eight (8) Bouts that were to be promoted under the Agreement. Gegard then entered into the Agreement, which provided that Gegard would receive guaranteed purse of $150,000.00 for his first four (4) Bouts, and then after his first four (4) Bouts were completed, Gegard would receive guaranteed purse for each subsequent bout of $200,000.00. Gegard would also receive a finish bonus of $50,000.00 for any Bouts won by knockout or submission, plus a promotional fee for each such bout of $600,000.00. Accordingly, after his fourth bout was completed, Gegard was guaranteed to earn $800,000.00 per bout, and up to $850,000.00.

32.    Gegard completed the initial four (4) Bouts under the Agreement, winning against Douglas Lima on October 29, 2020 by decision, and winning by TKOs against John Salter on August 13, 2021 and Austin Vanderford on February 25, 2022.

33.    Gegard then lost on a decision against Johnny Eblen ("**Eblen**") on June 24, 2022.

34.    This was Gegard's first loss in three (3) years.

35.    Having completed this fourth bout, Gegard's guaranteed purse for future Bouts would now increase to $200,000.00. (*See Id.*).

36.     Bellator, however, did not promote Gegard for nearly an entire year, with his next bout after the Eblen bout not scheduled until May 12, 2023, specifically as against Fabian Edwards ("**Edwards**").

37.     Despite aggressively asking to fight within 4 to 6 months after the Eblen bout (the standard bout schedule to which he was accustomed and the schedule that is the best for the fighter), Gegard was warehoused[3] nearly an entire year by Bellator.

38.     Gegard was very concerned Bellator intended to warehouse him indefinitely. Desperate to fight, Gegard took the Edwards bout despite carrying an injury that effectively forced him to fight Edwards with one arm.

39.     Gegard then lost the Edwards bout by decision.

40.     During late 2022 another development arose, namely, PFL and Bellator began discussing a merger. These discussions appear to have commenced in or around the last quarter of 2022, with public disclosure of the potential merger on January 5, 2023.[4]

41.     On or around October 3, 2023, Gegard and Bellator entered into the Addendum.

42.     The Addendum provided that the term of the Agreement would be extended by the *earlier* of eighteen (18) months from the date of the first bout after the Addendum was fully executed and effective or when Gegard had participated in three (3) Bouts.

43.     On November 30, 2023, the Bellator / PFL merger was officially announced (the "**Merger**"). The official press release proclaimed that this new PFL would be "fighter-first".[5]

44.     However, it would turn out that nothing could be further from the truth.

---

[3] Also known in fight parlance as being "marinated".

[4] https://www.mmamania.com/2023/1/5/23540348/bellator-up-for-sale-theyre-on-the-market

[5] https://pflmma.com/news/professional-fighters-league-acquires-bellator-in-industry-transformative-deal

45. After the Merger, the Promoter Defendants never promoted Gegard in another bout, despite Gegard and his representative, Nima Safapour ("**Safapour**"), aggressively and repeatedly demanding Bouts.

46. The Addendum was a subterfuge, intended to preserve Gegard as an asset of Bellator as a signed fighter for the purposes of Bellator's sale to PFL, when Bellator in fact had no intention of promoting Gegard because the Promoter Defendants did not want to pay their two-time champion Gegard the fees he was contractually owed on Bouts.

47. To get the Promoter Defendants to start promoting Gegard, Safapour reached out to PFL's Chairman and Founder Donn Davis ("**Davis**") in early January 2024.

48. Davis replied by email to Safapour on January 8, 2024, stating: "I am aware of Gegard given his very high compensation. Given Gegard is not a PPV draw, and is not a Champion, his deal is very surprising. PFL is fighter first league, so we respect and empower all fighters. If he desires to have opportunities here then I can have Mike Kogan reach out to you and work on options with you." (A true and correct copy of Davis's email is attached hereto as **Exhibit "A"**.)

49. Mike Kogan was Bellator's matchmaker, who was then hired by PFL ("**Kogan**").

50. Gegard was signed to the Agreement, where the Promoter Defendants agreed to promote Gegard, and had just signed an Addendum to that Agreement for three (3) more Bouts based upon promises that he would get three (3) more Bouts.

51. Yet now, post-Merger, the Promoter Defendants' Chairman was stating that: "**if** he [Gegard] desires opportunities here then I can have Mike Kogan reach out to you and work on options with you", meaning, **if** Gegard wanted to fight, Gegard would need to renegotiate his fees and terms on a match-by-match basis with Kogan. (*See* Ex. A).

52.     In short, Davis made clear that the Promoter Defendants had no intention of honoring the terms of Gegard's Agreement and that further Bouts were contingent upon Gegard reducing his fees.

53.     Indeed, even though Safapour and Gegard had repeatedly asked that Gegard be included on the Card (defined in Section V. below) for a major MMA event in Saudi Arabia, Gegard was not included on the Card when that event was announced on January 16, 2024.

54.     Safapour emailed the Promoter Defendants the next day, on January 17, 2024, noting that although Gegard was disappointed to have been left off the Saudi Arabia card, Gegard and the Promoter Defendants needed to have a discussion about the plan for 2024, while proposing a range of options for Gegard to fight, including fighting at 185 pounds or even being willing to come up to 205 pounds to fight Derek Brunson in the PFL $1 Million 205 pound weight class tournament. (A true and correct copy of Safapour's emails with the Promoter Defendants is attached hereto as **Exhibit "B"**.)

55.     Safapour concluded by again requesting that the Promoter Defendants advise "when can we please chat to make a plan for Gegard in 2024." (*See* Ex. B.)

56.     Unfortunately, Safapour received no response to this request.

57.     Safapour then emailed the Promoter Defendants again on January 23, 2024, noting that Ray Cooper ("**Cooper**") was scheduled to fight on the Saudi Arabia card. Gegard had been told that Cooper was not an option for that card, even though a match between Gegard and Cooper would have been highly compelling. (*See Id.*)

58.     Yet, Gegard was left off the Saudi Arabia card, while Cooper was included. Safapour concluded the email with a further request that "hopefully, we can have some promising

strategy for 2024 for Gegard" while referencing that he and Kogan were supposed to speak the next day after the presser. (*See Id.*)

59.    In return, Kogan tersely replied (incorrectly) that most of what Safapour was saying was "unapplicable" and that "we will connect tomorrow after the presser." (*See Id.*)

60.    Safapour, in turn, replied stating that he was "happy to chat tomorrow" but that he was "concerned that there is a lack of motivation to activate Gegard that will damage his brand and his ability to make a contribution to the PFL platform" and that "all we want is to be good partners to PFL and to create a path forward to help build the brand. It is not easy to do that if we get marinated into obscurity." (*See Id.*)

61.    Despite promising to speak with Safapour, Kogan did not call or meet with Safapour that next day.

62.    The Promoter Defendants still provided no plan for Gegard, no Bouts for Gegard, and no response in general to Safapour's inquiries.

63.    Safapour followed up by email on February 20, 2024, again asking that the Promoter Defendants "discuss and formulate a meaningful strategy for Gegard for 2024". He further noted that he had "suggested 4 different fight options since January 2024 for Gegard" but that, despite the Promoter Defendants' contractual duty to promote, he received no discussion on any of those options. (*See Id.*)

64.    Safapour reiterated that:

> I have also asked numerous times both telephonically to Ray[6] and via email on this thread that we schedule a call so we can formulate a strategy for 2024 for Gegard. I also said that Gegard would make himself available for the call should you feel that would be helpful. That seems to have been rejected as no one has responded to that request. Mike Kogan has told me he will call me, but I have yet to

---

[6] Safapour is referring here to Ray Sefo, President of MMA promotions at PFL.

have received a phone call from him on this matter and it has been ongoing since January.

(*See Id.*)

65.     Safapour further put the Promoter Defendants on notice that:

He [Gegard] is not being allowed to fight actively, and from a consumer's perspective an impression is going to the market that every time he fights he is coming out of retirement. Which is not something we ever wanted.

The spirit of the deal between Bellator and Gegard was always for him to fight a minimum of 2-3 times a year. He has averaged 1 fight a year throughout his tenure at Bellator. Its very unfortunate, as these are the best years of Gegard's prime that are being wasted by inactivity. We were always promised that he would be more active. These are also the most important fights that will secure his livelihood for his retirement. Instead, and respectfully, we are being marinated into obscurity which can be fatal to Gegard's brand and his ability to bring value to your organization. Furthermore, Gegard has actively been training without any knowledge of when he will fight. I am afraid he will be susceptible to overtraining and getting injured. We need to understand what is happening so we can responsibly manage his training schedule and his finances. All of which have been in further disarray due to the uncertainty of this most recent merger.

At the end of the day, Gegard is one of the few legends left in the sport that is still fighting very competitively. PFL is a fighter first promotion, and Gegard wants to be a good partner and elevate the PFL/Bellator brands. If you can please advise us on what the plan is for 2024 we would greatly appreciate it as we need some structure to plan out the year for Gegard's finances and his training regimen.

(*See Id.*).

66.     In response, Davis made the following representations and promises: "We value all fighters, and never want anyone to not have information, so thanks for reaching out. We don't know what the previous company promised, and obviously there are new plans now. What I can say is we will always be transparent partner with you. Mike [Kogan], please call tomorrow and provide update on our plans and thinking." (*See Id.*).

67.    Safapour responded indicating he would be available the next day for a call, with Kogan stating in return: "Yessir. Will connect". (*See Id.*).

68.    Safapour and Kogan then spoke, with Safapour summarizing that call a few days later on February 23, 2024, in an email to Kogan and Davis, stating, "Mike assured me that the company is committed to finding a solution for Gegard, which we sincerely appreciate." (*See Id.*).

69.    Yet, despite these representations from the highest levels within the Promoter Defendants, no meaningful conversation was engaged in and no plan for Gegard was proposed by the Promoter Defendants.

70.    Safapour followed up on February 29, 2024, after learning that Patricio Freire was swiftly scheduled on short notice to fight on March 22, 2024, despite having suffered two consecutive losses prior to that bout, and reiterating that, as Gegard was facing up to a year or more without competing, he "kindly request[s] that Gegard be booked for an upcoming event in the coming months" and that "given the precedent set with Patricio's situation, I trust we can find a similar solution for Gegard, especially considering the length of time he has been sidelined." (*See Id.*).

71.    Safapour received no response.

72.    Safapour then followed up again on March 19, 2024, stating: "It has come to our attention that, due to the scheduling constraints imposed by the new partnership, Gegard may not have the opportunity to compete until September, following the Dublin event in June. This prolonged period of inactivity—nearly 1 ½ years since his last contest—poses significant risks to Gegard's legacy, his ability to adequately prepare for a fight, and his financial well-being. That is assuming he gets booked for September which there is no reason to believe will even happen." (*See Id.*).

73.    Safapour further reiterated that "Despite our attempts to address this matter, the responses received thus far have been inadequate. Last December, I personally brought attention to the seriousness of this issue to various senior members of the talent team which I received almost no response. Thereafter, excuses have been provided for Gegard's forced inactivity, which only serve to exacerbate our concerns. Our suggestions for potential matchups, including fighters like Ray Cooper, were immediately dismissed because we were told Cooper was unavailable. However, a few short weeks after he was booked on the exact event we requested against another opponent." (*See Id.*).

