IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| GEGARD MOUSASI,<br><br>        Plaintiff,<br><br>v.<br><br>BELLATOR SPORT WORLDWIDE, LLC,<br>NEW BELLATOR, LLC, et al.,<br><br>        Defendants. | Civil Action No.: 2:24-cv-09844-EP-JBC |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION TO DISMISS PLAINTIFF'S SHERMAN ACT CLAIM**

Eric R. Breslin, Esq.
Sarah Fehm Stewart, Esq.
DUANE MORRIS LLP
200 Campus Drive, Suite 300
Florham Park, NJ 07932
erbreslin@duanemorris.com
sfstewart@duanemorris.com
(973) 424-2063

Sean P. McConnell, Esq.
DUANE MORRIS LLP
30 S. 17th Street
Philadelphia, PA 19103
spmcconnell@duanemorris.com
(215) 979-1947

# TABLE OF CONTENTS

**Pages**

**TABLE OF AUTHORITIES** ................................................................................................ ii

**INTRODUCTION** ................................................................................................................ 1

**FACTUAL BACKGROUND** ............................................................................................... 1

**I.     THE PARTIES** ......................................................................................................... 1

**II.    THE PROFESSIONAL FIGHTING INDUSTRY** ................................................. 2

**III.   PLAINTIFF'S CONCLUSORY ALLEGATIONS OF ANTICOMPETITIVE CONDUCT** ............................................................................................................... 4

**LEGAL ARGUMENT** ......................................................................................................... 5

**I.     STANDARD OF REVIEW** ..................................................................................... 5

**II.    PLAINTIFF FAILS TO PLEAD A PLAUSIBLE ANTITRUST CLAIM** .......... 6

**III.   PLAINTIFF FAILS TO PLEAD ANTITRUST STANDING** ............................. 10

**CONCLUSION** ................................................................................................................. 14

# **TABLE OF AUTHORITIES**

**Pages**

**Cases**

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ....................................................................................... 5

*Assoc. Gen. Contractors, Inc. v. Cal. State Council of Carpenters ("AGC")*, 459 U.S. 519 (1983) .................................................................................................................................. 10

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................................................ 6

*Brunson Commc'ns, Inc. v. Arbitron, Inc.*, 239 F. Supp. 2d 550 (E.D. Pa. 2002) ........................ 8

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977) .......................................... 11

*Cable Line, Inc. v. Comcast Cable Commc'ns of Pennsylvania, Inc.*, 767 F. App'x 348 (3d Cir. 2019) ............................................................................................................ 1, 6-7, 9

*Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104 (1986) ...................................................... 11

*Castleberry v. STI Grp.*, 863 F.3d 259 (3d Cir. 2017) .................................................................. 5

*City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256 (3d Cir. 1998) ................................. 10

*Connelly v. Lane Constr. Corp.*, 809 F.3d 780 (3d Cir. 2016) ..................................................... 6

*Gelman v. State Farm Mut. Auto. Ins. Co.*, 583 F.3d 187 (3d Cir. 2009) ..................................... 6

*Host Int'l, Inc. v. MarketPlace, PHL, LLC*, 32 F.4th 242 (3d Cir. 2022) ............................. 11-13

*ID Sec. Sys. Can., Inc. v. Checkpoint Sys., Inc.*, 249 F. Supp. 2d 622 (E.D. Pa. 2003) ............. 10

*Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737 (3d Cir. 1996) ................................... 8

*Le v. Zuffa, LLC*, 216 F. Supp. 3d 1154 (D. Nev. 2016) ......................................................... 4, 10

*LePage's, Inc. v. 3M,* 324 F.3d 141 (3d Cir. 2003) ...................................................................... 6

*Pa. Dental Ass'n v. Med. Serv. Ass'n*, 745 F.2d 248 (3d Cir. 1984) ............................................ 7

*Premier Comp Sols. LLC v. UPMC*, 377 F. Supp. 3d 506 (W.D. Pa. 2019) .............................. 10