74.    Considering Gegard's treatment, and the lack of engagement from the Promoter Defendants, Safapour concluded the email by stating: "It is evident that there is a fundamental lack of intention and reckless disregard to honor the commitments made to Gegard. If this is indeed the case, I believe we are left with no choice but to explore the option of PFL buying out Gegard's contract. That is not what we wanted as we were enthusiastic and optimistic about the merger. However, I don't see any other choice if PFL refuses to perform. With that being said, if there remains a genuine desire to fulfill the terms of the agreement in good faith, then we must engage in a constructive dialogue on how Gegard will be utilized immediately for the 2024 calendar. I request that you provide clarity on the next steps by Monday, March 25, 2024. As always, I am available at your earliest convenience to discuss this matter further." (*See Id.*).

75.    Safapour received no response from the Promoter Defendants. Safapour wrote a final written plea to the Promoter Defendants on March 26, 2024 to attempt to resolve this situation, stating:

> I hope this email finds you well. Congratulations on your Belfast event. I was happy to see that Patricio[7] was able to fight on short

---

[7] Safapour is referring to Patricio Freire.

notice, and have the opportunity to redeem himself and his legacy after two consecutive losses.

We were hoping to receive a response from you and your team yesterday. Similar to the last few emails I have sent, we have received no communication or efforts to resolve this problem with Gegard and PFL despite how pressing this matter has become. With that being said, I listened to Don's interview with Ariel Helwani last week in which he was promoting the upcoming Riyad PPV. He mentioned and promoted various inactive PFL fighters like Cyborg and Francis. Unfortunately, zero mention was made of Gegard being on that card despite there being no question that the budget could support having him on that event. It is disappointing to be in a situation where we have a promoter that either does not have a priority to promote us, or does not have an intention to book Gegard for a fight that has been owed for over a year now. My question is does PFL have an intention and a commitment to book Gegard on the Riyad PPV event? Please note, that even if he gets booked on that card and assuming it happens in September, that will be approximately 1 ½ years that Gegard has been marinated during a vital era of his career. Which is unacceptable. Every quarter that PFL refuses to perform is another critical portion of Gegard's career that is wasted that he can not get back.

Please also note that parties have been contacting us asking if we are retired. Which is insane as we have been ready, willing, and able to compete 2-3 times a year for the last 7 years. We have not responded up until this point as we have tried to gain clarity with what your intentions and plans are with Gegard. Which has been unsuccessful. As we are clearly not being promoted by our promoter, and false rumors are swirling in the market about Gegard to the detriment of his brand; we have no choice but to promote ourselves. We are in the process of scheduling various interviews with high profile journalists in our space to give an update on Gegard.

I hope we can find a resolution to this outstanding problem.

(*See Id.*).

76.    However, despite the repeated efforts of Gegard and Safapour, and despite Gegard being ready, willing, and able to fight, the Promoter Defendants never responded to these requests and continued to warehouse Gegard, causing tremendous damage to Gegard's career.

77.    Receiving no direct responses from the Promoter Defendants, and having not competed in 11 months, Gegard conducted an interview with a leading MMA blog *MMAJunkie* on April 16, 2024, stating, among other things, that:

> I knew there would be the sale. After that, there was no communication. We tried to contact PFL to get more information about what's going on, what they want to do next. But it feels like they're ignoring us. I talked to Mike [Kogan]. He went from Bellator to PFL. I told him, 'Give me information what you want to do with me.' They keep me on ice, let's say. They feel like I'm getting paid too much. They don't want to give me the fights. They owe me. But I know from other fighters that made the same, they fought already. There's no effort from them.
>
> The problem is my manager tried to contact them and they don't even respond," Mousasi said. "There's no effort to promote or get me a fight. It's radio silence with them. People think I'm retired. They're trying to be No. 2 organization in the world, but I think at least what they can do is tell me what their plans are with me.
>
> I know they owe me a fight. They have a contract with me. They want to maybe put pressure on me to take a pay cut. But why would I do that? I know they owe me fights. I know better, let's say that.
>
> I know my rights with what's in the contract," Mousasi said. "I'm waiting for them to respond and give me a fight. This is my way to send a message to them at least, because it's difficult to get them on the phone. I have to go media. It's like UFC cutting fighters and they find out online. I have to communicate through media with them. It's crazy.
>
> Every promotion has its own thing. UFC would give me every three, four months a fight, but they wouldn't pay me enough. Bellator, they paid me more, but I would fight a lot less. Now with PFL, they don't even give me a fight. This is the worst, I think. They don't even talk to you. It's like an ex-girlfriend or something.[8]

78.    Yet, despite even making this plea through the media, the Promoter Defendants remained silent and took no actions to try to promote Gegard in a bout.

---

[8] https://mmajunkie.usatoday.com/2024/04/mma-news-gegard-mousasi-frustrated-radio-silence-pfl-feeling-pressured-take-pay-cut

79.     In a final attempt to resolve this situation, Safapour met with Kogan and Eduardo Cunha Lima (Promoter Defendants' Senior Director of Fighter Relations) in Paris, France on or about May 17, 2024.

80.     During the meeting, Kogan stated that the Promoter Defendants are not giving any attention to Gegard and that Kogan even "hijacked" a talent call to discuss Gegard and try and force the issue with PFL but that nothing was resolved.

81.     Kogan even asked Safapour if he had spoken to other promoters to see if Gegard could fight elsewhere, and that if Safapour wanted to do it discreetly Kogan would not mind.

82.     Safapour reminded Kogan that Gegard was under exclusive contract with the Promoter Defendants and that Safapour and Gegard had not spoken to any other promoters.

83.     Kogan then said there was no way to get any movement from the Promoter Defendants, but that he did believe with certainty that he could get Gegard a full release from the Promoter Defendants or that, if Gegard would take less money than what he was contractually entitled to, Kogan could potentially convince the Promoter Defendants to give Gegard more priority on Bouts.

84.     Kogan then advised Safapour to get an attorney and draft a legal letter, as that might get the Promoter Defendants more focused on Gegard's issues.

85.     Safapour responded that they really preferred to deal with things diplomatically and that they simply wanted the Bouts that were promised to Gegard.

86.     Later that day Safapour was with Gegard and they encountered Kogan on the second floor of the fighter hotel where the temporary offices for the Promoter Defendants were located and where the fighter workout rooms were, and Kogan regurgitated everything he said in the morning meeting in front of Gegard, namely that Gegard was "too expensive," and that Gegard

should retain an attorney to draft a demand letter to send to the Promoter Defendants to get their attention so perhaps they might prioritize matters with Gegard.

87.    As such, the Promoter Defendants' own representatives had now expressly stated that the Promoter Defendants had no intention of honoring the Agreement and that, if anything, the Promoter Defendants were repudiating the Agreement.

88.    Five (5) days after the Paris meeting, and after the Promoter Defendants had repudiated the Agreement and directly told Gegard the only way he would elicit a response would be to hire a lawyer and threaten litigation, Gegard conducted an interview with the blog *MMAFighting* on May 22, 2024, accurately stating that the Promoter Defendants were not being communicative, that they had no intention of promoting him in future Bouts, that he made too much money, and that his only recourse was legal action.

89.    The Promoter Defendants purport to have then terminated the Agreement claiming that Gegard's statements violated the Agreement (the very Agreement the Promoter Defendants had repudiated and never honored). A true and correct copy of the purported termination of the Agreement by the Promoter Defendants is attached hereto as **Exhibit "C"**.

90.    Any purported notice of termination was ineffective as it was not sent in conformity with the notice provisions of the Agreement, which provisions require that for email notice, any such email notice must be confirmed (and is only effective upon the "successful sending of the **confirmed** facsimile or email …". [emphasis supplied]. The email purporting to terminate the Agreement the Promoter Defendants sent was never confirmed.

91.    Gegard, through his counsel, sent the Promoter Defendants a Notice and Demand on July 31, 2024, demanding, among other things, that pursuant to Section 16(F) of the Agreement, the Promoter Defendants cure their breaches of the Agreement.

92.     The Promoter Defendants' response failed to cure their breaches of the Agreement, and Gegard, through his counsel, expressly informed the Promoter Defendants by email on August 14, 2024 that the Promoter Defendants' response failed to cure their breaches.

93.     To date, neither Gegard, nor Safapour, nor Gegard's counsel, has received any further offer to cure the Promoter Defendants' breaches.

## V.    ALLEGATIONS COMMON TO THE MONOPSONY CLAIM

94.     As used herein:

a.      **Bellator/PFL Fighter**" means a person who is paid by the Promoter Defendants for participating in one or more professional MMA Bouts promoted by the Promoter Defendants and/or whose NIL was acquired for use and/or used in Promoter Licensed Merchandise and/or Promoter Promotional Materials.

b.      "**Bellator/PFL Licensed Merchandise**" means all apparel, footwear, hats, photographs, souvenirs, toys, collectibles, trading cards, and any and all other similar type products, including the sleeves, jackets and packaging for such products, that is (i) approved by the Promoter Defendants, (ii) contains the trademarks, trade names, logos and other intellectual property owned or licensed by the Promoter Defendants, including without limitation, the licensed marks, and (iii) not created, used or sold in connection with the promotion of any Bouts, Pre-Bout Events or Post-Bout Events.

c.      "**Bout**" means a sanctioned, supervised unarmed MMA contest between two individuals where competitors utilize a combination of martial arts disciplines to attempt to defeat their opponent within a regulated arena or

ring, adhering to a specific set of rules and regulations established by relevant athletic commissions.

d.     "**Card**" means the identification of all of the Bouts that occur during a single MMA event. The Card typically consists of the Main Card and the Undercard.

e.     "**Elite Professional MMA Fighter**" means any Professional MMA Fighter who has demonstrated success through competition in local and/or regional MMA promotions, or who has developed significant public notoriety amongst MMA Industry media and the consuming audience through demonstrated success in athletic competition. All Bellator/PFL Fighters are Elite Professional MMA Fighters.

f.     "**NIL**" of a Bellator/PFL Fighter means the name, professional name (e.g. sobriquet), image, likeness, voice, persona, signature, and/or biographical information of a Bellator/PFL Fighter.

g.     "**Main Card**" consists of Bouts between higher profile and more established Professional MMA Fighters and are featured on the main broadcast of the event, ending with a main event featured bout, and frequently, a co-main event featured bout.

h.     "**MMA**" means a competitive individual sport in which competitors use interdisciplinary forms of martial arts that include, e.g., jiu-jitsu, judo, karate, boxing, kickboxing, taekwondo, and/or wrestling to their strategic and tactical advantage in a supervised match. Scoring in live professional MMA Bouts is based on state athletic commission-approved definitions and

rules for striking (blows with the hand, feet, knees or elbows) and grappling (submission holds, chokeholds, throws or takedowns).

i.    "**MMA Industry**" means the business of promoting live MMA Bouts and may also include the promotion of Pay-Per-View MMA events to generate Pay-Per-View revenues and ticket sales as well as ancillary activities such as: the sale of live and taped television programming, video-on-demand, merchandise (videos, DVDs, video games, apparel, hats, sporting equipment, etc.), event and fighter sponsorships, and the collection of MMA-related copyright and trademark royalties.

j.    "**MMA Promoter**" or "**MMA Promotion**" means a person or entity that arranges professional live MMA Bouts for profit.

k.    "**Pay-Per-View**" or "**PPV**" means a type of pay television or broadcast service by which a subscriber of an Internet or television service provider can purchase events to view live via private telecast or Internet broadcast. The events are typically purchased live, but can also be purchased for several weeks after an event first airs. Events can be purchased using an on-screen guide, an automated telephone system, on the Internet or through a live customer service representative.

l.    "**Professional MMA**" or "**Professional MMA Fighter**" means a person who is compensated as a combatant in a Mixed Martial Arts bout.

m.    "**Relevant Input Market**" means the market for live Elite Professional MMA Fighter Services.

n.  "**Undercard**" consists of preliminary Bouts that occur before the Main Card of a particular Card and are typically not included on the main broadcast of the event. Typically, promoters intend the Undercard to provide fans with an opportunity to see up-and-coming and/or local professional MMA fighters or fighters who are not as well-known, popular, or accomplished as their counterparts on the Main Card.