*Presque Isle Colon & Rectal Surgery v. Highmark Health*, 391 F. Supp. 3d 485 (W.D. Pa. 2019) .................................................................................................................................... 7

*Prod. Source Int'l, LLC v. Foremost Signature Ins. Co.*, 234 F. Supp. 3d 619 (D.N.J. 2017) .................................................................................................................................... 5


*Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57 (3d Cir. 2010) ..........................12

*Schmidt v. Skolas*, 770 F.3d 241 (3d Cir. 2014) ................................................................................2

*SEI Glob. Servs., Inc. v. SS&C Advent*, 496 F. Supp. 3d 883 (E.D. Pa. 2020), *aff'd*, No. 20-3386, 2022 U.S. App. LEXIS 18121 (3d Cir. June 30, 2022) ............................................12

*SEI Glob. Servs., Inc. v. SS&C Advent*, No. 20-3386, 2022 U.S. App. LEXIS 18121 (3d Cir. June 30, 2022) ..............................................................................................................11

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) .................................................2

*W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85 (3d Cir. 2010) ......................... 6-7, 11

*Weyerhaeuser Co. v. Ross–Simmons Hardwood Lumber Co.*, 549 U.S. 312 (2007) ..................1, 7

*Yeager's Fuel v. Pa. Power & Light Co.*, 953 F. Supp. 617 (E.D. Pa. 1997) ..................................7

*ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012).........................................................7

*Zuber v. Boscov's*, 871 F.3d 255 (3d Cir. 2017).................................................................................5

**Statutes**

Sherman Antitrust Act, § 2 ................................................................................................. 1, 6-7, 14

**Court Rules**

Fed. R. Civ. P. 8(a)(2)..........................................................................................................................5

Fed. R. Civ. P. 12(b)(6).................................................................................................................*Passim*

Local Civil Rule 12.2.........................................................................................................................14

## INTRODUCTION

This is a contract dispute between a fighter and his promoters. Compl. (Doc. 1). In addition to a breach of contract and other claims, Plaintiff Gegard Mousasi ("*Plaintiff*") alleges a federal antitrust claim under § 2 of the Sherman Act (Fourth Cause of Action) against Defendants Bellator Sport Worldwide, LLC ("*Bellator*"), New Bellator, LLC ("*New Bellator*") (a subsidiary of Professional Fighters League ("*PFL*")) (Bellator and PFL are collectively referred to as the "*Promoter Defendants*"), Peter Murray, Donn Davis, Ray Sefo, Mike Kogan, Jim Bramson, and George Pineda (collectively, the "*Individual Defendants*" and, together with the Promoter Defendants, the "*Defendants*"). Plaintiff alleges that the Promoter Defendants have violated § 2 of the Sherman Act "by engaging in an anticompetitive scheme to maintain and enhance their monopsony power in the market for live Elite Professional MMA Fighter services."[1] Compl. ¶ 236. Defendants dispute many of the facts alleged by Plaintiff, but even assuming those facts as true for purposes of this Motion, Plaintiff has not plausibly pleaded a legally sufficient monopsony claim, nor has he adequately pleaded antitrust standing to pursue any such claim.

## FACTUAL BACKGROUND

**I.    THE PARTIES**

According to the Complaint, Plaintiff is a seasoned professional fighter who has fought over sixty bouts for numerous promoters over the past two decades. Compl. at ¶¶ 19-24.

---

[1] The Supreme Court has characterized a monopsony as follows: "Monopsony power is market power on the buy side of the market. As such, a monopsony is to the buy side of the market what a monopoly is to the sell side and is sometimes colloquially called a 'buyer's monopoly.'" *Weyerhaeuser Co. v. Ross–Simmons Hardwood Lumber Co.*, 549 U.S. 312, 320 (2007); *see also Cable Line, Inc. v. Comcast Cable Commc'ns of Pennsylvania, Inc.*, 767 F. App'x 348, 351 (3d Cir. 2019) ("A 'monopsony' exists when a market is controlled by one buyer.").