95.    The Promoter Defendants have monopsony power in the Relevant Input Market.

96.    The Promoter Defendants' own press release demonstrates the power the Promoter Defendants have over the Relevant Input Market describing itself as the "industry co-leader" with UFC with a fighter roster that is "equal in stature to UFC."[9] As the Promoter Defendants well know, post-Merger, there are only two realistic options for fighters that want to compete in elite-level MMA – either with the Promoter Defendants, or UFC. Despite their "fighter first" rhetoric, the Promoter Defendants have used their new market position instead to relentlessly depress fighter wages, ruthlessly wielding their monopsony power.

**The Relevant Input Market**

97.    Elite Professional MMA Fighters are elite athletes who typically train for years before competing professionally. In live professional MMA Bouts, mixed martial artists compete by using multiple disciplines of martial arts, including wrestling, judo, jiu-jitsu, Muay Thai, karate, taekwondo and boxing. Such Bouts are registered with, sanctioned by and conducted according to rules promulgated by the Athletic Commission (or equivalent thereof) for the jurisdiction in which the bout is held.

---

[9] https://pflmma.com/news/professional-fighters-league-acquires-bellator-in-industry-transformative-deal

98.    Elite Professional MMA Fighters are typically compensated for participating as a combatant in a live Elite Professional MMA bout.

99.    Athletes who have trained for, and now engage in, sports other than MMA, including professional boxing, and those who engage in a single martial art, such as judo, are not substitutes for Elite Professional MMA Fighters. For instance, boxers and those who engage in a single martial art are generally not trained in the additional forms of martial arts (which may include wrestling, judo, jiu-jitsu, taekwondo, Muay Thai and karate) necessary to become, and successfully compete as, an Elite Professional MMA Fighter.

100.    Importantly, there are no reasonably interchangeable sports to which Elite Professional MMA Fighters can turn when demand and compensation for Elite Professional MMA Fighters is artificially suppressed below competitive levels. Other martial arts disciplines do not have the audiences necessary for the fighters to earn competitive wages or even generally to be paid at all. For this and other reasons, no material number of Elite Professional MMA Fighters could successfully transition to other sports sufficient to prevent a monopsonist in the market for Elite Professional MMA Fighter services from artificially suppressing Elite Professional MMA Fighter compensation by even a significant amount for a substantial period of time.

101.    For instance, with respect to judo, judo tournaments occur infrequently, and the major ones (World Championships, Olympics) are for "amateur" fighters, that is, unpaid athletes. Brazilian Jiu Jitsu ("**BJJ**") is a popular amateur sport, but there are very few tournaments that offer more than nominal prizes (as opposed to awarding salaries or prize money to competitors) and even those occur rarely. Karate and Muay Thai, much like BJJ and judo, are mainly amateur disciplines. Muay Thai and kickboxing are striking disciplines that do not employ any of the grappling techniques of MMA of and in which knowledge and proficiency is required to

successfully compete. None of these sports would be plausible alternatives for Elite Professional MMA Fighters who are facing artificial suppression of their compensation by a monopsonist in the market for Elite Professional MMA Fighter services.

102.    Neither boxing nor "professional" WWE wrestling provides reasonable alternatives for Elite Professional MMA Fighters. Professional boxing requires years of intensive, specialized and limited training in a striking art that MMA Fighters do not undergo. While Elite Professional MMA Fighters do train in boxing, that is but one of many martial arts disciplines Elite Professional MMA Fighters must practice, and it is not (and, indeed, cannot) be their sole focus. As a result, no material number of Elite Professional MMA Fighters could successfully transition to boxing sufficient to prevent a monopsonist in the market for Elite Professional MMA Fighter services from artificially suppressing Elite Professional MMA Fighter compensation below competitive levels by even a significant degree for a substantial period of time.

103.    Although professional wrestling does pay compensation to its "wrestlers," professional wrestling events are staged, and depend predominantly on acting ability. It is extremely unusual for an athlete to possess the right combination of skills to excel in both MMA and professional wrestling, and furthermore, professional wrestling is not a sport at all requiring competition between athletes. For this reason alone, professional wrestling is not a reasonable substitute for MMA. No material number of Elite Professional MMA Fighters could successfully transition to professional wrestling sufficient to prevent a monopsonist in the market for Elite Professional MMA Fighter services from artificially suppressing MMA Fighter compensation by even a significant degree for a substantial period of time.

104.    Because other sports are not plausible alternatives for Elite Professional MMA Fighters, reducing the compensation of Elite Professional MMA Fighters below competitive levels

by even a significant degree for a substantial period of time will not cause sufficient numbers of Elite Professional MMA Fighters to switch to other sports or professions to make the Elite Professional MMA Fighter compensation suppression unprofitable. Quite simply, MMA is a highly specialized and unique sport engaged in by elite athletes with years of cross-disciplinary training. They have nowhere else to deploy their highly-specialized skills.

### The Relevant Geographic Market

105.    The relevant geographic market for the Relevant Input Market is United States based MMA Promotion companies that promote fights in the United States, the U.K., the European Union, Saudi Arabia and the United Arab Emirates (the "**Relevant Geographic Market**").

106.    Publicly available information regarding the market share of MMA Promoters within the Relevant Geographic Market is somewhat scarce and will be the subject of extensive discovery in this action.

107.    However, based on information that is publicly available, as well as general industry knowledge, a reasonable and good faith assessment is that the MMA Promoter market share within the Relevant Geographic Market is completely dominated by the UFC and the Promoter Defendants, with very few realistic options for Elite Professional MMA fighters aside from those two MMA Promoters.

108.    In the United States, the UFC is the largest MMA Promoter, with the Promoter Defendants a relatively close second. Any other MMA Promoters are small to the point of only controlling a small fraction of the United States MMA Promotion market (likely less than 5%). There is a start-up MMA Promoter "Global Fight League" that is emerging, but as that MMA Promoter has not yet promoted a single fight, they have zero market share at present.

109.    In the United Kingdom, the UFC is the largest MMA Promoter, with the Promoter Defendants a relatively close second, with other promoters having a minimal presence.

110.    In the European Union, although there is a more fragmented market than in the United States or the United Kingdom, as there are numerous smaller regional promotions that cater to different countries or regions, each holding a niche market share, it remains true that for Elite Professional MMA fighters, the UFC is the largest MMA Promoter, with the Promoter Defendants a relatively close second. KSW (Konfrontacja Sztuk Walki) dominates the Polish and broader Central/Eastern European market.

111.    Regarding the Gulf States of Saudi Arabia and the United Arab Emirates, neither Saudi Arabia nor the UAE has a homegrown major MMA promotion remotely comparable to the UFC or the Promoter Defendants.

112.    Accordingly, in the Relevant Geographic Market, there are only two realistic options for Elite Professional MMA fighters, the UFC or the Promoter Defendants.

113.    Regarding opportunities outside of the Relevant Geographic Market, the only truly viable market for Elite MMA fighters is the Asian market as the South American and African MMA markets are largely underdeveloped, and in the Asian market, ONE Championship holds a dominant position in the Asian market, with RIZIN promotions as a prominent promotion in Japan.

114.    In sum, the only potential realistic alternative to UFC and the Promoter Defendants across the World for Elite MMA fighters would be to relocate to the Asian market (e.g., Japan, China and South Korea) and fight for ONE Championship or RIZIN, a move that would of course impose tremendous financial and other burdens on fighters who live and work in the United States and Europe, and accordingly is not a truly viable alternative for the vast majority of Elite MMA fighters.

115.    Competing outside of the Relevant Geographic Market imposes substantial costs on Elite Professional MMA Fighters, including higher costs of training, travel, and lodging and reduced sponsorship income. Moreover, Elite Professional MMA Fighters may have difficulty, or face significant costs associated with, obtaining necessary visas and approvals for themselves, family members, sparring partners, or trainers needed for fighting outside of the Relevant Geographic Market.

116.    As a result, an Elite Professional MMA Fighter could not practically turn to an MMA Promotion company that is focused on Bouts outside of the Relevant Geographic Market to earn a living or competitive compensation as an Elite Professional MMA Fighter.

117.    Nearly all MMA promotion companies that promote outside of the Relevant Geographic Market (*e.g.*, that promote in Asia, Africa, Oceania, or Latin America) focus on regional or local fighters, frequently holding only a few events per year while paying substantially less than the Promoter Defendants (or UFC). Further, these MMA Promoters lack the global prestige of the Promoter Defendants, and most MMA Fighters would not view these MMA Promoters as interchangeable with the Promoter Defendants.

118.    Accordingly, Elite Professional MMA Fighters in the Relevant Geographic Market do not view participation in MMA Bouts outside of the Relevant Geographic Market as a reasonable substitute for Bouts in the Relevant Geographic Market.

119.    As such, a monopsonist in the Relevant Input Market would only need to control fighter services in the Relevant Geographic Market to be able to suppress Elite Professional MMA Fighter compensation substantially below competitive levels.

120.    In any case, the Promoter Defendants, by luring Elite Professional MMA Fighters from all over the World to fight exclusively for the Promoter Defendants, deprive promoters of

Elite Professional MMA Fighters outside of the Relevant Geographic Market of Elite Professional MMA Fighters.

121.    Accordingly, no significant number of Elite Professional MMA Fighters can earn competitive compensation for appearing in live Elite Professional MMA events outside of the Relevant Geographic Market.

122.    Successful foreign fighters participate in Elite Professional MMA Bouts for the Promoter Defendants. But, to the extent the Promoter Defendants are a net importer of foreign labor, this fact would serve to enhance their monopsony power and bargaining power vis-à-vis Elite Professional MMA Fighters as a whole.

**The Promoter Defendants Have Monopsony Power
with Respect to Elite Professional MMA Fighter Services**

123.    At all times relevant, the Promoter Defendants have and continue to have monopsony power in the Relevant Input Market, *i.e.*, the market for Elite Professional MMA Fighter services, whether that market includes only the Relevant Geographic Market or, alternatively, the entire world.

124.    Along with the UFC, the Promoter Defendants control the vast majority of the market for Elite Professional MMA Fighter services, whether the geographic market includes only the Relevant Geographic Market or, alternatively, the entire world.

125.    The Promoter Defendants thereby possess the ability to reduce the demand of, and compensation for, Elite Professional MMA Fighter services without losing so much revenue as to make their conduct unprofitable.

126.    The only alternative MMA Promoter at the level of the Promoter Defendants is the UFC, and the UFC appears to engage in the same monopsony practices complained of here (see

*Le v. Zuffa, LLC,* 2023 WL 5085064, at *48 (D. Nev. Aug. 9, 2023), and is therefore not a solution to the problems faced by the Bellator/PFL Elite MMA Fighters.

127.    In addition, as more specifically outlined below, the Bellator/PFL Elite MMA Fighters are subject to exclusivity and so-called "matching clauses" restricting their ability to move to the UFC even if it did present a better alternative.

128.    As a result of the Promoter Defendants' monopsony power in the Relevant Input Market, Elite Professional MMA Fighters therefore do not have the ability to turn to MMA Promoters other than the Promoter Defendants or the UFC to earn competitive compensation in response to the Promoter Defendants' artificial suppression of demand and compensation for Elite Professional MMA Fighter services.