Plaintiff first started fighting professionally in 2003 in a hand-to-hand or 2H2H bout. *Id.*[2] In addition to 2H2H, Plaintiff has also fought in mixed martial arts ("*MMA*") bouts for various promoters, including Pride Fighting, Dream Fighting in Japan, Strikeforce, Ultimate Fighting Championship ("*UFC*"), and Bellator. *Id.* The Individual Defendants currently or previously worked for the Promoter Defendants as one of the many different promoters of professional bouts. *Id.*[3]

## II.  THE PROFESSIONAL FIGHTING INDUSTRY

Plaintiff alleges that the "Relevant Input Market" is "the market for live Elite Professional MMA Fighter services."[4] *Id.* ¶ 238. By Plaintiff's definition, the "Elite Professional MMA Fighters" in this market are "highly skilled" athletes, who have trained in "multiple disciplines of martial arts, including wrestling, judo, jiu-jitsu, Muay Thai, karate, taekwondo and boxing." *Id.* ¶¶ 97, 131. Plaintiff concludes that Elite Professional MMA Fighters are not substitutes for other athletes who are only trained in a single martial art, or alternative forms of competitive fighting such as 2H2H fighting, boxing or wrestling. *Id.* ¶ 99. Moreover, Plaintiff claims that other fighting disciplines do not have the audiences necessary for fighters to earn competitive wages, and in some cases, any compensation at all. *Id.* ¶ 100. For these reasons, Plaintiff contends that "there are no reasonably interchangeable sports" or

---

[2] *See also* https://www.espn.com/mma/fighter/history/_/id/2431313/gegard-mousasi. On a Rule 12(b)(6) motion, the Court may take judicial notice of public records. *See, e.g., Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014).

[3] PFL acquired Bellator Sport Worldwide LLC's assets as of November 2023. https://deadline.com/2023/11/paramount-global-bellator-professional-fighters-league-mma-ufc-1235629678/. The court may also take judicial notice of this fact.

[4] Relatedly, Plaintiff defines the "Relevant Output Market" as "the market for promoting live Elite Professional MMA events." *Id.* ¶ 146.

"plausible alternatives" in which Elite Professional MMA Fighters could compete or otherwise transition to avoid the Promoter Defendants' alleged monopsony in the Relevant Input Market. *Id.* ¶¶ 100, 101-03.

Plaintiff broadly defines the "Relevant Geographic Market" as "United States-based MMA Promotion companies that promote fights in the United States, the U.K., the European Union, Saudi Arabia, and the United Arab Emirates" or, "alternatively, the entire world."[5] *Id.* ¶¶ 237, 239. Although Plaintiff admits that his information about the Promoter Defendants' market share is "scarce," he nevertheless asserts that the Relevant Geographic Market is "dominated by the UFC and the Promoter Defendants[.]" *Id.* ¶¶ 106–07, 112. Plaintiff vaguely alleges that the market in the United States is divided among the UFC (the "largest" promotor) and the Promotor Defendants (a "relatively close second"), and that "[a]ny other MMA Promoters are small to the point of only controlling a small fraction of the United States MMA Promotion market (likely less than 5%)." *Id.* ¶ 108.[6] Plaintiff asserts that the same division exists in the U.K. but concedes that the European Union is "a more fragmented market" and "there are numerous smaller regional promotions that cater to different countries or regions, each holding a niche market share." *Id.* ¶¶ 109, 110. Plaintiff also alleges that Saudi Arabia and the UAE offer similar regional competitive opportunities. *Id.* ¶ 111. With one vague exception, Plaintiff does

---

[5] Outside of his defined Relevant Geographic Market, Plaintiff acknowledges that there is a "viable market for Elite MMA fighters is the Asian market," specifically, that "ONE Championship holds a dominant position in the Asian market, with RIZIN promotions as a prominent promotion in Japan." *Id.* ¶ 113. There are also promotional leagues in China and South Korea. *Id.* ¶ 114. Plaintiff also acknowledged that other promotional leagues exist broadly in Africa, Oceania, and Latin America. *Id.* ¶ 117.