129.    The Promoter Defendants' control of the Relevant Input Market affords it the ability to, *inter alia*, (i) compensate Elite Professional MMA Fighters below competitive levels profitably for a substantial period of time, (ii) artificially suppress demand for Elite Professional MMA Fighter services below competitive levels, (iii) require Bellator/PFL Fighters to enter into restrictive contracts, (iv) impair or preclude Bellator/PFL Fighters from engaging in their profession or working with would-be rival promoters; (v) expropriate the rights to Bellator/PFL Fighters NIL in perpetuity for little or no compensation (which is below competitive levels), and (vi) expropriate the NIL and deprive Bellator/PFL Fighters of competitive levels of payment for the exploitation of their NIL in Bellator/PFL Licensed Merchandise and/or Promotional Materials licensed or sold by the Promoter Defendants or their licensees.

130.    Whether the relevant market is the Relevant Geographic Market only, or the entire World, the Promoter Defendants are capable of artificially reducing compensation—and have in fact artificially reduced compensation—of Elite Professional MMA Fighters without causing so

many Elite Professional MMA Fighters to switch to other sports or professions so as to make that compensation reduction unprofitable.

131.    Barriers to entry in the Relevant Input Market are high. To become an Elite Professional MMA Fighter, one needs to be highly skilled and spend many years under specialized training in multiple martial arts disciplines. Because MMA is a unique blend of various martial arts disciplines, including boxing, Muay Thai (kick-boxing), judo, wrestling, BJJ, taekwondo and karate, a high level of proficiency in any one discipline alone is not sufficient to achieve elite level status as an Elite Professional MMA Fighter. For example, while a professional boxer may possess the mental and athletic skill to box and take blows in the form of punches, if he does not possess expert ability to grapple, wrestle or engage in other martial arts, he will not succeed as an Elite Professional MMA Fighter. Elite Professional MMA Fighters are rare multidisciplinary athletes who can perform at very high levels in more than one discipline. Also, training is costly and time consuming.

132.    To achieve elite status, Professional MMA Fighters train daily, making alternative simultaneous full-time employment nearly impossible. Training also requires the services of professional trainers and the relevant space and training equipment. To rise to the level of a fighter capable of being promoted by the Promoter Defendants, i.e., an Elite Professional MMA Fighter, a Professional MMA Fighter typically needs to work his or her way up the ranks in local and regional promotions, often earning very little money in the process.

## Overview of the MMA Industry

133.    The popularity of MMA as a combat sport began to take off during the 1990s. Professional MMA has since become one of the most popular and fastest growing spectator sports in the U.S. and North America.

134.    Elite Professional MMA Fighters are among the most respected professional athletes in the world. Elite Professional MMA Fighters include world-class and Olympic athletes utilizing all disciplines of martial arts, including wrestling, judo, jiu-jitsu, Muay Thai, taekwondo, karate and boxing, in one-on-one Bouts.

135.    Professional MMA Fighters typically achieve the status of Elite Professional MMA Fighters only after participating successfully in events organized by other local or regional MMA Promoters.

136.    MMA Promotions are not organized into leagues or teams as is common in many organized sports. Typically, Professional MMA Fighters compete against other Professional MMA Fighters who are under contract with the same promoter.

137.    MMA Promoters host events that ordinarily contain seven to twelve Bouts on a Card, and Bouts are organized by recognized weight classes. Together, all of the Bouts for an event constitute the Card. The Card at a typical event includes an Undercard, or a set of preliminary Bouts, that generally feature up-and-coming and/or local Professional MMA Fighters, and the Main Card, which typically features Professional MMA Fighters who are further along in their careers and/or possess higher levels of public notoriety.

138.    The strength of the Card draws ticket purchases for live events as well as viewers for broadcasts. The strength of the Card also draws merchandise sales and licensing fees, and contributes to the rates paid by sponsors, advertisers and broadcasters. The Card thus helps to determine the size and scale of the physical venue in which the event takes place, the scope and breadth of its distribution and event sponsorship rates, and the merchandising campaign for the event.

139.    Professional MMA events in the United States are sanctioned in the U.S. by the same state athletic commissions as boxing. Nearly all athletic commissions in North America are members of the Association of Boxing Commissions ("**ABC**"). All member commissions of the ABC have passed the Unified Rules of Mixed Martial Arts ("**Rules**") which govern professional MMA Bouts and establish MMA weight classes, ring-fighting area requirements and equipment, length and number of rounds in a bout, the rest period between rounds, the nature of the protective gear worn by fighters, judging requirements, fouls, and other bout rules and regulations.

140.    As more fully set forth below, due to the anticompetitive scheme alleged herein, the Promoter Defendants has been able to suppress Elite Professional MMA Fighters' compensation to a very low percentage of the revenues generated from Bouts.

141.    Athletes in sports such as boxing and the "Big 4," i.e., football, baseball, basketball and hockey in the United States, generally earn more than 50% of league revenue, which is, upon information and belief, a significantly higher percentage of revenues than those paid to Bellator/PFL Fighters.

142.    The Promoter Defendants have illegally acquired, maintained, and exercised monopsony power in the market for Elite Professional MMA Fighter services, i.e., the Relevant Input Market, through an aggressive series of exclusionary and anticompetitive acts. The anticompetitive effects associated with this ill-gotten monopsony power manifest themselves as artificially suppressed compensation for Elite Professional MMA Fighters and the improper expropriation of Elite Professional MMA Fighters' NIL resulting in artificial underpayments (including non-payment) to Bellator/PFL Fighters.

143.    The Promoter Defendants have illegally obtained and maintained their monopsony position in the Relevant Input Market (i.e., the market for Elite Professional MMA Fighter

services), through an anticompetitive scheme to exclude and impair actual or potential rival MMA Promoters such that they do not have access to the Elite Professional MMA Fighters necessary to sustain and grow a profitable rival promotion company. As a result, Elite Professional MMA Fighters have no effective alternative promoter with whom to contract for live Elite Professional MMA Bouts.

144.    The Promoter Defendants' illegal monopsony position is sustained, in part, through the use of exclusive dealing agreements with Bellator/PFL Fighters that lock in Elite Professional MMA Fighter services perpetually and exclusively for the Promoter Defendants. The Promoter Defendants' exclusive contracts foreclose would-be rival promoters from vital inputs—namely Elite Professional MMA Fighter services with the notoriety needed to sustain a successful live Elite Professional MMA promotion.

145.    Through the anticompetitive scheme alleged herein, the Promoter Defendants has garnered and maintained unrivaled bargaining power vis-à-vis Elite Professional MMA Fighters. The Promoter Defendants use their monopsony power to extract exclusionary and restrictive concessions from all of their MMA Fighters.

146.    All Bellator/PFL Fighters are classified as independent contractors that are compensated based on the number of fights in which they participate. But the Promoter Defendants uses standard form agreements with all or nearly all of the Bellator/PFL Fighters that require, inter alia, exclusivity and assignments of the rights to Fighters' Identities. Given that, through the alleged scheme, the Promoter Defendants dominate the Relevant Output Market, i.e., the market for promoting live Elite Professional MMA events, Elite Professional MMA Fighters have little choice but to accept the Promoter Defendants' exclusionary terms if they want to try to earn a living as Elite Professional MMA Fighters.

147.    The Promoter Defendants' Agreement with Gegard, and upon information and belief, with all the Bellator/PFL Fighters, contains, at least the following restrictive provisions:

a.    The "**Exclusivity Clause**" which binds Bellator/PFL Fighters into a restricted relationship with the Promoter Defendants and prohibits them from appearing in Bouts televised or organized by actual or potential competing or rival MMA Promotions unless approved by the Promoter Defendants, thus preventing Bellator/PFL Fighters from receiving competitive purses from co-promoted or competitor MMA events. This clause blocks actual or potential competing or rival MMA Promoters from having access to Elite Professional MMA Fighters under contract with the Promoter Defendants for protracted periods of time.

b.    The "**Champion's Clause**" which, if the Bellator/PFL Fighter is the current champion of any weight class at the end of the initial contract term, allows the Promoter Defendants to extend the Bellator/PFL Fighter's contract for at least an additional year, preventing the Bellator/PFL Fighter from financially benefiting from his or her "championship" status by soliciting competing bids from other MMA Promoters even after the end of his or her original contract term with the Promoter Defendants. This clause specifically blocks actual or potential competing or rival MMA Promoters from having access to Elite Professional MMA Fighters, which are needed for actual or potential competing or rival MMA Promoters to hold events that would be commercially successful. This clause also denies Bellator/PFL Fighters free agency—despite their allegedly being independent contractors.

c.    The "**Right to First Offer**" and "**Right to Match**" clauses which grant the Promoter Defendants the option to match the financial terms and conditions of any

offer made to a Bellator/PFL Fighter during the term of their existing contract by any other MMA Promoter(s). Because the Promoter Defendants' contracts typically require fighters to assign the Bellator/PFL Fighter's name, image, likeness, voice, persona, and other identifying information ("**NIL**") exclusively to the Promoter Defendants in perpetuity, any offers from actual or potential competing or rival MMA Promoters would likely be less attractive since they wouldn't include compensation for the Bellator/PFL Fighter's NIL rights, thus artificially suppressing competition and potentially forcing actual or potential competing or rival MMA Promoters to make significantly higher bids to secure the Bellator/PFL Fighter.

d.     The "**Ancillary Rights Clause**" which grants the Promoter Defendants exclusive and perpetual worldwide rights to the Bellator/PFL Fighter's NIL, as well as the NIL of all "persons associated or affiliated with the Fighter [the Bellator/PFL Fighter] such as Fighter's trainers, corners, seconds, or assistants". These "Ancillary Rights" extend to any medium, including merchandising, video games, and broadcasts, for all commercial purposes, in perpetuity. This prevents the Bellator/PFL Fighter from profiting from their established reputation and restricts their post-contract career opportunities.

e.     The "**IP Clause**" which prohibits the Bellator/PFL Fighter from using any of the Promoter Defendants' names, marks, logos, pictures, or even the championship belt(s) from Promoter Defendants, which thereby restricts the Bellator/PFL Fighter from referring to themselves as a "Bellator or PFL fighter" and from promoting their championship history with the Promoter Defendants, without the Promoter

Defendants' express written permission. This restricts the Bellator/PFL Fighters' ability to promote themselves and limits the appeal to any actual or potential competing or rival MMA Promoters of contracting with the Bellator/PFL Fighter. As a result, actual or potential competing or rival MMA Promoters might be at a disadvantage when trying to contract with former Bellator/PFL Fighters or simply not want to, including former champions, since those Bellator/PFL Fighters are restricted from promoting their championship history with the Promoter Defendants.

f.     The "**Promotion Clause**" which obligates Bellator/PFL Fighters to participate in promotional activities for Bouts in which they are scheduled to fight, including but not limited to, participating in press conferences, interviews, appearances, media shoots, and other sponsorship and promotional activities (any of which may be telecast, broadcast, recorded and/or filmed) and also requires cooperation with the Promoter Defendants' promotional efforts for any other Bouts, events, and broadcasts as reasonably required by the Promoter Defendants. By contrast, **according to the Promoter Defendants**, no affirmative obligation exists for the Promoter Defendants to promote the Bellator/PFL Fighter and the Promoter Defendants regularly punish athletes who do not bow to their whims by warehousing them.