[6] According to Plaintiff, there is a start-up MMA Promoter, "Global Fight League," currently emerging in the Relevant Geographic Market, "but as that MMA Promoter has not yet promoted a single fight, they have zero market share at present." *Id.* ¶ 108.

not assign any percentage values indicating the specific division of market share of MMA Promoters within the Relevant Geographic Market. Nonetheless, he somehow concludes that the Promoter Defendants "have and continue to have monopsony power in the Relevant Input Market," throughout the Relevant Geographic Market.

### III. PLAINTIFF'S CONCLUSORY ALLEGATIONS OF ANTICOMPETITIVE CONDUCT

Plaintiff contends that, due to the Promoter Defendants' "dominance" in the Relevant Input Market and Relevant Geographic Market, they "possess the ability to reduce the demand of, and compensation for, Elite Professional MMA Fighter services without losing so much revenue as to make their conduct unprofitable." *Id.* ¶ 125. According to Plaintiff, the Promoter Defendants leverage their market power to (1) artificially suppress compensation for Elite Professional MMA Fighters and (2) improperly expropriate Elite Professional MMA Fighters' NIL. *See id.* ¶ 142. Plaintiff also alleges that the Promotor Defendants enforce exclusive and restrictive agreements that limit Elite Professional MMA Fighters' ability to sign with alternative promoters and allow the Promoter Defendants to unfairly "warehouse" fighters. *Id.* ¶¶ 127, 144. Relying on *Le v. Zuffa, LLC*, 216 F. Supp. 3d 1154 (D. Nev. 2016) (a recent antitrust case brought against UFC in the District of Nevada that alleges the same theory of monopsony as Plaintiff alleges in this case), Plaintiff contends that even if Elite Professional MMA Fighters could freely move about the market, the "only alternative MMA Promoter at the level of the Promoter Defendants is the UFC, and the UFC appears to engage in the same monopsony practices," and so transfer to the UFC is not a "solution" either. *Id.* ¶ 126.

Despite allegations of a "captive labor market," Plaintiff has signed with other promoters throughout his career, including the UFC, before signing with the Promoter Defendants in 2017 and 2020. *Id.* ¶¶ 21-24. He specifically alleges that he could have rejoined UFC when he signed

4

with the Promoter Defendants. *Id.* ¶ 30. He claims that the Promoter Defendants intentionally "warehoused" him for several bouts, "diminished [Plaintiff's] brand to the point the audience believed he was retired," and then, once his value was depreciated, they attempted to "force [Plaintiff] to agree to less than what he was contractually owed." *Id.* ¶ 151-152. Plaintiff alleges that his exclusive agreement with the Promoter Defendants prohibited him from transferring to an alternative MMA Promoter, and the restrictive terms were exploited in bad faith to artificially depress his wages. *Id.* ¶ 166. In fact, following PFL's acquisition of Bellator's assets, New Bellator merely sought to renegotiate Plaintiff's contract to reflect his actual fighting value, in light of Plaintiff's recent injuries, reduced performance, and various losses. *See id.*, Exhibit C.

## LEGAL ARGUMENT

### I. STANDARD OF REVIEW

The court must accept as true the factual allegations in the complaint, viewing all reasonable inferences in the light most favorable to the plaintiff, when deciding a Rule 12(b)(6) motion. *Zuber v. Boscov's*, 871 F.3d 255, 258 (3d Cir. 2017) (quotation marks omitted). The plaintiff must plead "a short and plain statement of the claim," Fed. R. Civ. P. 8(a)(2), sufficient to give the defendant "fair notice of what the claim is and the grounds upon which it rests." *Prod. Source Int'l, LLC v. Foremost Signature Ins. Co.*, 234 F. Supp. 3d 619, 623 (D.N.J. 2017). However, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The court is **not** required to accept as true "unwarranted inferences, or a legal conclusion couched as a factual allegation." *Castleberry v. STI Grp.*, 863 F.3d 259, 263 (3d Cir. 2017) (quotation marks omitted).