g.     The "**Retirement Clause**" which gives the Promoter Defendants the power to "suspend the Term for the full and entire period of such retirement, regardless of its length" thereby effectively extending the Term of the agreements into perpetuity.

h.  Tolling provisions, which extend the term of the Bellator/PFL Fighter's contract during periods when he or she is injured, retired, or otherwise declines to compete, thus virtually prohibiting even disgruntled athletes from sitting out the term and signing with actual or potential competing or rival MMA Promoters. Gegard's Agreement provides that: "Should any Bout be postponed or unable to be scheduled due to retirement, incarceration, loss of travel authorization or inability to obtain same, suspension by a Commission, positive drug test, unwillingness to compete, or any other similar reason, of Fighter, the obligation of the Promoter relating to the Bouts, timing of the Bouts, required offers of Bouts and the Term of this Agreement shall, upon written notice from the Promoter to Fighter, be extended by the period of time necessary to reschedule and hold the postponed Bout (if a Bout was scheduled) or, if no bout was scheduled, the time necessary for Fighter to be able to participate in a bout to be thereafter scheduled and held."

i.  The "**Sponsorship and Endorsement Clause**" which grants the Promoter Defendants sole discretion over all sponsorship and endorsement approvals. In effect, the Sponsorship and Endorsement Clause requires the approval of the Promoter Defendants before an entity can contract with a Bellator/PFL Fighter to sponsor or endorse the entity's product or service during any the Promoter Defendants' events. This gives the Promoter Defendants control over sponsors and Fighters and allows the Promoter Defendants to block opportunities for sponsors where: (i) the Promoter Defendants have decided to boycott the sponsor in retaliation for the sponsor having endorsed non-Bellator/PFL Fighters or otherwise worked with actual or potential rival MMA Promoters; (ii) the sponsors have

refused to pay the Promoter Defendants a fee for the right to sponsor a Bellator/PFL Fighter; or (iii) the sponsors are engaged in ancillary business endeavors that compete with the Promoter Defendants in any segment of the MMA Industry that the Promoter Defendants intend to dominate, such as, e.g., MMA publications, MMA video games, gyms, online MMA stores, energy drinks, online gaming sites, fan festivals and apparel providers. This clause gives substantial power to the Promoter Defendants to block sponsors from working with actual or potential competing or rival MMA Promoters and to deprive them of key revenue opportunities for themselves and their fighters, making actual or potential competing or rival MMA Promoters less profitable and a less attractive option for Elite Professional MMA Fighters.

148.    All the Promoter Defendants' contracts with Bellator/PFL Fighters—and the exclusionary provisions therein—taken together form part of the Promoter Defendants' anticompetitive scheme to impair actual or potential rivals and enhance their monopsony power in the Relevant Input Market. Cumulatively, the exclusionary contractual provisions deprive the Promoter Defendants' would-be rivals of all or virtually all the critical input necessary to compete in the MMA Industry, that is, Elite Professional MMA Fighter services.

149.    As part of their exclusionary scheme, the Promoter Defendants' exclusive contracts make it impossible for Bellator/PFL Fighters who might someday wish to compete in the UFC to do so.  As a result, Bellator/PFL Fighters have refused offers to fight for actual or potential rival promoters, even those that offer higher compensation, out of fear that the Promoter Defendants would retaliate against both the promoter and the Fighter. Professional MMA Fighters are deterred by the Promoter Defendants because Professional MMA Fighters recognize that being banned

from future opportunities to fight for the Promoter Defendants if they breach contracts will substantially diminish their ability to earn income as Elite Professional MMA Fighters. Moreover, the Promoter Defendants have control over key sponsors that the Promoter Defendants threaten to never work with if they contract with an Elite Professional MMA Fighter against the Promoter Defendants' wishes.

150.    Indeed, as demonstrated by the Promoter Defendants' actions towards Gegard, the Promoter Defendants are capable of artificially reducing compensation – and have in fact artificially reduced compensation – of fighters without causing so many fighters to switch to other sports or professions so as to make that compensation reduction unprofitable.

151.    Indeed, Gegard's treatment by the Promoter Defendants is a perfect encapsulation of the Promoter Defendants' monopsony power. Knowing that Gegard's only other option is the UFC, the Promoter Defendants warehoused Gegard and diminished Gegard's brand to the point the audience believed he was retired, and then, with his brand tarnished, UFC was not even an option for Gegard.

152.    Then the Promoter Defendants leveraged their market position and monopsony to try to force Gegard to agree to less than what he was contractually owed.

153.    Such conduct is not limited to Gegard. The Promoter Defendants have relentlessly exercised their monopsony power to depress fighter wages across the Promoter Defendants' men's and women's rosters.

154.    One example of the Promoter Defendants' abuse of their monopsony power is Douglas Lima, a three-time champion for the Promoter Defendants who the Promoter Defendants were seemingly warehousing because Douglas Lima was being paid a high amount as a three-time champion, with Lima stating on the social media platform X that:



155.    Notably, another prominent fighter, Cris Cyborg, replied "I'm having a hard time getting a bout agreement sent to me too!"

156.    Indeed, in response to posts on Instagram® about Gegard's situation, multiple fighters responded stating that they too were being treated the same way by the Promoter Defendants.

157.    The Bellator/PFL Fighter Julia Budd commented:



158.    The Bellator/PFL Fighter Joao Zeferino commented:



159.    Douglas Lima further commented:



160.    The Promoter Defendants have clearly engaged in a broad scheme among Bellator/PFL Fighters to depress their wages and compensation.

161.    The Promoter Defendants have an almost completely captive labor market, with each Bellator/PFL Fighter having invested so much time, energy, and money to get to the level of an Elite MMA Professional Fighter, they are forced to adhere to the Promoter Defendants' coercive tactics, including one-sided exclusive contracts and assigning their NIL in perpetuity to the Promoter Defendants.

162.    And then, if a Bellator/PFL Fighter, such as Gegard, simply wants to enforce their own contract and get promoted to fight Bouts for the wages the Promoter Defendants have agreed to pay, the Promoter Defendants exercise their monopsony power and warehouses them, forcing them to either fight for less, or not fight at all.

163.    There are no legitimate procompetitive justifications for the anticompetitive conduct alleged in this Complaint, or for any aspect of the anticompetitive conduct standing alone. Even if, *arguendo*, such justifications existed, there are less restrictive means of achieving those purported procompetitive effects. To the extent the anticompetitive conduct or any aspect of the anticompetitive conduct has any cognizable procompetitive effects, they are substantially outweighed by the anticompetitive effects

164.    This anticompetitive conduct has clearly harmed and damaged Gegard.

165.    Gegard was locked into an exclusive Agreement, which prevented him from fighting for the only realistic alternative MMA Promoter, the UFC.

166.    The Promoter Defendants leveraged that exclusivity by exploiting the Agreement in bad faith to warehouse Gegard, unless he agreed to fight for far less than what he was

contractually owed, thereby leveraging the Promoter Defendants' monopsony power over Gegard to lower his wages.

167.    The Promoter Defendants' monopsony power was so great in fact, that, after they were done warehousing Gegard, his career and reputation had been damaged to such a degree, his wages are permanently depressed, and he cannot find Bouts for anything close to what he was contractually owed, whether for the Promoter Defendants or any other promotion.

168.    Accordingly, this monopsony perpetrated by the Promoter Defendants is such that it cost Gegard the $2,550,000.00 in wages Gegard should have been paid by the Promoter Defendants for the three Bouts that Gegard was contractually owed, which wages were lost because the Promoter Defendants tried to illegally depress his wages by warehousing him unless he agreed to reduce his contractually owed wages.

169.    This monopsony has further cost Gegard significant compensation as his reputation has been so damaged he can only find Bouts for a fraction of what he would have earned.

170.    This monopsony has further lost Gegard numerous sponsorship opportunities due to being warehoused and wrongfully considered a "retired" fighter.

171.    In total, the monopsony has damaged Gegard for millions of dollars in addition to the $2,550,000.00 in wages Gegard should have been paid by the Promote Defendants for his three Bouts.

## VI.    <u>ALLEGATIONS COMMON TO THE MISCLASSIFICATION CLAIMS</u>

172.    The Promoter Defendants purport to classify Gegard as an independent contractor rather than an employee.

173.    The Promoter Defendants have misclassified Gegard as an independent contractor rather than an employee.

174.    Under New Jersey law (which the Promoter Defendants, not Gegard, chose to govern this Agreement) an individual is presumed to be an employee unless the employer can demonstrate the following – known as the "ABC Test":

    A.    Such individual has been and will continue to be free from control or direction over the performance of such service, both under his contract of service and in fact; ***and***

    B.    Such service is either outside the usual course of the business for which such service is performed, or that such service is performed outside of all the places of business of the enterprise for which such service is performed; ***and***

    C.    Such individual is customarily engaged in an independently established trade, occupation, profession or business.

See *N.J.S.A.* 43:21–19(i)(6); *Hargrove v. Sleepy's, LLC* (2015) 220 N.J. 289, 305.

175.    "[T]he failure to satisfy **any one** of the three criteria results in an 'employment' classification." *Carpet Remnant Warehouse, Inc. v. N.J. Dep't of Labor*, 125 N.J. 567, 581 (1991) (emphasis supplied).

176.    The Promoter Defendants clearly fail the ABC Test.

177.    Regarding prong A., to satisfy this prong, the worker must operate without the direct supervision or control of the hiring entity. This includes freedom in deciding how, when, and where the work is performed, and the hiring entity should not dictate the worker's methods or schedule.

178.    Here, the opposite is true, as the Promoter Defendants hold Gegard to an **exclusive** contract, he cannot fight for anyone other than the Promoter Defendants, and the Promoter

Defendants have total control over where, when and how Gegard fights, with the Agreement expressly stating that: "All Bouts shall be on dates and at sites to be designated by Bellator/PFL, in its sole and absolute discretion."

179.    The Promoter Defendants further exercised control over Gegard's conduct, requiring that Gegard: (a) conduct himself with "decency, social conventions and morals"; (b) "not commit any act, become involved in any situation or occurrence, or make any statement which will reflect negatively upon or bring disrepute, contempt, scandal, ridicule or disdain to [various persons and entities including the Promoter Defendants]; (c) prohibiting Gegard from making any statements "demeaning to any race, religion, ethnic group, women, any group based upon sexual preference, and/or which encourage or glorify illegal acts"; (d) prohibiting Gegard from any conduct that would "shock, insult, or offend the public or reflect unfavorably upon any current or potential sponsor [and other related persons and entities]; (e) not to "authorize or be involved with any advertising material or publicity statements that contain language or material generally considered to be obscene, libelous, slanderous, or defamatory; (f) "refrain from making any public statement or remark (whether spoken or in writing) that may damage or otherwise negatively affect [various persons or entities including the Promoter Defendants]; (g) "not engage in any criminal conduct"; (vii) that Gegard stay "in good physical and mental health and will do nothing during the Term to potentially impair his health, including, but not limited to, the use of any illegal, prohibited, controlled or banned substances"; (h) "not engage in any abnormally dangerous activity having a potential for injury that could conceivably prevent Fighter [Gegard] from engaging in bouts"; (i) "not engage in any combat sports without the express written approval of [the Promoter Defendants], including any and all martial arts, boxing, kickboxing, wrestling, or MMA (except as necessary for training activities); **and** (j) Gegard "will remain in good physical shape and within

the designated weight class Fighter competed in when Fighter first entered into this Agreement, as set forth in Exhibit A, unless otherwise agreement in writing by [the Promoter Defendants]".