The plaintiff must allege "'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads

5

factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Gelman v. State Farm Mut. Auto. Ins. Co.*, 583 F.3d 187, 190 (3d Cir. 2009) (quoting *Iqbal,* 556 U.S. at 678). "A complaint that pleads facts 'merely consistent with a defendant's liability . . . stops short of the line between possibility and plausibility of entitlement to relief." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (quoting *Iqbal*, 556 U.S. at 679). The "plausibility" determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* (quoting *Iqbal*, 556 U.S. at 679). The court should dismiss the complaint under Rule 12(b)(6) if the factual allegations in the complaint fail "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

## II. PLAINTIFF FAILS TO PLEAD A PLAUSIBLE ANTITRUST CLAIM

To plead a monopsony claim under Section 2 of the Sherman Act, "a plaintiff must allege monopsony power and conduct by the monopsonist that excludes its rivals—i.e., other buyers in the same market." *Cable Line, Inc.*, 767 F. App'x at 351; *see also LePage's, Inc. v. 3M,* 324 F.3d 141, 149 (3d Cir. 2003) (explaining that plaintiff must show, as with a monopoly claim, (1) the possession of monopsony power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident). "A firm that has substantial power on the buy side of the market (i.e., monopsony power) is generally free to bargain aggressively when negotiating the prices it will pay for goods and services. […] This reflects the general hesitance of courts to condemn unilateral behavior, lest vigorous competition be chilled." *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 103 (3d Cir. 2010).

As to the first element, a plaintiff must plead that the defendant possesses "substantial monopsony power." *Id.* Typically, "the size of market share is a primary determinant of whether monopoly power exists."[7] *Pa. Dental Ass'n v. Med. Serv. Ass'n*, 745 F.2d 248, 260 (3d Cir. 1984). Though there is no perfect formula for determining market power, courts have found that a "60%-80%" share of the geographic market for services, "with significant entry barriers" to the market, and with "very few alternatives" in the market, will sufficiently establish monopsony power. *W. Penn.*, 627 F.3d at 103–04; *Miller Indstries Towing Equip. Inc. v. NRC Indus.*, 659 F. Supp. 3d 451, 466 (D.N.J. 2023) ("Courts within the Third Circuit have held a defendant has significant market share supporting an inference of monopoly power if the defendant possesses sixty percent or more market share in the relevant market." (internal quotation and citation omitted); *Presque Isle Colon & Rectal Surgery v. Highmark Health*, 391 F. Supp. 3d 485, 502 (W.D. Pa. 2019) (defendant had monopsony power when it possessed "in excess of" 65-75% of all health insurance market in Western Pennsylvania); *see also Yeager's Fuel v. Pa. Power & Light Co.*, 953 F. Supp. 617, 651 (E.D. Pa. 1997) (explaining that, in the context of monopoly claims, a market share of 90% is generally sufficient to establish monopoly power, while 60% can suffice with other factors, and 31% is insufficient). *Cf. Cable Line, Inc.*, 767 F. App'x at 351–52 ("Plaintiffs acknowledge that Comcast is not the only buyer of cable

---

[7] There is limited precedent on monopsony claims within the Third Circuit, though courts generally apply the same Section 2 standards to monopsonization claims as monopolization claims. *See, e.g., Presque Isle*, 391 F. Supp. 3d at 502 ("The Court applies the same standard as a claim of monopoly to this situation of an allege monopsony based on the close "kinship between monopoly and monopsony," which suggests that "similar legal standards should apply to claims of monopolization and to claims of monopsonization." (internal citations omitted)); *see also ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 280 (3d Cir. 2012) ("[The Supreme Court] in *Weyerhaeuser* established the straightforward principle that the exercise of market power on prices for the purpose of driving out competitors should be judged by the same standard, whether such power is exercised on the input [buy] or output [sell] side of the market."). Therefore, cases addressing monopolies in similar alleged factual circumstances are applicable.

installation services in the Regions. Notwithstanding that concession, the Complaint does not allege any facts concerning those other companies and how, if at all, Comcast unlawfully excluded them from the market for cable installation. Absent those allegations [to support a monopsony], the Complaint does not adequately allege the relevant market, which is fatal to their claim.").