180.    The Promoter Defendants further controlled Gegard by controlling his attire during his work, requiring that Gegard agree that: (a) "no wording, symbol, picture, design, name, advertising, or informational material shall appear on his person, trunks, robe, shoes, or other items worn by Fighter, his trainers, seconds, or assistants without prior written approval of [the Promoter Defendants] during any Bout Events hereunder"; (b) that Gegard "shall not display any wording, symbol, picture, design, name, advertising, or informational material on Fighter's person, trunks, robe, shoes, or other items worn by Fighter, his trainers, seconds, or assistants during any Bout Events hereunder or at any [Promoter Defendants]-sponsored activity which is: (i) in conflict or competition with [the Promoter Defendants] or the sponsors of [the Promoter Defendants], ViacomCBS, Paramount Network or its successors; (ii) in conflict with the requirements of any telecaster; (ii) may cause injury to the reputation or business of [the Promoter Defendants], ViacomCBS, Paramount Network or its successors, or their respective sponsors; or (iv) is considered by [the Promoter Defendants], in its sole discretion, to be in bad taste".

181.    The Promoter Defendants further controlled Gegard by requiring that Gegard undergo medical testing, requiring him to: "complete a full physical medical examination and undergo testing and receive affirmative clearance therefrom, including, but not limited to, the following tests and examinations: CBC, Hepatitis B, Hepatitis C, HIV, RH and Blood Type, RPR, PT, PTT, Urinalysis with drug screening, EKG, CT Scan, MRI, Dilated Ophthalmological exam, and such other testing as [the Promoter Defendants] or the applicable Commission may require."

182.    The Promoter Defendants further controlled Gegard by not allowing him to assign his services under the Agreement, expressly requiring that his services were personal to the

Promoter Defendants under the Agreement: "The rights and obligations of Fighter arising from this Agreement are personal to Fighter and may not be assigned, licensed, pledged, or transferred for any reason."

183.    The Promoter Defendants clearly fail prong A of the ABC Test, and fail the ABC Test as a whole, as it must satisfy all three prongs to properly categorize Gegard as an independent contractor. See *Carpet Remnant Warehouse, Inc. v. N.J. Dep't of Labor,* 125 *N.J.* 567, 581 (1991).

184.    The Promoter Defendants also clearly fail prongs B and C as well, failing all three prongs of the ABC Test.

185.    Prong B of the ABC Test is that the employer must show that service is performed either outside the usual course of the business for which the service is performed or is performed outside all the places of business of the enterprise for which the service is performed.

186.    To satisfy this prong, the worker's services must be distinct from the usual business activities of the hiring entity, or the work must be done outside of the hiring entity's places of business. For example, if a bakery hires a plumber to fix a leak, this would meet criterion B because plumbing is outside the bakery's usual course of business.

187.    Here, the entire business of the Promoter Defendants is promoting MMA fights, and Gegard is a Bellator/PFL MMA fighter who fights exclusively for the Promoter Defendants. The Promoter Defendants hence clearly fail prong B of the ABC Test.

188.    Prong C of the ABC Test is that the employer must show that the worker is customarily engaged in an independently established trade, occupation, profession, or business to demonstrate the worker is independent and not an employee.

189.    This prong requires that the worker has their own business, advertises their services to the public, or works for multiple clients. This criterion ensures that the worker is operating an independent business rather than being economically dependent on the hiring entity.

190.    Here, the Promoter Defendants required that Gegard "grants to Bellator/PFL the exclusive unrestricted, worldwide rights to secure, promote, arrange, present, coordinate, create, and produce all MMA, martial arts, and unarmed combatant contests."

191.    The Promoter Defendants improperly and illegally misclassified Gegard as an independent contractor when he was really an employee.

## VII.    <u>CONCLUSION</u>

192.    The Promoter Defendants breached their Agreement with Gegard and breached the implied covenant of good faith and fair dealing as well.

193.    The Promoter Defendants have also engaged in anti-competitive monopsony conduct in violation of the Sherman Act, and have further misclassified Gegard as an independent contractor when he was in actuality an employee.

194.    Gegard has been damaged in a variety of harmful ways. He was not paid the earnings from the three Bouts he would have received had the Promoter Defendants honored the Agreement and promoted those Bouts, which earnings would have been $2,550,000.00.

195.    He was further warehoused for such long periods of time that his career suffered immensely, including by putting him in a situation where any other options he may have had, such as with the UFC, were no longer viable. Indeed, multiple media sources and other fighters were publicly asking if Gegard was in fact "retired," harming his reputation and career.

196.    Based on his history as a two-time champion and a fighter touted by such luminaries of the sport as Khabib Nurmagomedov, Gegard would very likely have received substantial

additional offers after completing the three Bouts under his Agreement, whether with UFC or elsewhere.

197.    However, due to the Promoter Defendants' conduct, including their warehousing of Gegard, Gegard lost any such opportunities.

198.    In turn, having been warehoused for so long that figures in the industry and relevant market were openly asking if Gegard was "retired," Gegard lost out on lucrative sponsorship opportunities as well.

199.    Gegard accordingly asserts the below causes of action.

200.    All conditions precedent to the bringing of this action have occurred, been waived, or been performed.

<u>**FIRST CAUSE OF ACTION**</u>
**(For Breach of Contract Against the Promoter Defendants)**

201.    In Plaintiff's first ground for relief, Plaintiff alleges breach of contract to promote Plaintiff under the Agreement. Plaintiff repeats and re-alleges the allegations of paragraphs 1 through 200 as though fully set forth herein.

202.    The Agreement is a valid and binding agreement between the parties.

203.    Plaintiff has performed his obligations under the Agreement.

204.    The fundamental benefit of the bargain under the Agreement was that: (1) the Promoter Defendants would promote Plaintiff: "Promoter **shall** promote and Fighter [Mr. Mousasi] shall participate in Bouts as set forth elsewhere in the Term of this Agreement" [emphasis supplied] ***and*** (2) Plaintiff would **exclusively** fight for the Promoter Defendants: "Fighter [Gegard] hereby grants to Promoter the exclusive unrestricted, worldwide rights to secure, promote, arrange, present, coordinate, create and produce all MMA, martial arts, and unarmed

contests (individually, a "Bout" and collectively, the "Bouts" to be engaged in by Fighter during the Term of this Agreement …"

205.    Although Plaintiff strictly honored his side of the bargain and fully performed all of his obligations under the Agreement, including by remaining ready, willing and able to fight and remaining exclusive to the Promoter Defendants even while being warehoused and even when directly encouraged by Kogan to explore other promotions, the Promoter Defendants failed for perform their fundamental obligations under the Agreement.

206.    Indeed, instead of promoting Plaintiff, the Promoter Defendants punitively warehoused Plaintiff and did not promote him in Bouts, including failing to promote him in any of the three (3) Bouts provided for in the Addendum, in a bad faith attempt to force Plaintiff to accept less than his contractually agreed fees for his services.

207.    This is a material breach of the Agreement.

208.    Further, the Agreement required that the Promoter Defendants "offer standard long-term promotional contracts to one (1) Team Mousasi fighter during each full year of the Term".

209.    Despite Plaintiff proposing an appropriate number of recruits for this purpose, the Promoter Defendants did not offer contracts to Team Mousasi fighters in breach of the Agreement.

210.    Plaintiff gave Promoter Defendants notice of breach and an opportunity to cure as required under the Agreement.

211.    Promoter Defendants remain in material breach of the Agreement and did not cure their breaches within the time period allotted for a cure.

212.    The Promoter Defendants' breaches have cost Plaintiff at least $2,550,000.00 in compensation under the Agreement for the three (3) Bouts (Plaintiff would have earned $850,000.00 per Bout) he should have been promoted for under the Addendum, and cost Plaintiff

further compensation that Plaintiff would have earned in other Bouts and from sponsorship opportunities.

213.    As a direct and proximate result of Promoter Defendants' numerous breaches of the parties' Agreement, Plaintiff has suffered significant and extensive damages and financial injury, and has been, and will continue to be, harmed.

<u>**SECOND CAUSE OF ACTION**</u>
**(For Breach of the Covenant of Good Faith and Fair Dealing**
**Against the Promoter Defendants)**

214.    In Plaintiff's second ground for relief, Plaintiff alleges that Promoter Defendants breached the implied covenant of good faith and fair dealing. Plaintiff repeats and re-alleges the allegations of paragraphs 1 through 200, as though fully set forth herein.

215.    Plaintiff and the Promoter Defendants entered into a valid and binding agreement – the Agreement.

216.    In every contract between parties, there is an implied covenant imposed upon both parties to deal in good faith and fairly as to not frustrate the other party's expectation of benefits under the contract.

217.    The Agreement contained an implied covenant of good faith and fair dealing.

218.    Promoter Defendants have taken the position that the Agreement does not expressly obligate them to promote Plaintiff for any particular number of Bouts, thereby claiming they are not in breach of the Agreement (a position that Plaintiff disputes).

219.    However, the fundamental benefit of the bargain under the Agreement was that the Promoter Defendants would promote Plaintiff in Bouts and Plaintiff would in turn fight exclusively for the Promoter Defendants in Bouts.

220.    The Promoter Defendants warehoused Plaintiff and refused to promote him for Bouts in the prime of his career in an intentional and bad faith scheme to attempt to force the Plaintiff to accept less than the wages he was owed under the Agreement.

221.    The Promoter Defendants refused to properly promote Plaintiff in Bouts, despite multiple written requests by Plaintiff and his representative to be promoted in Bouts along with numerous other requests by Plaintiff and his representative to be promoted in Bouts.

222.    The Promoter Defendants refused to promote Plaintiff in Bouts based on the bad faith motive that the Promoter Defendants wanted to force Plaintiff to accept less than what he was contractually owed for Bouts.

223.    The Promoter Defendants intentionally warehoused Plaintiff and refused to promote him for Bouts with a conscious disregard for Plaintiffs right to receive his fundamental benefit under the Agreement.

224.    By warehousing Plaintiff and refusing to promote him for Bouts the Promoter Defendants have frustrated Plaintiff's reasonable expectation of receiving the fundamental benefit of the Agreement – that Promoter Defendants promote Plaintiff for Bouts.

225.    By warehousing Plaintiff and refusing to promote him for Bouts the Promoter Defendants have frustrated Plaintiff's receipt of compensation under the Agreement, as well as damaging his career and reputation to the point where others in the MMA Industry openly question if Plaintiff was "retired" when Plaintiff was in fact not retied and was actively seeking Bouts through the Promoter Defendants.

226.    This in turn has cost Plaintiff at least $2,550,000.00 in compensation under the Agreement for the three (3) Bouts (Plaintiff would have earned $850,000.00 per Bout) he should

have been promoted for under the Addendum, and cost Plaintiff further compensation that Plaintiff would have earned in other Bouts and from sponsorship opportunities.

227.    As a direct and proximate result of Promoter Defendants' numerous breaches of the covenant of good faith and fair dealing, Plaintiff has suffered significant and extensive damages and financial injury, and has been, and will continue to be, harmed.

### THIRD CAUSE OF ACTION
### (Unjust Enrichment Against the Promoter Defendants)

228.    Plaintiff repeats and re-alleges the allegations of paragraphs 1 through 200, as though fully set forth herein.

229.    The Promoter Defendants have been unjustly enriched at Plaintiff's expense.

230.    Specifically, Plaintiff conferred a substantial benefit to the Promoter Defendants by fighting exclusively for the Promoter Defendants allowing them, among other things, to identify the two time champion Plaintiff as an MMA fighter on their roster, the Promoter Defendants knew of and appreciated that Plaintiff was providing these benefits, and the Promoter Defendants retained these benefits without compensating Plaintiff by retaining the benefits of holding Plaintiff as an exclusive MMA fighter on their roster without promoting him for Bouts or paying him.