Plaintiff has failed to allege facts plausibly supporting an inference that Promoter Defendants had market power in any relevant market. To the contrary, the Complaint alleges only that based on "a reasonable and good faith assessment" of the market, UFC is the largest promoter, the Promoter Defendants are "a relatively close second" and that the remaining market (in the United States and U.K., specifically) is "likely less than 5%." Compl. ¶ 108. These allegations are conclusory and insufficient as a matter of law. Even if Promoter Defendants' market share was co-equal with UFC's share, which it is not, that would mean that Promoter Defendants' share is at most 47.5%, well below the market share needed to support an allegation of monopsony. *See, e.g., Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 749-50 (3d Cir. 1996) (finding that control of 47% of the New Jersey milk market, "without concrete evidence of anticompetitive behavior," did not show monopoly power); *St. Clair v. Citizens Fin. Grp.*, No. 08-1257, 2008 U.S. Dist. LEXIS 92135, at *21 (D.N.J. Nov. 12, 2008) (quoting *Brunson Commc'ns, Inc. v. Arbitron, Inc.*, 239 F. Supp. 2d 550, 568 (E.D. Pa. 2002) for the proposition that "Courts are reluctant to find monopoly power where the defendant business controls less than fifty percent of the given market."); *Desai v. Impacta, S.A.*, No. 89-4817, 1990 U.S. Dist. LEXIS 11892, at *28 (D.N.J. Sep. 7, 1990) (explaining that "absent special circumstances, a defendant must have a market share of at least fifty percent before he can be found guilty of monopolization").

Plaintiff's allegations are also contradictory and internally inconsistent. While Plaintiff makes the legal conclusion that "barriers to entry are high" and that there are "no effective alternative promoters," Compl. ¶¶ 131, 143, he has clearly pleaded the existence of promotional leagues beyond that of UFC and the Promoter Defendants within the relevant market. In Saudia Arabia, the UAE, and the European Union, there are a multitude of promotional leagues, including KSW (Konfrontacja Sztuk Walki), which Plaintiff claims "dominates the Polish and broader Central/Eastern European market." *Id.* ¶¶ 110, 111. Plaintiff also alleged that a new promotional league was emerging in the United States. *Id.* ¶ 108. Even in Plaintiff's alternative market ("the whole world"), there are available promotional leagues in Asia, such as RIZIN, as well as those in Africa, Oceania, and Latin America. *Id.* ¶¶ 113, 114, 117. Indeed, Plaintiff alleges that he also fought for other MMA Promoters, including UFC, before signing with the Promoter Defendants in 2017 and 2020. *Id.* ¶¶ 21-24.[8] He specifically alleges that he could have rejoined UFC when he signed with the Promoter Defendants. *Id.* ¶¶ 30, 126. Plaintiff acknowledges the existence of multiple competitors within the market, and acknowledges that he was free to contract with any of these options prior to contracting with Promoter Defendants, while alleging no facts to support an inference that these competitors were not viable substitutes. *Cable Line, Inc.*, 767 F. App'x at 351–52 ("[T]he Complaint does not allege any facts concerning those other companies and how, if at all, Comcast unlawfully excluded them from the market for cable installation.").

Further, when considered in conjunction with the monopsony allegations brought against the UFC in *Le*—cited in Plaintiff's Complaint, *see* Compl. ¶ 126—it is all the more unlikely that

---

[8] Plaintiff's relevant product market definition also seems overly narrow in that it supposedly excludes 2H2H and other types of professional fighting, despite the fact that Plaintiff himself has fought professionally in these formats. *See, supra,* n. 2.