231.    As a direct and proximate result of the Promoter Defendants' unjust enrichment, Plaintiff has lost at least $2,550,000.00 in compensation under the Agreement for the three (3) Bouts (Plaintiff would have earned $850,000.00 per Bout) he should have been promoted for under the Addendum, and cost Plaintiff further compensation that Plaintiff would have earned in other Bouts and from sponsorship opportunities.

232.    Instead, the Promoter Defendants refused to promote those Bouts, warehousing Plaintiff while retaining the benefit of having the Plaintiff locked into an exclusive contract with the Promoter Defendants.

233.    Defendants have been unjustly enriched to Plaintiff's substantial detriment.

234.    Plaintiff is entitled to recover the monetary amount representing the unjust enrichment from the Promoter Defendants.

**FOURTH CAUSE OF ACTION**
**(For Monopsonization Under Section 2 of the Sherman Act (15 U.S.C. § 2)**
**Against the Promoter Defendants)**

235.    Plaintiff repeats and re-alleges the allegations of paragraphs 1 through 200, as though fully set forth herein.

236.    In Plaintiff's third cause of action, Plaintiff alleges that Promoter Defendants have violated 15 U.S.C. § 2, the Sherman Act, by engaging in an anticompetitive scheme to maintain and enhance their monopsony power in the market for live Elite Professional MMA Fighter services.

237.    The Relevant Geographic Market is United States based MMA Promotion companies that promote fights in the United States, the U.K., the European Union, Saudi Arabia and the United Arab Emirates.

238.    The Relevant Input Market is the market for live Elite Professional MMA Fighter services

239.    Promoter Defendants possess monopsony power in the Relevant Input Market, whether the geographic market includes the Relevant Geographic Market or the entire world.

240.    Promoter Defendants have obtained, enhanced, and maintained dominance in both the Relevant Input Market and the Relevant Geographic Market through the exclusionary scheme alleged herein.

241.    Promoter Defendants have abused and continue to abuse the power to maintain and enhance their market dominance in the market for Elite Professional MMA Fighter services

through an exclusionary scheme to impair and foreclose competition by depriving actual and potential competitors in the Relevant Output Market of necessary inputs (*e.g.*, Elite Professional MMA Fighters).

242.    Promoter Defendants' exclusionary scheme includes, but is not limited to, leveraging their monopsony power in the Relevant Input Market and the Relevant Geographic Market through the use of exclusive agreements with Elite Professional MMA Fighters, and, upon information and belief, with venues, and sponsors.

243.    As a direct and proximate result of the Promoter Defendants' unlawful monopsonization in continuing violation of Section 2 of the Sherman Act (15 U.S.C. § 2), Plaintiff has suffered injury and damages in the form of artificially suppressed compensation in amounts to be proven at trial.

244.    Plaintiffs seeks money damages from Promoter Defendants for these violations, including the $2,550,000.00 in compensation under the Agreement for the three (3) Bouts (Plaintiff would have earned $850,000.00 per Bout) he should have been promoted for under the Addendum, and further compensation that Plaintiff would have earned in other Bouts and from sponsorship opportunities, all of which was lost due to the Promoter Defendants' monopsony and anti-competitive behavior. These damages represent the additional compensation Plaintiff would have received for his Elite Professional MMA Fighter services absent the anticompetitive scheme alleged herein, and the additional compensation Plaintiff would have received for exploitation of his NIL in the absence of the violations alleged.

245.    Pursuant to 15 U.S.C. § 15, the Clayton Act, Plaintiff's actual damages should be trebled. Plaintiff's injuries directly result from the Defendants' unlawful conduct and are of the type the antitrust laws are designed to prevent.

246.     Plaintiff further seeks injunctive relief barring Promoter Defendants from engaging in the anticompetitive scheme alleged herein. The violations set forth above, and the effects thereof, are continuing and will continue unless injunctive relief is granted. Plaintiff's injuries are of the type the antitrust laws were designed to prevent, and flow directly from the Defendant's unlawful conduct.

## FIFTH CAUSE OF ACTION
**(Violation of New Jersey Wage and Hour Law (N.J.S.A. 34:11-4.1 *et seq*.)**
**Against All Defendants)**

247.     Plaintiff repeats and re-alleges the allegations of paragraphs 1 through 200, as though fully set forth herein.

248.     During extended periods of inactivity ("warehousing"), Plaintiff, despite being contractually obligated to maintain full-time training and fight readiness, received no compensation from Defendants for work performed from May 2023 to May 2024, despite repeatedly demanding payment by demanding Bouts to fight where he would be paid.

249.     This constitutes a violation of New Jersey's Wage and Hour Law, N.J.S.A. 34:11-4.1 et seq.

250.     Plaintiff fully performed all duties and responsibilities as required by his employment with the Defendant.

251.     Yet, during the time periods in which Defendants warehoused Plaintiff and Plaintiff continued to training full time and meeting all his other employment obligations, the Defendants' paid Plaintiff nothing, despite Plaintiff's full time employment for Defendants and despite Plaintiff completing all work required of him.

252.     Plaintiff has failed to pay Plaintiff regular wages totaling at least $2,550,000.00 (the wages he would have received for the three Bouts that he should have been promoted to fight in)

for work performed during the period of May 2023 to May 2024. Plaintiff has made multiple demands for payment, but Defendants have refused and continue to refuse to make such payments.

253.    As a result of Defendants' failure to pay regular wages, Plaintiff has suffered financial loss.

254.    Defendants failure to pay Plaintiff his earned wages is a violation of New Jersey Wage and Hour Law.

255.    Under N.J.S.A. 34:11-4.7, every employer shall pay all wages due to their employees in full at least twice during each calendar month.

256.    Defendants, acting through their officers and agents, including but not limited to Peter Murray (CEO), Donn Davis (Founder, Chairman, and Co-owner), Ray Sefo (President of MMA Promotion), Mike Kogan (Executive), Jim Bramson (Executive Vice President and General Counsel), and George Pineda (Vice President and Deputy General Counsel), willfully failed to pay Plaintiff the wages due to him in violation of N.J.S.A. 34:11-4.7, which requires that wages be paid at least twice per calendar month.

257.    Each of Peter Murray (CEO), Donn Davis (Founder, Chairman, and Co-owner), Ray Sefo (President of MMA Promotion), Mike Kogan (Executive), Jim Bramson (Executive Vice President and General Counsel), and George Pineda (Vice President and Deputy General Counsel) had the power to hire and fire Plaintiff, supervised and controlled employee work schedules or conditions of employment, determined the rate and method of payment, and maintained employment records (or consciously chose not to maintain such records or direct that they not be maintained).

258.    Yet, Peter Murray (CEO), Donn Davis (Founder, Chairman, and Co-owner), Ray Sefo (President of MMA Promotion), Mike Kogan (Executive), Jim Bramson (Executive Vice

President and General Counsel), and George Pineda (Vice President and Deputy General Counsel), each of whom have direction and control over the Promoter Defendants, directed the Promoter Defendants not to give Plaintiff any further Bouts, which meant that Plaintiff, who was an employee of the Promoter Defendants, was not paid the wages employee Plaintiff was due, in direct violation of N.J.S.A. 34:11-4.7.

259.    Plaintiff is entitled to recover the unpaid wages, along with interest and costs of the suit, under the New Jersey Wage Payment Law from all Defendants.

260.    The Individual Defendants exercised significant control over the Promoter Defendants' operations, including decisions related to employee classification, payroll, and working conditions. Their actions and/or inactions, as detailed above, directly contributed to the NJWHL violations. These individuals are therefore personally liable for the unpaid wages under established principles of agency and corporate law in New Jersey. (*See Liu v. New Dickson Trading, LLC*, No. CV2115779ESJRA, 2023 WL 3736351, at \*4 (D.N.J. May 30, 2023)).

### SIXTH CAUSE OF ACTION
**(Fair Labor Standards Act: Unpaid Overtime Wages Against All Defendants)**

261.    Plaintiff repeats and re-alleges the allegations of paragraphs 1 through 200 and 248 through 260 as though fully set forth herein.

262.    At all relevant times, the Promoter Defendants, as directed by the Individual Defendants, were employers engaged in interstate commerce under the Fair Labor Standards Act ("**FLSA**"), 29 U.S.C. § 201 et seq.

263.    Plaintiff was employed by the Promoter Defendants, as directed by the Individual Defendants, as an employee, not as an independent contractor, as will be further detailed below.

264.    The Promoter Defendants, as directed by the Individual Defendants, employed Plaintiff within the meaning of FLSA.

265.    The Promoter Defendants, as directed by the Individual Defendants, engaged in a pattern and practice of violating the FLSA by failing to compensate Plaintiff for overtime work exceeding 40 hours per workweek.

266.    Plaintiff has consented in writing to be party to this action, pursuant to 29 U.S.C. § 216(b).

267.    The overtime wage provisions set forth in 29 U.S.C. §§ 201, *et seq*., apply to Defendants.

268.    At all relevant times and continuing to the present time, Defendants had a policy, pattern and/or practice of failing to pay overtime compensation to misclassified employees for hours that they had worked in excess of 40 hours per workweek.

269.    This failure constitutes a willful violation or reckless disregard of the FLSA, specifically 29 U.S.C. §§ 207(a)(1) and 215(a).

270.    Plaintiff's regularly scheduled workweek included training, media appearances, and fight preparation, all essential to his performance and under the exclusive control of the Defendants.

271.    The Promoter Defendants' willful failure to pay, or reckless disregard of the obligation to pay, overtime compensation is directly attributable to the actions and/or inactions of the Individual Defendants.

272.    Each of Peter Murray (CEO), Donn Davis (Founder, Chairman, and Co-owner), Ray Sefo (President of MMA Promotion), Mike Kogan (Executive), Jim Bramson (Executive Vice President and General Counsel), and George Pineda (Vice President and Deputy General Counsel) had the power to hire and fire Plaintiff, supervised and controlled employee work schedules or conditions of employment, determined the rate and method of payment, and maintained

employment records (or consciously chose not to maintain such records or direct that they not be maintained).

273.    Yet, Defendants Peter Murray (CEO), Donn Davis (Founder, Chairman, and Co-owner), Ray Sefo (President of MMA Promotion), Mike Kogan (Executive), Jim Bramson (Executive Vice President and General Counsel), and George Pineda (Vice President and Deputy General Counsel), each of whom have direction and control over the Promoter Defendants, directed the Promoter Defendants not to pay Plaintiff any overtime compensation, or recklessly disregarded the obligation to pay Plaintiff overtime compensation, resulting in Plaintiff, who was an employee of the Promoter Defendants, not receiving the overtime compensation he was due, in direct violation of FLSA.

274.    As a result of Defendants' willful failure to compensate their employees, including Plaintiff, at a rate of not less than one and one-half times the regular rate of pay for work performed in excess of 40 hours in a workweek, Defendants have violated and continues to violate the FLSA, 29 U.S.C. §§ 201, et seq., including 29 U.S.C. §§ 207(a)(1) and 215(a).

275.    Defendants also violated the FLSA's record-keeping requirements under 29 U.S.C. §§ 211(c) and 215(a) by failing to accurately record, report, and compensate Plaintiff for all hours worked.