9

the Promoter Defendants could be considered a monopsony. In *Le*, the plaintiff claimed that UFC possessed 90% of the market share in the United States. *See* 216 F. Supp. 3d at 1159. Taking as true that allegation, as well as Plaintiff's allegation that the Promoter Defendants and the UFC make up a 95% majority of the market, that would mean the UFC possesses a 90% share, and the Promoter Defendants only possess a 5% share. Even if Plaintiff could show additional anticompetitive factors, a 5% share of market power is not sufficient to demonstrate a monopsony. *See Storis v. GERS Retail Sys.*, No. 94-4400, 1995 U.S. Dist. LEXIS 7614, at *12 (D.N.J. May 31, 1995) (holding that "less than a 40% market share is insufficient, as a matter [of] law, to establish market power"); *Desai*, 1990 U.S. Dist. LEXIS 11892, at *28-29 (approximate market share of 5% was "too small, as a matter of law, to enable [defendant] to commit the offense of monopolization"); *Premier Comp Sols. LLC v. UPMC*, 377 F. Supp. 3d 506, 535 (W.D. Pa. 2019) (finding that a market share of 6.1% was "too low" to establish a monopoly); *ID Sec. Sys. Can., Inc. v. Checkpoint Sys., Inc.*, 249 F. Supp. 2d 622, 648 (E.D. Pa. 2003) ("As a matter of law, a market share of less than 30 percent is presumptively insufficient to establish the market power that is a prerequisite to a defendant's enjoying a dangerous probability of achieving monopoly power.").

### III.     PLAINTIFF FAILS TO PLEAD ANTITRUST STANDING

In addition to the failure above, Plaintiff's antitrust claim must also be dismissed because he fails to establish antitrust standing to pursue his claim. Courts, including those in this circuit, have imposed a rigorous, sensible standing requirement, referred to as "antitrust standing" to determine whether the plaintiff is the proper party to bring a private antitrust action. *City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256, 264 (3d Cir. 1998). To survive a Rule 12(b)(6) motion, a plaintiff must allege that he has antitrust standing, which requires that the plaintiff suffer an antitrust injury and be an appropriate plaintiff to bring the antitrust case. *Assoc.*

*Gen. Contractors, Inc. v. Cal. State Council of Carpenters ("AGC")*, 459 U.S. 519, 540-44 (1983). The Third Circuit refines the AGC factors to five:

> (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages.

*Host Int'l, Inc. v. MarketPlace, PHL, LLC*, 32 F.4th 242, 249 (3d Cir. 2022).

The antitrust injury requirement is the most important factor. *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 110 n.5 (1986). With respect to antitrust injury, plaintiff must allege more than conclusory statements and must provide specific facts to plausibly suggest injury to competition, not just to a particular competitor. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). The injury "must reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *W. Penn*, 627 F.3d at 101. "Put differently, an antitrust injury must have an 'anti-competitive effect on the competitive market.'" *SEI Glob. Servs., Inc. v. SS&C Advent*, No. 20-3386, 2022 U.S. App. LEXIS 18121, at *6 (3d Cir. June 30, 2022) (quoting *Eichorn v. AT&T Corp.*, 248 F.3d 131, 140 (3d Cir. 2001)). The doctrine of antitrust injury requires every plaintiff to show that the challenged conduct "affected the prices, quantity, or quality of goods or services, not just its own welfare." *Host Int'l, Inc. v. MarketPlace, PHL, LLC*, 32 F.4th 242, 251 (3d Cir. 2022) (cleaned up). Plaintiff must allege either: "(1) harm to the competitive market or (2) that its harm 'flows from' any supposed anticompetitive effects of [the defendant's actions]." *SEI Glob. Servs.*, 2022 WL 2356730, at *2.