276.    As a result of Defendants' FLSA violations, Plaintiff, is entitled (a) to recover from Defendants his unpaid wages for all of the hours worked by him, as overtime compensation, (b) to recover an additional, equal amount as liquidated damages, and (c) to recover his unreasonably delayed payment of wages, reasonable attorneys' fees, and costs and disbursements of this action, pursuant to 29 U.S.C. § 216(b).

277.    Because Defendants' violations of the FLSA have been willful, a three-year statute of limitations applies, pursuant to 29 U.S.C. § 255.

278.    During the last three (3) years, Gegard worked at least 1,248 hours in total overtime.

279.    The Individual Defendants exercised significant control over Promoter Defendants' operations, including decisions related to employee classification, payroll, and working conditions.

280.    Their actions and/or inactions, as detailed above, directly contributed to the FLSA violations. These individuals are therefore personally liable for the unpaid wages under established principles of agency and corporate law in New Jersey. (*See Liu v. New Dickson Trading, LLC*, No. CV2115779ESJRA, 2023 WL 3736351, at *4 (D.N.J. May 30, 2023)).

**SEVENTH CAUSE OF ACTION**
**(New Jersey Wage and Hour Law: Unpaid Overtime Wages**
**Against All Defendants)**

281.    Plaintiff repeats and re-alleges the allegations of paragraphs 1 through 200, 248 through 260, and 262 through 280, as though fully set forth herein.

282.    At all relevant times, Plaintiff was employed by Defendants within the meaning of the New Jersey State Wage and Hour Laws, N.J.S.A 34:11-56a et seq. (the "**NJWHL**") and each of the Defendants was an employer within the meaning of NJWHL.

283.    The overtime wage provision of the NJWHL and its supporting regulations apply to Defendants.

284.    Defendants willfully violated Plaintiff's rights by failing to pay him the legally required amount of overtime compensation at rates not less than one and one-half times their regular rate of pay for all hours worked by them in excess of 40 hours in a workweek, in violation of the NJWHL and its regulations.

285.    During the last three (3) years, Gegard worked at least 1,248 hours in total overtime.

286.    The Promoter Defendants' willful failure to pay, or reckless disregard of the obligation to pay, overtime compensation is directly attributable to the actions and/or inactions of the Individual Defendants.

287.    Specifically, the Promoter Defendants, acting through their officers and agents, including but not limited to Peter Murray (CEO), Donn Davis (Founder, Chairman, and Co-owner), Ray Sefo (President of MMA Promotion), Mike Kogan (Executive), Jim Bramson (Executive Vice President and General Counsel), and George Pineda (Vice President and Deputy General Counsel), knew, or should have known, of the requirements under the NJWHL to pay Plaintiff his overtime compensation, and willfully failed to pay Plaintiff the overtime compensation due to him in violation of NJWHL or recklessly disregarded the obligation to pay Plaintiff the overtime compensation due to him in violation of NJWHL.

288.    Each of Peter Murray (CEO), Donn Davis (Founder, Chairman, and Co-owner), Ray Sefo (President of MMA Promotion), Mike Kogan (Executive), Jim Bramson (Executive Vice President and General Counsel), and George Pineda (Vice President and Deputy General Counsel) had the power to hire and fire Plaintiff, supervised and controlled employee work schedules or conditions of employment, determined the rate and method of payment, and maintained employment records (or consciously chose not to maintain such records or direct that they not be maintained).

289.    Yet, Defendants Peter Murray (CEO), Donn Davis (Founder, Chairman, and Co-owner), Ray Sefo (President of MMA Promotion), Mike Kogan (Executive), Jim Bramson (Executive Vice President and General Counsel), and George Pineda (Vice President and Deputy General Counsel), each of whom have direction and control over the Promoter Defendants, directed the Promoter Defendants not to pay Plaintiff any overtime compensation, or recklessly

disregarded the obligation to pay Plaintiff overtime compensation, resulting in Plaintiff, who was an employee of the Promoter Defendants, not receiving the overtime compensation he was due, in direct violation of NJWHL.

290.    Defendants knew and/or showed reckless disregard that their conduct was prohibited by the NJWHL.

291.    As a result of Defendant's willful violations of the NJWHL, Plaintiff is entitled to recover from Defendants his unpaid overtime wages, reasonable attorneys' fees and costs of this action and pre-judgment and post-judgment interest, including the employer's share of FICA, FUTA, state unemployment insurance, and any other required employment taxes, reasonable attorneys' fees and costs and costs of this action, pursuant to N.J.S.A. § 34:11-56a.

292.    The Individual Defendants exercised significant control over Promoter Defendants' operations, including decisions related to employee classification, payroll, and working conditions. Their actions and/or inactions, as detailed above, directly contributed to the NJWHL violations. These individuals are therefore personally liable for the unpaid wages under established principles of agency and corporate law in New Jersey. (*See Liu v. New Dickson Trading, LLC*, No. CV2115779ESJRA, 2023 WL 3736351, at *4 (D.N.J. May 30, 2023)).

## <u>EIGHTH CAUSE OF ACTION</u>
### (Failure to Maintain Records Against All Defendants in Violation of FLSA and NJWHL)

293.    Plaintiff repeats and re-alleges the allegations of paragraphs 1 through 200, 248 through 260, 262 through 280, and 282 through 292 as though fully set forth herein.

294.    Under the FLSA and NJWHL, the Defendants are required to keep and maintain accurate records setting forth the total hours worked each day by Plaintiff for each workweek and other employment information.

295.    The Defendants have failed to maintain true, accurate and complete records containing this required information, including the total hours worked each day and each workweek by Plaintiff.

296.    Specifically, the Promoter Defendants, acting through their officers and agents, including but not limited to Peter Murray (CEO), Donn Davis (Founder, Chairman, and Co-owner), Ray Sefo (President of MMA Promotion), Mike Kogan (Executive), Jim Bramson (Executive Vice President and General Counsel), and George Pineda (Vice President and Deputy General Counsel), knew, or should have known, of the requirements under the FLSA and NJWHL to keep and maintain accurate records setting forth the total hours worked each day by Plaintiff for each workweek and other employment information, and willfully failed to keep those records or recklessly disregarded the obligation to keep those records in violation of FLSA and NJWHL.

297.    Each of Peter Murray (CEO), Donn Davis (Founder, Chairman, and Co-owner), Ray Sefo (President of MMA Promotion), Mike Kogan (Executive), Jim Bramson (Executive Vice President and General Counsel), and George Pineda (Vice President and Deputy General Counsel) had the power to hire and fire Plaintiff, supervised and controlled employee work schedules or conditions of employment, determined the rate and method of payment, and maintained employment records (or consciously chose not to maintain such records or direct that they not be maintained).

298.    Yet, Defendants Peter Murray (CEO), Donn Davis (Founder, Chairman, and Co-owner), Ray Sefo (President of MMA Promotion), Mike Kogan (Executive), Jim Bramson (Executive Vice President and General Counsel), and George Pineda (Vice President and Deputy General Counsel), each of whom have direction and control over the Promoter Defendants, directed the Promoter Defendants not to keep and maintain accurate records setting forth the total

hours worked each day by Plaintiff for each workweek and other employment information and willfully failed to keep those records or recklessly disregarded the obligation to keep those records in violation of FLSA and NJWHL.

299.    The aforementioned conduct is in violation of, *inter alia*, the FLSA and the NJWHL and is otherwise unlawful.

300.    As a direct and proximate cause of the aforementioned conduct, Plaintiff has suffered damages.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38 (b), Plaintiff demands a trial by jury.

## DEMAND FOR JUDGMENT

**WHEREFORE**, Plaintiff Gegard Mousasi respectfully requests that this Court enter Judgment in his favor and against Defendants Bellator Sport Worldwide, LLC, New Bellator, LLC (a subsidiary of Professional Fighters League), Peter Murray, Donn Davis, Ray Sefo, Mike Kogan, Jim Bramson, and George Pineda as follows:

**On Plaintiff's First, Second and Third Causes of Action Against the Promoter Defendants**

(a)    Awarding compensatory, consequential and/or equitable monetary damages in an amount to be determined at trial, but not less than $15,000,000.00 and additionally awarding applicable pre-judgment interest;

(b)    Awarding punitive damages;

(c)    An award of prejudgment and post-judgment interest; ***and***

(d)    Such further and other relief as the Court may deems just and proper;

**On Plaintiff's Fourth Cause of Action Against the Promoter Defendants**

(a)    Entering judgment against Defendants, holding Defendant liable for the antitrust violations alleged;

(b)     Awarding Plaintiff treble the amount of damages actually sustained by reason of the antitrust violations alleged herein Pursuant to 15 U.S.C. § 15 (the Clayton Act) plus the reasonable costs of this action including attorneys' fees;

(c)     Orders such equitable relief as is necessary to correct for the anticompetitive market effects caused by the unlawful conduct of the Promoter Defendants;

(d)     Awarding Plaintiff the costs of his suit, including reasonable attorneys' fees as provided by law;

(e)     An award of prejudgment and post-judgment interest; ***and***

(f)     Such further and other relief as the Court may deems just and proper.

**On Plaintiff's Fifth, Sixth, Seventh, and Eighth Causes of Action Against All Defendants**

(a)     An injunction requiring Defendants to: (i) cease their unlawful practices under the NJWHL and FLSA and comply with the law; (ii) pay on behalf of Plaintiff to the Internal Revenue Service of the United States of America the combined work-employee contribution under the Federal Insurance Contributions Act (FICA) comprised of both social security and Medicare taxes (15.3%), federal income tax not withheld, federal unemployment insurance tax act (FUTA) payments, as well as any penalties and interest; (iii) pay on behalf of Plaintiff any state income taxes, state disability insurance payments, state unemployment compensation payments, and any other amounts that Defendants were required to withhold from Plaintiff's wages, plus any interest and penalties; ***and*** (iv) keep and maintain true, accurate and complete records as required by the FLSA and NJWHL;

(b)     A declaratory judgment that the practices complained of herein are unlawful under the FLSA and the NJWHL;

(c)     An award of unpaid wages for all hours worked in excess of 40 in a workweek at a rate of one and one-half the regular rate of pay under the FLSA and the NJWHL;

(d)     An award of liquidated damages pursuant to 20 U.S.C. § 21 and the NJWHL;

(e)     An award of damages representing the employer's share of FICA, FUTA, state unemployment insurance, and any other required employment taxes;

(f)     An award of prejudgment and post-judgment interest;

(g)     An award of costs and expenses of this action together with reasonable attorneys' fees; ***and***

(h)     Such further and other relief as the Court may deems just and proper.

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2

I hereby certify under penalty of perjury under the laws of the United States of America that to the best of my knowledge, this matter is not the subject to any other action pending in any court, or of any pending arbitration or administrative proceeding. I understand that if the foregoing statement is willful false, I am subject to punishment.

Date: October 16, 2024

> JEFFREY I. WASSERMAN, ESQ.
> WASSERMAN LITTLE LLC
> 1200 Route 22 East, Suite 2000, #2238
> Bridgewater, New Jersey 08807
> jwasserman@wassermanlittle.com
> (973) 486-4801
>
> &
>
> SINGH, SINGH & TRAUBEN, LLP
> THOMAS K. RICHARDS
> trichards@singhtraubenlaw.com
> 400 S. Beverly Drive, Suite 240
> Beverly Hills, California 90212
> Tel: 310.856.9705 | Fax: 888.734.3555
> (*pro hac vice* motion to be filed)
>
> By: _____
>       Jeffrey I. Wasserman
>
> *Attorneys for Plaintiff*
> *Gegard Mousasi*