Plaintiff improperly seeks to elevate an ordinary contractual dispute into an alleged "anticompetitive scheme" involving the Promoter Defendants. The gravamen of Plaintiff's Complaint centers on his dissatisfaction with the terms of his agreement, including his compensation and his promotion as a fighter within the Promoter Defendants' league. *See* Compl. ¶¶ 19-93. But Plaintiff's agreement with Promoter Defendants has since been terminated (a fact that precipitated this very suit) and Plaintiff may now freely contract with UFC or any other promoter. Indeed, aside from Plaintiff's sole antitrust claim, the majority of Plaintiff's claims are based in tort or contract. *Id.* ¶¶ 201-300. But "not every business tort or breach of contract that has an adverse impact on a competitor can form the basis of an antitrust claim." *SEI Glob. Servs., Inc. v. SS&C Advent*, 496 F. Supp. 3d 883, 901 (E.D. Pa. 2020), *aff'd*, No. 20-3386, 2022 U.S. App. LEXIS 18121 (3d Cir. June 30, 2022). Plaintiff specifically complains of the Promoter Defendants' use of exclusive agreements, and argues that restrictive contracts have deprived Elite Professional MMA Fighters of signing with rival MMA Promoters. *See* Compl. ¶¶ 241, 242. It is well-established, however, that an "[a]n objectionable term in a commercial agreement, without more, is not an antitrust violation." *Host Int'l, Inc.* 32 F.4th at 250. Although a plaintiff may personally find exclusive agreements "undesirable," he must also show how they are "unreasonable restraints" on the market. *Id.*; *see also Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 76 (3d Cir. 2010) ("[I]t is widely recognized that in many circumstances [exclusive dealing arrangements] may be highly efficient—to assure supply, price stability, outlets, investment, best efforts or the like—and pose no competitive threat at all.").

In this regard, Plaintiff cannot overcome the allegations in his own Complaint. Despite Plaintiff's broad theory that the Promoter Defendants' use of exclusive agreements is preventing

competition, he also alleges that the largest promoter in the industry, UFC, uses similar agreements. *See id.* ¶ 126. And yet, Plaintiff reports that he almost signed an agreement with UFC before signing with the Promoter Defendants, and that he has previously signed with at least four other MMA Promoters (including UFC) his career. *Id.* ¶¶ 21-24. Not only does the use of exclusive agreements appear to be standard industry practice, but it has not prevented Plaintiff from signing with different promoters in the past. He has not demonstrated that the use of exclusive agreements by the Promoter Defendants has pervasively chilled competition or depressed wages in the market—it has only prevented him, in this sole instance, from leaving an unsatisfactory promoter relationship. Plaintiff attempts to cites "examples" of other Elite Professional MMA Fighters having difficulty getting fight promotions with the Promoter Defendants but does no more than allege that warehousing is a common practice, especially for fighters like Plaintiff, who were injured and consistently losing bouts. *See id.* ¶¶ 33-39, 154-159. As relevant here, when the only harm alleged is harm to the plaintiff, and not to competition, the antitrust claims should be dismissed. *Host Int'l, Inc.*, 32 F.4th at 252.

13

## CONCLUSION

For the foregoing reasons, Count IV[9] of Plaintiff's Complaint, raising a claim under § 2 of the Sherman Act, should be dismissed under Fed. R. Civ. P. 12(b)(6), with prejudice, for failure to state a claim upon which relief can be granted.

Dated: Florham Park, New Jersey
February 21, 2025

                                                   DUANE MORRIS LLP

                                     By:    /s/ Sarah Fehm Stewart
                                                      Eric R. Breslin, Esq.
                                                      Sarah Fehm Stewart, Esq.
                                                      DUANE MORRIS LLP
                                                      200 Campus Drive, Suite 300
                                                      Florham Park, NJ 07932
                                                      erbreslin@duanemorris.com
                                                      sfstewart@duanemorris.com
                                                      (973) 424-2063

                                                      Sean P. McConnell, Esq.
                                                      DUANE MORRIS LLP
                                                      30 S. 17th Street
                                                      Philadelphia, PA 19103
                                                      spmcconnell@duanemorris.com
                                                      (215) 979-1947

---

[9] Pursuant to Local Civil Rule 12.2, Defendants will answer the remaining Counts of the Complaint within 14 days after entry of the Court's order resolving this Motion.