Jeffrey I. Wasserman, Esq.
WASSERMAN LITTLE LLC
1200 Route 22 East, Suite 2000, #2238
Bridgewater, New Jersey 08807
jwasserman@wassermanlittle.com
(973) 486-4801

        & 

Thomas K. Richards, Esq.
SINGH, SINGH & TRAUBEN, LLP
400 South Beverly Drive, Suite 240
Beverly Hills, California 90212
trichards@sst.law
(310) 856-9705
(admitted *pro hac vice*)

## IN UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| GEGARD MOUSASI<br><br>        Plaintiff,<br><br>v.<br><br>BELLATOR SPORT WORLDWIDE, LLC,<br>NEW BELLATOR, LLC (a Subsidiary of<br>Professional Fighters League), PETER<br>MURRAY, DONN DAVIS, RAY SEFO,<br>MIKE KOGAN, JIM BRAMSON, GEORGE<br>PINEDA and DOES 1 through 100,<br><br>        Defendants. | Civil Action No.: 2:24-cv-09844-EP-JBC<br><br>**FIRST AMENDED COMPLAINT** |

## COMPLAINT

Plaintiff, Gegard Mousasi ("**Gegard**"), by his attorneys, Wasserman Little LLC and Singh,

Singh & Trauben, LLP, as and for his Complaint against Defendants Bellator Sport Worldwide,

LLC ("**Bellator**"), New Bellator, LLC (a subsidiary of Professional Fighters League) ("**PFL**")

(Bellator and PFL are collectively referred to as the "**PFL/Bellator**"), Peter Murray, Donn Davis,

Ray Sefo, Mike Kogan, Jim Bramson, and George Pineda (collectively, the "**Individual Defendants**"), sets forth the following allegations.

## I.    NATURE OF THE ACTION

1.    Gegard is a well-known and successful professional MMA (defined in Section V. below) fighter. PFL/Bellator materially breached its contract and covenant of good faith and fair dealing with Gegard by failing to promote Gegard in Bouts (defined in Section V. below) and have been unjustly enriched.

2.    PFL/Bellator further engaged in an anti-competitive scheme to maintain and enhance its monopsony power in the market for MMA fighter services in violation of the Sherman Act, 15 U.S.C. § 2.

3.    All Defendants have also misclassified Gegard as an independent contractor when Gegard was in fact an employee and are liable under various misclassification-related labor and employment claims.

4.    Gegard accordingly brings claims for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, a claim for relief under Section 2 of the Sherman Act, 15 U.S.C. § 2 (the "**Sherman Act Claim**") and misclassification-related labor and employment claims (the "**Labor and Employment Claims**").

## II.    THE PARTIES

5.    Plaintiff Gegard Mousasi is an individual residing in The Netherlands.

6.    Defendant Bellator Sport Worldwide, LLC is a Delaware limited liability company with its principal place of business in Los Angeles, California.

7.    Defendant New Bellator, LLC (a subsidiary of Professional Fighters League), is a Delaware limited liability company with its principal place of business in New York, New York.

8.      Defendant Peter Murray is the CEO of PFL and, upon information and belief, resides in the State of New York.

9.      Defendant Donn Davis is the founder, chairman and co-owner of PFL and, upon information and belief, resides in Great Falls, Virginia.

10.     Defendant Ray Sefo is President of MMA promotion for PFL and, upon information and belief, resides in Las Vegas, Nevada.

11.     Defendant Mike Kogan is an executive of PFL and, upon information and belief, resides in Miami, Florida.

12.     Defendant Jim Bramson is an Executive Vice President and General Counsel of PFL and, upon information and belief, resides in Washington D.C.

13.     Defendant George Pineda is a Vice President and Deputy General Counsel of PFL and, upon information and belief, resides in Los Angeles, California.

### III.      JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action by reason of diversity of citizenship pursuant to 28 U.S.C. § 1332.

15.     The amount in controversy in this action exceeds $75,000.00, exclusive of attorneys' fees, interest, and costs.

16.     Additionally, Plaintiff brings a claim under Section 2 of the Sherman Act, 15 U.S.C. § 2 as well as claims under Fair Labor Standards Act (the "**FLSA**") 29 U.S.C. §§ 201, *et seq*., and this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a), and section 4 of the Clayton Act, 15 U.S.C. § 15(a)(2).

17.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(1), (b)(2), and (c)(2) because Defendants are subject to personal jurisdiction in this District. This District has

personal jurisdiction because Defendants' conduct business in this District and a substantial part of the events giving rise to Plaintiff's claims took place in this District. Furthermore, Defendants transact business in this District and have engaged in activities in this District that subject them to the jurisdiction of this Court.

18.    In addition, the governing written agreement mandates that the courts located in New Jersey shall have sole and exclusive jurisdiction over this dispute.

## IV.    ALLEGATIONS COMMON TO ALL CLAIMS

19.    Gegard has been a professional MMA fighter since 2003.

20.    As is the case with virtually all professional MMA fighters, Gegard has fought throughout his career for MMA Promoters (defined in Section V. below) who plan and host Bouts and provide equipment and other services.

21.    Gegard first fought professionally for the MMA Promoter Pride Fighting, and then moved on to start fighting for the MMA Promoter Dream Fighting in Japan ("**Dream**"), becoming a multi-weight champion in Dream.

22.    Gegard also signed with the MMA Promoter Strikeforce in or around 2009, becoming its 205-pound champion.

23.    Gegard then began fighting for the MMA Promoter Ultimate Fighting Championship ("**UFC**") in 2013.

24.    Then, on July 9, 2017, Gegard signed with Bellator and entered into a Fighter Promotional Agreement with Bellator on or about February 8, 2020 (the "**2020 Agreement**"), which was subsequently amended by an addendum entered into on or about October 3, 2023 (the "**Addendum**") (collectively, the 2020 Agreement and the Addendum are referred to as the "**Agreement**").

25.     Among other terms, the Agreement requires that Gegard's services as a professional MMA fighter be rendered exclusively to PFL/Bellator: "Fighter [Gegard] hereby grants to Promoter the **_exclusive_** unrestricted, worldwide rights to secure, promote, arrange, present, coordinate, create and produce all MMA, martial arts, and unarmed contests (individually, a "Bout" and collectively, the "Bouts" to be engaged in by Fighter during the Term of this Agreement …"). [Emphasis supplied].

26.     Gegard is one of the most successful fighters in Bellator's history.

27.     Gegard's overall record is 49 wins and 9 losses with two different runs as a champion with Bellator.

28.     Indeed, in the 10 Bouts in which he participated for Bellator, Gegard was either competing for the title or defending the title in 7 of those Bouts.

29.     As of February 2022, ESPN was openly debating if Gegard was the best middleweight fighter in the World.[1]



---

[1] https://www.espn.com/mma/story/_/id/33342235/bellator-275-gegard-mousasi-bellator-overlooked-middleweight-champion-best-world

30.     Khabib Nurmagomedov, widely considered one of the greatest MMA fighters of all time, called Gegard "the most underrated fighter in MMA today":[2]





31.     At the time the Agreement was entered, Gegard was coming off a victory against Lyoto Machida and was in a position where he could have rejoined UFC as his promotional company (Gegard had previously fought for UFC before joining Bellator in 2017).

32.     However, Bellator induced Gegard to enter into the Agreement by raising his per bout compensation and further promising him eight (8) Bouts that were to be promoted under the

---

[2] https://x.com/TeamKhabib/status/1497351500854480897;
https://www.espn.com/mma/story/_/id/34131182/why-khabib-nurmagomedov-calls-bellator-gegard-mousasi-most-underrated-bouter-mma

Agreement. Gegard then entered into the Agreement, which provided that Gegard would receive guaranteed purse of $150,000.00 for his first four (4) Bouts, and then after his first four (4) Bouts were completed, Gegard would receive guaranteed purse for each subsequent bout of $200,000.00. Gegard would also receive a finish bonus of $50,000.00 for any Bouts won by knockout or submission, plus a promotional fee for each such bout of $600,000.00. Accordingly, after his fourth bout was completed, Gegard was guaranteed to earn $800,000.00 per bout, and up to $850,000.00.

33.    Gegard completed the initial four (4) Bouts under the Agreement, winning against Douglas Lima on October 29, 2020 by decision, and winning by TKOs against John Salter on August 13, 2021 and Austin Vanderford on February 25, 2022.

34.    Gegard then lost on a decision against Johnny Eblen ("**Eblen**") on June 24, 2022.

35.    This was Gegard's first loss in three (3) years.

36.    Having completed this fourth bout, Gegard's guaranteed purse for future Bouts would now increase to $200,000.00. (*See Id.*).

37.    Bellator, however, did not promote Gegard for nearly an entire year, with his next bout after the Eblen bout not scheduled until May 12, 2023, specifically as against Fabian Edwards ("**Edwards**").

38.    Despite aggressively asking to fight within 4 to 6 months after the Eblen bout (the standard bout schedule to which he was accustomed and the schedule that is the best for the fighter), Gegard was warehoused[3] nearly an entire year by Bellator.

39.    Gegard was very concerned Bellator intended to warehouse him indefinitely. Desperate to fight, Gegard took the Edwards bout despite carrying an injury that effectively forced him to fight Edwards with one arm.

---

[3] Also known in fight parlance as being "marinated".

40.     Gegard then lost the Edwards bout by decision.

41.     During late 2022 another development arose, namely, PFL and Bellator began discussing a merger. These discussions appear to have commenced in or around the last quarter of 2022, with public disclosure of the potential merger on January 5, 2023.[4]



42.     On or around October 3, 2023, Gegard and Bellator entered into the Addendum.

43.     The Addendum provided that the term of the Agreement would be extended by the *earlier* of eighteen (18) months from the date of the first bout after the Addendum was fully executed and effective or when Gegard had participated in three (3) Bouts.

44.     On November 20, 2023, the Bellator / PFL merger was officially announced (the "**Merger**"). The official press release proclaimed that this new PFL would be "fighter-first".[5]

---

[4] https://www.mmamania.com/2023/1/5/23540348/bellator-up-for-sale-theyre-on-the-market

[5] https://pflmma.com/news/professional-fighters-league-acquires-bellator-in-industry-transformative-deal

# Professional Fighters League Acquires Bellator in Industry Transformative Deal

NOVEMBER 20, 2023 PFL

*PFL Forms Global Powerhouse Poised to be MMA Co-Leader*

*PFL + Bellator Combined Fighter Roster Equal to UFC – Both Rosters 30% Top 25 World-Ranked*

*PFL to Launch Reimagined Bellator in 2024 with Bellator International Champions Series*

*PFL Champions vs. Bellator Champions in Landmark MMA Mega-Event to be Staged in 2024*

**NEW YORK (MONDAY, NOVEMBER 20, 2023)** - Professional Fighters League (PFL) announced it has completed the acquisition of Bellator from Paramount Global (NASDAQ:PARA), creating a global powerhouse in mixed-martial arts (MMA) and accelerating the combined company to become the industry co-leader.

PFL has acquired an immense number of top fighters through the Bellator acquisition, and its combined fighter roster is now equal in stature to UFC. PFL and UFC both showcase rosters that are 30% comprised of fighters who are top 25 independently world-ranked in their weight-classes. In addition, PFL + Bellator now has the best roster of women's fighters in the world. All newly acquired Bellator fighters will become part of the PFL platform and available to compete in PFL fight franchises.

PFL will continue the Bellator brand, and Bellator will be the "one-off" event product from PFL. PFL will launch a reimagined Bellator product in 2024 – the "Bellator International Champions Series." The Bellator International Champions Series will consist of eight fight events each year hosted in major cities across the globe, and each Bellator event will feature two compelling co-main fights competing for championship belts.

Bellator becomes one of five live fight franchises of the Professional Fighters League: PFL League Season, PFL PPV Super Fights, PFL Challenger Series, PFL International Leagues, and Bellator. Overall, the company can now meet fan and media demand by producing and programming a year-round calendar of live fight content with 30 premium MMA events per year.

PFL as a fighter-first and fan-focused organization plans to stage a landmark mega-event in 2024 – PFL Champions vs. Bellator Champions. The PFL Champions vs. Bellator Champions mega-event will feature the champions of each weight-class in a head- to-head epic fight experience.

Details of Bellator events, distribution, partnerships, and management will be announced at a later date.

Donn Davis, PFL Chairman and Founder, and Peter Murray, PFL CEO, continue to lead and operate the combined company.

"PFL is now a global powerhouse in MMA," said Donn Davis, PFL Founder and Chairman. "Our Bellator acquisition turbocharges PFL's mission to innovate the sport and become the industry co-leader."

"The combined PFL and Bellator fighter rosters are second to none in MMA," said Peter Murray, PFL CEO. "We can't wait to bring MMA fans what they have been asking for - best vs best with the PFL Champions vs Bellator Champions Mega-Event."

MMA with 650 million global fans is the third largest fan-base of all sports worldwide. MMA is the sports growth business of this decade with its current $1.75 billion industry revenue projected to grow 10% annually to $4 billion by 2032.

Bellator has served fighters and fans worldwide for more than a decade, staging an astounding 301 major MMA fight events. Bellator has successfully identified and developed dozens of acclaimed MMA world champions. Bellator's current fighter roster has 46 fighters world-ranked in the top 25 of their weight-class per independent source Fight Matrix Rankings.

PFL is the only organization in MMA with the sports-season format, where individual fighters compete in a regular season, playoffs, and championship each year. The combined roster of PFL and Bellator boasts 30% of its fighters independently world-ranked in the top 25 of their respective weight-class, the same percentage as UFC. PFL has an expansive global vision for the sport and is building the "Champions League of MMA" with PFL Europe, PFL MENA, and more international leagues in development. PFL leads in technology and innovation, with its proprietary PFL SmartCage, powering fight analytics, real-time betting, AI scoring, and a next- generation viewing experience. PFL is primetime on ESPN/ESPN+ in the U.S. and is broadcast and streamed in 150 countries with 20 premium media distribution partners.

Citi and LionTree served as financial advisors to PFL and Sidley Austin LLP served as legal counsel to PFL.

**ABOUT PROFESSIONAL FIGHTERS LEAGUE**
Professional Fighters League (PFL) is a global powerhouse in MMA and the fastest-growing sports league world-wide. PFL has five live fight franchises, offering year-round content: PFL League Season, PFL PPV Super Fights, PFL Challenger Series, PFL International Leagues, and Bellator. Founded in 2018, PFL is backed by major blue-chip investors including SRJ, Ares, Knighthead, Luxor Capital, Waverley Capital, Elysian Park Ventures, and numerous NBA, MLB, NHL, and MLS team owners. MMA is the growth sport business of this decade, with 650 million fans worldwide, the youngest audience demographic, and true global revenue streams.

**MEDIA CONTACTS**

**PFL**
Loren Mack; lmack@pflmma.com

**Paramount**
Allie McLarty; allison.mclarty@paramount.com

BACK TO NEWS

45.     However, it would turn out that nothing could be further from the truth.

46.     After the Merger, PFL/Bellator never promoted Gegard in another bout, despite Gegard and his representative, Nima Safapour ("**Safapour**"), aggressively and repeatedly demanding Bouts.

47.     The Addendum was a subterfuge, intended to preserve Gegard as an asset of Bellator as a signed fighter for the purposes of Bellator's sale to PFL, when Bellator in fact had no intention of promoting Gegard because PFL/Bellator did not want to pay its two-time champion Gegard the fees he was contractually owed on Bouts.

48.     To get PFL/Bellator to start promoting Gegard, Safapour reached out to PFL's Chairman and Founder Donn Davis ("**Davis**") in early January 2024.

49.     Davis replied by email to Safapour on January 8, 2024, stating: "I am aware of Gegard given his very high compensation. Given Gegard is not a PPV draw, and is not a Champion, his deal is very surprising. PFL is fighter first league, so we respect and empower all fighters. If he desires to have opportunities here then I can have Mike Kogan reach out to you and work on options with you." (A true and correct copy of Davis's email is attached hereto as **Exhibit "A"**.)

50.     Mike Kogan was Bellator's matchmaker, who was then hired by PFL ("**Kogan**").

51.     Gegard was signed to the Agreement, where PFL/Bellator agreed to promote Gegard, and had just signed an Addendum to that Agreement for three (3) more Bouts based upon promises that he would get three (3) more Bouts.

52.     Yet now, post-Merger, PFL/Bellator's Chairman was stating that: "**if** he [Gegard] desires opportunities here then I can have Mike Kogan reach out to you and work on options with you", meaning, **if** Gegard wanted to fight, Gegard would need to renegotiate his fees and terms on a match-by-match basis with Kogan. (*See* Ex. A).

53.    In short, Davis made clear that PFL/Bellator had no intention of honoring the terms of Gegard's Agreement and that further Bouts were contingent upon Gegard reducing his fees.

54.    Indeed, even though Safapour and Gegard had repeatedly asked that Gegard be included on the Card (defined in Section V. below) for a major MMA event in Saudi Arabia, Gegard was not included on the Card when that event was announced on January 16, 2024.

55.    Safapour emailed PFL/Bellator the next day, on January 17, 2024, noting that although Gegard was disappointed to have been left off the Saudi Arabia card, Gegard and PFL/Bellator needed to have a discussion about the plan for 2024, while proposing a range of options for Gegard to fight, including fighting at 185 pounds or even being willing to come up to 205 pounds to fight Derek Brunson in the PFL $1 Million 205 pound weight class tournament. (A true and correct copy of Safapour's emails with PFL/Bellator is attached hereto as **Exhibit "B"**.)

56.    Safapour concluded by again requesting that PFL/Bellator advise "when can we please chat to make a plan for Gegard in 2024." (*See* Ex. B.)

57.    Unfortunately, Safapour received no response to this request.

58.    Safapour then emailed PFL/Bellator again on January 23, 2024, noting that Ray Cooper ("**Cooper**") was scheduled to fight on the Saudi Arabia card. Gegard had been told that Cooper was not an option for that card, even though a match between Gegard and Cooper would have been highly compelling. (*See Id.*)

59.    Yet, Gegard was left off the Saudi Arabia card, while Cooper was included. Safapour concluded the email with a further request that "hopefully, we can have some promising strategy for 2024 for Gegard" while referencing that he and Kogan were supposed to speak the next day after the presser. (*See Id.*)

60.     In return, Kogan tersely replied (incorrectly) that most of what Safapour was saying was "unapplicable" and that "we will connect tomorrow after the presser." (*See Id.*)

61.     Safapour, in turn, replied stating that he was "happy to chat tomorrow" but that he was "concerned that there is a lack of motivation to activate Gegard that will damage his brand and his ability to make a contribution to the PFL platform" and that "all we want is to be good partners to PFL and to create a path forward to help build the brand. It is not easy to do that if we get marinated into obscurity." (*See Id.*)

62.     Despite promising to speak with Safapour, Kogan did not call or meet with Safapour that next day.

63.     PFL/Bellator still provided no plan for Gegard, no Bouts for Gegard, and no response in general to Safapour's inquiries.

64.     Safapour followed up by email on February 20, 2024, again asking that PFL/Bellator "discuss and formulate a meaningful strategy for Gegard for 2024". He further noted that he had "suggested 4 different fight options since January 2024 for Gegard" but that, despite PFL/Bellator's contractual duty to promote, he received no discussion on any of those options. (*See Id.*)

65.     Safapour reiterated that:

> I have also asked numerous times both telephonically to Ray[6] and via email on this thread that we schedule a call so we can formulate a strategy for 2024 for Gegard. I also said that Gegard would make himself available for the call should you feel that would be helpful. That seems to have been rejected as no one has responded to that request. Mike Kogan has told me he will call me, but I have yet to have received a phone call from him on this matter and it has been ongoing since January.

(*See Id.*).

---

[6] Safapour is referring here to Ray Sefo, President of MMA promotions at PFL.

66.     Safapour further put PFL/Bellator on notice that:

He [Gegard] is not being allowed to fight actively, and from a consumer's perspective an impression is going to the market that every time he fights he is coming out of retirement. Which is not something we ever wanted.

The spirit of the deal between Bellator and Gegard was always for him to fight a minimum of 2-3 times a year. He has averaged 1 fight a year throughout his tenure at Bellator. Its very unfortunate, as these are the best years of Gegard's prime that are being wasted by inactivity. We were always promised that he would be more active. These are also the most important fights that will secure his livelihood for his retirement. Instead, and respectfully, we are being marinated into obscurity which can be fatal to Gegard's brand and his ability to bring value to your organization. Furthermore, Gegard has actively been training without any knowledge of when he will fight. I am afraid he will be susceptible to overtraining and getting injured. We need to understand what is happening so we can responsibly manage his training schedule and his finances. All of which have been in further disarray due to the uncertainty of this most recent merger.

At the end of the day, Gegard is one of the few legends left in the sport that is still fighting very competitively. PFL is a fighter first promotion, and Gegard wants to be a good partner and elevate the PFL/Bellator brands. If you can please advise us on what the plan is for 2024 we would greatly appreciate it as we need some structure to plan out the year for Gegard's finances and his training regimen.

(*See Id.*).

67.     In response, Davis made the following representations and promises: "We value all fighters, and never want anyone to not have information, so thanks for reaching out. We don't know what the previous company promised, and obviously there are new plans now. What I can say is we will always be transparent partner with you. Mike [Kogan], please call tomorrow and provide update on our plans and thinking." (*See Id.*).

68.     Safapour responded indicating he would be available the next day for a call, with Kogan stating in return: "Yessir. Will connect". (*See Id.*).

69.     Safapour and Kogan then spoke, with Safapour summarizing that call a few days later on February 23, 2024, in an email to Kogan and Davis, stating, "Mike assured me that the company is committed to finding a solution for Gegard, which we sincerely appreciate." (*See Id.*).

70.     Yet, despite these representations from the highest levels within PFL/Bellator, no meaningful conversation was engaged in and no plan for Gegard was proposed by PFL/Bellator.

71.     Safapour followed up on February 29, 2024, after learning that Patricio Freire was swiftly scheduled on short notice to fight on March 22, 2024, despite having suffered two consecutive losses prior to that bout, and reiterating that, as Gegard was facing up to a year or more without competing, he "kindly request[s] that Gegard be booked for an upcoming event in the coming months" and that "given the precedent set with Patricio's situation, I trust we can find a similar solution for Gegard, especially considering the length of time he has been sidelined." (*See Id.*).

72.     Safapour received no response.

73.     Safapour then followed up again on March 19, 2024, stating: "It has come to our attention that, due to the scheduling constraints imposed by the new partnership, Gegard may not have the opportunity to compete until September, following the Dublin event in June. This prolonged period of inactivity—nearly 1 ½ years since his last contest—poses significant risks to Gegard's legacy, his ability to adequately prepare for a fight, and his financial well-being. That is assuming he gets booked for September which there is no reason to believe will even happen." (*See Id.*).

74.     Safapour further reiterated that "Despite our attempts to address this matter, the responses received thus far have been inadequate. Last December, I personally brought attention to the seriousness of this issue to various senior members of the talent team which I received almost

no response. Thereafter, excuses have been provided for Gegard's forced inactivity, which only serve to exacerbate our concerns. Our suggestions for potential matchups, including fighters like Ray Cooper, were immediately dismissed because we were told Cooper was unavailable. However, a few short weeks after he was booked on the exact event we requested against another opponent." (*See Id.*).

75.     Considering Gegard's treatment, and the lack of engagement from PFL/Bellator, Safapour concluded the email by stating: "It is evident that there is a fundamental lack of intention and reckless disregard to honor the commitments made to Gegard. If this is indeed the case, I believe we are left with no choice but to explore the option of PFL buying out Gegard's contract. That is not what we wanted as we were enthusiastic and optimistic about the merger. However, I don't see any other choice if PFL refuses to perform. With that being said, if there remains a genuine desire to fulfill the terms of the agreement in good faith, then we must engage in a constructive dialogue on how Gegard will be utilized immediately for the 2024 calendar. I request that you provide clarity on the next steps by Monday, March 25, 2024. As always, I am available at your earliest convenience to discuss this matter further." (*See Id.*).

76.     Safapour received no response from PFL/Bellator. Safapour wrote a final written plea to PFL/Bellator on March 26, 2024 to attempt to resolve this situation, stating:

> I hope this email finds you well. Congratulations on your Belfast event. I was happy to see that Patricio[7] was able to fight on short notice, and have the opportunity to redeem himself and his legacy after two consecutive losses.
>
> We were hoping to receive a response from you and your team yesterday. Similar to the last few emails I have sent, we have received no communication or efforts to resolve this problem with Gegard and PFL despite how pressing this matter has become. With that being said, I listened to Don's interview with Ariel Helwani last

---

[7] Safapour is referring to Patricio Freire.

week in which he was promoting the upcoming Riyad PPV. He mentioned and promoted various inactive PFL fighters like Cyborg and Francis. Unfortunately, zero mention was made of Gegard being on that card despite there being no question that the budget could support having him on that event. It is disappointing to be in a situation where we have a promoter that either does not have a priority to promote us, or does not have an intention to book Gegard for a fight that has been owed for over a year now. My question is does PFL have an intention and a commitment to book Gegard on the Riyad PPV event? Please note, that even if he gets booked on that card and assuming it happens in September, that will be approximately 1 ½ years that Gegard has been marinated during a vital era of his career. Which is unacceptable. Every quarter that PFL refuses to perform is another critical portion of Gegard's career that is wasted that he can not get back.

Please also note that parties have been contacting us asking if we are retired. Which is insane as we have been ready, willing, and able to compete 2-3 times a year for the last 7 years. We have not responded up until this point as we have tried to gain clarity with what your intentions and plans are with Gegard. Which has been unsuccessful. As we are clearly not being promoted by our promoter, and false rumors are swirling in the market about Gegard to the detriment of his brand; we have no choice but to promote ourselves. We are in the process of scheduling various interviews with high profile journalists in our space to give an update on Gegard.

I hope we can find a resolution to this outstanding problem.

(*See Id.*).

77.    However, despite the repeated efforts of Gegard and Safapour, and despite Gegard being ready, willing, and able to fight, PFL/Bellator never responded to these requests and continued to warehouse Gegard, causing tremendous damage to Gegard's career.

78.    Receiving no direct responses from PFL/Bellator, and having not competed in 11 months, Gegard conducted an interview with a leading MMA blog *MMAJunkie* on April 16, 2024, stating, among other things, that:

I knew there would be the sale. After that, there was no communication. We tried to contact PFL to get more information about what's going on, what they want to do next. But it feels like they're ignoring us. I talked to Mike [Kogan]. He went from Bellator

to PFL. I told him, 'Give me information what you want to do with me.' They keep me on ice, let's say. They feel like I'm getting paid too much. They don't want to give me the fights. They owe me. But I know from other fighters that made the same, they fought already. There's no effort from them.

The problem is my manager tried to contact them and they don't even respond," Mousasi said. "There's no effort to promote or get me a fight. It's radio silence with them. People think I'm retired. They're trying to be No. 2 organization in the world, but I think at least what they can do is tell me what their plans are with me.

I know they owe me a fight. They have a contract with me. They want to maybe put pressure on me to take a pay cut. But why would I do that? I know they owe me fights. I know better, let's say that.

I know my rights with what's in the contract," Mousasi said. "I'm waiting for them to respond and give me a fight. This is my way to send a message to them at least, because it's difficult to get them on the phone. I have to go media. It's like UFC cutting fighters and they find out online. I have to communicate through media with them. It's crazy.

Every promotion has its own thing. UFC would give me every three, four months a fight, but they wouldn't pay me enough. Bellator, they paid me more, but I would fight a lot less. Now with PFL, they don't even give me a fight. This is the worst, I think. They don't even talk to you. It's like an ex-girlfriend or something.[8]

79.    Yet, despite even making this plea through the media, PFL/Bellator remained silent and took no actions to try to promote Gegard in a bout.

80.    In a final attempt to resolve this situation, Safapour met with Kogan and Eduardo Cunha Lima (PFL/Bellator's Senior Director of Fighter Relations) in Paris, France on or about May 17, 2024.

---

[8] https://mmajunkie.usatoday.com/2024/04/mma-news-gegard-mousasi-frustrated-radio-silence-pfl-feeling-pressured-take-pay-cut

81.    During the meeting, Kogan stated that PFL/Bellator are not giving any attention to Gegard and that Kogan even "hijacked" a talent call to discuss Gegard and try and force the issue with PFL but that nothing was resolved.

82.    Kogan even asked Safapour if he had spoken to other promoters to see if Gegard could fight elsewhere, and that if Safapour wanted to do it discreetly Kogan would not mind.

83.    Safapour reminded Kogan that Gegard was under exclusive contract with PFL/Bellator and that Safapour and Gegard had not spoken to any other promoters.

84.    Kogan then said there was no way to get any movement from PFL/Bellator, but that he did believe with certainty that he could get Gegard a full release from PFL/Bellator or that, if Gegard would take less money than what he was contractually entitled to, Kogan could potentially convince PFL/Bellator to give Gegard more priority on Bouts.

85.    Kogan then advised Safapour to get an attorney and draft a legal letter, as that might get PFL/Bellator more focused on Gegard's issues.

86.    Safapour responded that they really preferred to deal with things diplomatically and that they simply wanted the Bouts that were promised to Gegard.

87.    Later that day Safapour was with Gegard and they encountered Kogan on the second floor of the fighter hotel where the temporary offices for PFL/Bellator were located and where the fighter workout rooms were, and Kogan regurgitated everything he said in the morning meeting in front of Gegard, namely that Gegard was "too expensive," and that Gegard should retain an attorney to draft a demand letter to send to PFL/Bellator to get its attention so perhaps they might prioritize matters with Gegard.

88.     As such, PFL/Bellator's own representatives had now expressly stated that PFL/Bellator had no intention of honoring the Agreement and that, if anything, PFL/Bellator were repudiating the Agreement.

89.     Five (5) days after the Paris meeting, and after PFL/Bellator had repudiated the Agreement and directly told Gegard the only way he would elicit a response would be to hire a lawyer and threaten litigation, Gegard conducted an interview with the blog *MMAFighting* on May 22, 2024, accurately stating that PFL/Bellator were not being communicative, that they had no intention of promoting him in future Bouts, that he made too much money, and that his only recourse was legal action.

90.     PFL/Bellator purports to have then terminated the Agreement claiming that Gegard's statements violated the Agreement (the very Agreement PFL/Bellator had repudiated and never honored). A true and correct copy of the purported termination of the Agreement by PFL/Bellator is attached hereto as **Exhibit "C"**.

91.     Any purported notice of termination was ineffective as it was not sent in conformity with the notice provisions of the Agreement, which provisions require that for email notice, any such email notice must be confirmed (and is only effective upon the "successful sending of the **<u>confirmed</u>** facsimile or email …". [emphasis supplied]. The email purporting to terminate the Agreement PFL/Bellator sent was never confirmed.

92.     Gegard, through his counsel, sent PFL/Bellator a Notice and Demand on July 31, 2024, demanding, among other things, that pursuant to Section 16(F) of the Agreement, PFL/Bellator cure its breaches of the Agreement.

93.     PFL/Bellator's response failed to cure its breaches of the Agreement, and Gegard, through his counsel, expressly informed PFL/Bellator by email on August 14, 2024 that PFL/Bellator's response failed to cure its breaches.

94.     To date, neither Gegard, nor Safapour, nor Gegard's counsel, has received any further offer to cure PFL/Bellator's breaches.

## V.     ALLEGATIONS COMMON TO THE SHERMAN ACT CLAIM

95.     As used herein:

a.      "**Bout**" means a sanctioned, supervised unarmed MMA contest between two individuals where competitors utilize a combination of martial arts disciplines to attempt to defeat their opponent within a regulated arena or ring, adhering to a specific set of rules and regulations established by relevant athletic commissions.

b.      "**Card**" means the identification of all of the Bouts that occur during a single MMA event. The Card typically consists of the Main Card and the Undercard.

c.      "**Main Card**" consists of Bouts between higher-profile and more established Professional MMA Fighters and are featured on the main broadcast of the event, ending with a main event featured bout, and frequently, a co-main event featured bout.

d.      "**Undercard**" consists of preliminary Bouts that occur before the Main Card of a particular Card and are typically not included on the main broadcast of the event. Typically, promoters intend the Undercard to provide fans with an opportunity to see up-and-coming and/or local Professional MMA fighters or fighters who are not as well-known, popular, or accomplished as their counterparts on the Main Card.

e.      "**Elite Professional MMA Fighter**" means any Professional MMA Fighter who has demonstrated success through competition in local and/or regional MMA promotions, or who has developed significant public notoriety amongst MMA Industry media and the consuming audience through demonstrated success in athletic competition who can command a guaranteed purse of at least $100,000.00 per Bout.

f.      "**Bellator/PFL Fighter**" means a person who is paid by PFL/Bellator for participating in one or more professional MMA Bouts promoted by PFL/Bellator and/or whose NIL was acquired for use and/or used in Promoter Licensed Merchandise and/or Promoter Promotional Materials.

g.      "**Bellator/PFL Licensed Merchandise**" means all apparel, footwear, hats, photographs, souvenirs, toys, collectibles, trading cards, and any and all other similar type products, including the sleeves, jackets and packaging for such products, that is (i) approved by

PFL/Bellator, (ii) contains the trademarks, trade names, logos and other intellectual property owned or licensed by PFL/Bellator, including without limitation, the licensed marks, and (iii) not created, used or sold in connection with the promotion of any Bouts, Pre-Bout Events or Post-Bout Events.

h.    "**MMA**" means a competitive individual sport in which competitors use interdisciplinary forms of martial arts that include, e.g., jiu-jitsu, judo, karate, boxing, kickboxing, taekwondo, and/or wrestling to their strategic and tactical advantage in a supervised match. Scoring in live professional MMA Bouts is based on state athletic commission-approved definitions and rules for striking (blows with the hand, feet, knees or elbows) and grappling (submission holds, chokeholds, throws or takedowns).

i.    "**MMA Industry**" means the business of promoting live MMA Bouts and may also include the promotion of Pay-Per-View MMA events to generate Pay-Per-View revenues and ticket sales as well as ancillary activities such as: the sale of live and taped television programming, video-on-demand, merchandise (videos, DVDs, video games, apparel, hats, sporting equipment, etc.), event and fighter sponsorships, and the collection of MMA-related copyright and trademark royalties.

j.    "**MMA Promoter**" or "**MMA Promotion**" means a person or entity that arranges professional live MMA Bouts for profit.

k.    "**NIL**" of a Bellator/PFL Fighter means the name, professional name (e.g. sobriquet), image, likeness, voice, persona, signature, and/or biographical information of a Bellator/PFL Fighter.

l.    "**Pay-Per-View**" or "**PPV**" means a type of pay television or broadcast service by which a subscriber of an Internet or television service provider can purchase events to view live via private telecast or Internet broadcast. The events are typically purchased live, but can also be purchased for several weeks after an event first airs. Events can be purchased using an on-screen guide, an automated telephone system, on the Internet or through a live customer service representative.

m.    "**Professional MMA**" or "**Professional MMA Fighter**" means a person who is compensated as a combatant in a Mixed Martial Arts bout.

n.    "**Relevant Input Market**" means the market for live Elite Professional MMA Fighter Services.

## Overview of the MMA Industry

95.    The popularity of MMA as a combat sport surged in the 1990s, making Professional

MMA one of the fastest-growing spectator sports in the U.S. and North America.

96.    Elite Professional MMA Fighters, among the world's most respected athletes, are world-class and Olympic-caliber competitors who excel in multiple martial arts disciplines—such as wrestling, judo, jiu-jitsu, Muay Thai, taekwondo, karate, and boxing—in one-on-one Bouts. They typically achieve elite status after years of success in local or regional MMA promotions.

97.    Unlike many organized sports, MMA Promotions are not structured into leagues or teams. Professional MMA Fighters usually compete against others under contract with the same promoter, with events featuring seven to twelve Bouts organized by weight class on a Card. The Card's strength—driven by the notoriety of its fighters—determines ticket sales, broadcast viewership, merchandise revenue, and sponsorship rates.

## The Relevant Input Market

95.    The Relevant Input Market is the market for live Elite Professional MMA Fighter Services. Elite Professional MMA Fighters train for years in multiple martial arts disciplines—wrestling, judo, jiu-jitsu, Muay Thai, karate, taekwondo, and boxing—to compete in sanctioned Bouts under athletic commission rules.

96.    PFL/Bellator has monopsony power in the Relevant Input Market.

97.    PFL/Bellator's own press release demonstrates the power PFL/Bellator has over the Relevant Input Market describing itself as the "industry co-leader" with UFC with a fighter roster that is "equal in stature to UFC."[9]

---

[9] https://pflmma.com/news/professional-fighters-league-acquires-bellator-in-industry-transformative-deal



98.     As PFL/Bellator well knows, post-Merger, there are only two realistic options for fighters that want to compete in elite-level MMA – either with PFL/Bellator, or UFC. Despite their "fighter first" rhetoric, PFL/Bellator has used its new market position instead to relentlessly depress fighter wages, ruthlessly wielding their monopsony power.

99.     Elite Professional MMA Fighters are elite athletes who typically train for years before competing professionally. In live professional MMA Bouts, mixed martial artists compete by using multiple disciplines of martial arts, including wrestling, judo, jiu-jitsu, Muay Thai, karate, taekwondo and boxing. Such Bouts are registered with, sanctioned by and conducted according to rules promulgated by the Athletic Commission (or equivalent thereof) for the jurisdiction in which the bout is held.

100.     Elite Professional MMA Fighters are typically compensated for participating as a combatant in a live Elite Professional MMA bout.

101.    No other sports are reasonable substitutes. Athletes in boxing or single-discipline martial arts (e.g., judo, karate) lack the cross-disciplinary skills required for MMA. Alternative martial arts like judo or Brazilian Jiu-Jitsu offer limited, mostly amateur competitions with nominal or no pay, while boxing demands specialized striking training distinct from MMA's broader focus. Professional wrestling, reliant on acting rather than athletic competition, is not a viable alternative.

102.    Other martial arts disciplines do not have the audiences necessary for the fighters to earn competitive wages or even generally to be paid at all. For this and other reasons, no material number of Elite Professional MMA Fighters could successfully transition to other sports sufficient to prevent a monopsonist in the market for Elite Professional MMA Fighter services from artificially suppressing Elite Professional MMA Fighter compensation by even a significant amount for a substantial period of time.

103.    For instance, with respect to judo, judo tournaments occur infrequently, and the major ones (World Championships, Olympics) are for "amateur" fighters, that is, unpaid athletes. Brazilian Jiu Jitsu ("**BJJ**") is a popular amateur sport, but there are very few tournaments that offer more than nominal prizes (as opposed to awarding salaries or prize money to competitors) and even those occur rarely. Karate and Muay Thai, much like BJJ and judo, are mainly amateur disciplines. Muay Thai and kickboxing are striking disciplines that do not employ any of the grappling techniques of MMA of and in which knowledge and proficiency is required to successfully compete. None of these sports would be plausible alternatives for Elite Professional MMA Fighters who are facing artificial suppression of their compensation by a monopsonist in the market for Elite Professional MMA Fighter services.

104.    Neither boxing nor "professional" WWE wrestling provides reasonable alternatives for Elite Professional MMA Fighters. Professional boxing requires years of intensive, specialized and limited training in a striking art that MMA Fighters do not undergo. While Elite Professional MMA Fighters do train in boxing, that is but one of many martial arts disciplines Elite Professional MMA Fighters must practice, and it is not (and, indeed, cannot) be their sole focus. As a result, no material number of Elite Professional MMA Fighters could successfully transition to boxing sufficient to prevent a monopsonist in the market for Elite Professional MMA Fighter services from artificially suppressing Elite Professional MMA Fighter compensation below competitive levels by even a significant degree for a substantial period of time.

105.    Although professional wrestling does pay compensation to its "wrestlers," professional wrestling events are staged, and depend predominantly on acting ability. It is extremely unusual for an athlete to possess the right combination of skills to excel in both MMA and professional wrestling, and furthermore, professional wrestling is not a sport at all requiring competition between athletes. For this reason alone, professional wrestling is not a reasonable substitute for MMA. No material number of Elite Professional MMA Fighters could successfully transition to professional wrestling sufficient to prevent a monopsonist in the market for Elite Professional MMA Fighter services from artificially suppressing MMA Fighter compensation by even a significant degree for a substantial period of time.

106.    Because other sports are not plausible alternatives for Elite Professional MMA Fighters, reducing the compensation of Elite Professional MMA Fighters below competitive levels by even a significant degree for a substantial period of time will not cause sufficient numbers of Elite Professional MMA Fighters to switch to other sports or professions to make the Elite Professional MMA Fighter compensation suppression unprofitable. Quite simply, MMA is a

highly specialized and unique sport engaged in by elite athletes with years of cross-disciplinary training. They have nowhere else to deploy their highly-specialized skills.

107. Consequently, suppressing compensation below competitive levels will not drive Elite Professional MMA Fighters to other sports in sufficient numbers to deter a monopsonist, as their unique, multidisciplinary skills are not interchangeable elsewhere.

## The Relevant Geographic Market

108. The relevant geographic market for the Relevant Input Market is the United States, the U.K., the European Union, Saudi Arabia and the United Arab Emirates (the "**Relevant Geographic Market**").

109. The Relevant Geographic Market is dominated by the UFC and PFL/Bellator, with very few realistic options for Elite Professional MMA fighters aside from those two MMA Promoters as no other MMS Promoters have any reach across the entire Relevant Geographic Market.

110. The UFC is the largest MMA Promoter in the Relevant Geographic Market, with PFL/Bellator second.

111. UFC and PFL/Bellator control the United States market for Elite MMA Fighters. There is a start-up MMA Promoter "Global Fight League" that is emerging, but that MMA Promoter has not yet promoted a single fight, and accordingly have zero market share at present.

112. In the United Kingdom, the UFC is the largest MMA Promoter, with PFL/Bellator second, with no other known promoters of Elite MMA Fighters (again meaning fighters who earn a guaranteed purpose of over $100,000 a fighter).

113. In the European Union, the UFC is the largest MMA Promoter, with PFL/Bellator second. There two regional promotions in the European Union, KSW (Konfrontacja Sztuk Walki)

and Oktagon promotions, but they only have a handful of Elite MMA Fighters and no reach across

the entire Relevant Geographic Market, with KWS focused on Poland and Oktagon focused on the

Czech Republic and Slovakia.

114.    Regarding the Gulf States of Saudi Arabia and the United Arab Emirates, these

markets are also dominated by UFC (largest) PFL/Bellator (second largest). Neither Saudi Arabia

nor the UAE have homegrown MMA Promoters that promote across the Relevant Geographic

Region or that have Elite MMA Fighters under contract.

115.    Accordingly, in the Relevant Geographic Market, there are only two options for

Elite Professional MMA fighters, the UFC or PFL/Bellator.

116.    Regarding opportunities outside of the Relevant Geographic Market, the only truly

viable market for Elite MMA fighters is the Asian market as the South American and African

MMA markets are largely underdeveloped.

117.    In the Asian market, there are two larger promoters, ONE Championship and

RIZIN.

118.    However, ONE Champtionship has largely deviated from MMA, choosing to focus

on Muay Thai and other disciplines, with a focus on Bangkok, Thailand in particular as a base of

fights and operations. Plaintiff is not a Muay Thai fighter, but is an Elite MMA Fighter, who is not

based in Thailand or Asia at all, and ONE Championship is not an option for him.

119.    As for RIZIN, it is focused almost entirely on Japan and its only Elite MMA

Fighters are Japanese. As a promotion almost entirely dedicated to the Japanese market featuring

Japanese fighters, RIZIN is not an option for Plaintiff who is not of Japanese descent.

120.    Moreover, competing outside of the Relevant Geographic Market imposes

substantial costs on Elite Professional MMA Fighters, including higher costs of training, travel,

and lodging and reduced sponsorship income. Moreover, Elite Professional MMA Fighters may have difficulty, or face significant costs associated with, obtaining necessary visas and approvals for themselves, family members, sparring partners, or trainers needed for fighting outside of the Relevant Geographic Market.

121.    Moreover, any of the other MMA promotion companies that promote outside of the Relevant Geographic Market (*e.g.*, that promote in Asia, Africa, Oceania, or Latin America) not mentioned above focus on regional or local fighters, frequently holding only a few events per year while paying substantially less than $100,000 per Bout. Further, these MMA Promoters lack the prestige of PFL/Bellator, and Elite MMA Fighters would not view these MMA Promoters as interchangeable with PFL/Bellator.

122.    As such, even if Plaintiff wanted to go outside of the Relevant Geographic Market he does not have the realistic option of fighting for ONE Championship or RIZIN as an Elite MMA Fighter, or any other local or smaller promoters across the World.

123.    As a result, an Elite Professional MMA Fighter could not practically turn to an MMA Promotion company that is focused on Bouts outside of the Relevant Geographic Market to earn a living or competitive compensation as an Elite Professional MMA Fighter.

124.    Accordingly, for Elite Professional MMA Fighters in the Relevant Geographic Market participation in MMA Bouts outside of the Relevant Geographic Market is not a reasonable substitute for Bouts in the Relevant Geographic Market.

125.    As such, a monopsonist in the Relevant Input Market would only need to control fighter services in the Relevant Geographic Market to be able to suppress Elite Professional MMA Fighter compensation substantially below competitive levels.

126.     Moreover, PFL/Bellator, by luring Elite Professional MMA Fighters from all over the World to fight exclusively for PFL/Bellator, deprive promoters of Elite Professional MMA Fighters outside of the Relevant Geographic Market of Elite Professional MMA Fighters.

127.     Accordingly, no significant number of Elite Professional MMA Fighters can earn competitive compensation for appearing in live Elite Professional MMA events outside of the Relevant Geographic Market.

128.     Successful foreign fighters participate in Elite Professional MMA Bouts for PFL/Bellator. But, to the extent PFL/Bellator are a net importer of foreign labor, this fact would serve to enhance its monopsony power and bargaining power vis-à-vis Elite Professional MMA Fighters as a whole.

129.     In sum, in the Relevant Geographic Market, Plaintiff has only two choices, PFL/Bellator or UFC.

130.     However, due to PFL/Bellator exclusive contract practices including in owning his NIL in perpetuity, he is effectively barred from UFC as well, leaving PFL/Bellator as a true monopsonist over his services and wages. This enhances enhancing PFL/Bellator's monopsony power or, alternatively, its dominance in a duopsony with UFC.

### The Relevant Market Share

131.     Within the Relevant Input Market, PFL/Bellator control a significant share.

132.     Post-merger, PFL/Bellator has approximately 200 fighters, with around 30 Elite MMA Fighters earning at or above $100,000.00 in guaranteed money per Bout.

133.     UFC has about 700 fighters, with around 140 Elite MMA Fighters earning at or above $100,000.00 in guaranteed money per Bout. Other promoters within the Relevant

Geographic Market, such as KSW and Oktagon, collectively employ only a handful of Elite MMA Fighters.

134.    RIZIN and ONE Championship, are outside of the Relevant Geographic Market, with RIZIN essentially limiting its Elite MMA Fighters only to Japanese fighters.

135.    Accordingly, across the Relevant Geographic Market there are a total of 170 Elite MMA Fighters.

136.    There are no other United States Based MMA Promotion Companies that promote any Elite MMA Fighters within the Relevant Geographic Market other than UFC and PFL/Bellator.

137.    As such, post-Merger, within the Relevant Geographic Market, PFL/Bellator control approximately 20% of the Elite MMA Fighters and UFC controls 80% of the Elite MMA Fighters, collectively dominating 100% of the Relevant Input Market in the Relevant Geographic Market. As such, and alternatively, even if PFL/Bellator's 20% market share does not confer full monopsony power, its duopsony with UFC (100% combined share) violates Sherman Act Section 2.

138.    Significant barriers prevent new promotions from entering the market, including the difficulty of securing top talent, broadcast deals, and sponsorships.

139.    For instance, new entrants like the Global Fight League require $150M–$300M to launch a season but struggle to raise capital due to the entrenched positions of PFL/Bellator and UFC, further solidifying their control over fighter compensation and opportunities.

140.    Indeed, Global Fight League has yet to promote a single fight.

141. The November 2023 Merger between PFL and Bellator significantly intensified the anticompetitive environment by reducing the possible options for Elite MMA Fighters from three competing promotions to just two.

142. This deliberate reduction in labor choice for Elite MMA Fighters, along with the sidelining of high-profile talent, demonstrates the Merger's anticompetitive impact on the market and on Plaintiff specifically.

143. This highly limited market for Elite MMA Fighter Services gives PFL/Bellator substantial market power and allows PFL/Bellator to act as a monopsonist in the Relevant Geographic Market, limiting competitive alternatives for Elite MMA Fighters like Plaintiff, or alternatively, when viewed in conjunction with the UFC, forms a duopsony also limiting competitive alternatives for Elite MMA Fighters like Plaintiff.

144. In this concentrated market, PFL/Bellator can independently set lower wages, exploiting its position as a dominant buyer, whether as a monopsonist or, alternatively, as part of a duopsony with UFC.

145. In this concentrated market, PFL/Bellator and UFC can independently set lower wages, knowing fighters have no other options in the Relevant Geographic Market.

146. Plaintiff, for example, was pressured to accept reduced pay under threat of continued inactivity, a tactic made possible by PFL/Bellator's monopsony or, alternatively, because of PFL/Bellator's duopsony with UFC.

147. As such, pay for Elite MMA Fighters in the Relevant Geographic Market is notably lower than in more competitive sports labor markets, where athletes typically earn much higher guaranteed salaries and a higher share of revenue.

148.    The concentrated market structure, whether characterized as a monopsony, or alternatively as PFL/Bellator's monopsony operating in a duopsony with UFC, has reduced the number of opportunities for Elite MMA Fighters.

149.    When fighters cannot fight, they lose their marketability, allowing PFL/Bellator to depress wages even further.

150.    The Merger has curtailed opportunities for Elite MMA Fighters to compete, enhancing the PFL/Bellator's monopsony power by limiting viable alternatives outside of the PFL/Bellator and UFC.

151.    Post-Merger, PFL/Bellator has further entrenched this reduction in competition. According to "Have Fighter Complaints Overshadowed 2024 PFL Championship Event?" published by MMA Junkie on November 26, 2024, the 2024 PFL Championship was marred by widespread fighter dissatisfaction, with the article noting that "a trio of current Bellator champions in Patricio Freire, Corey Anderson and Patchy Mix have come out with grievances against the company surrounding a lack of fights."[10]

152.    This Merger enabled PFL/Bellator to dictate terms to fighters, leveraging its enhanced market power.

153.    Further, UFC, as alleged in *Le v. Zuffa*, similarly restricts competition as a monopsony, leaving fighters with no good competitive options. (*See Le v. Zuffa, LLC,* 2023 WL 5085064, at *48 (D. Nev. Aug. 9, 2023).

///

///

---

[10] https://mmajunkie.usatoday.com/2024/11/pfl-video-bellator-champions-complain-reaction-analysis

**PFL/Bellator Has Monopsony Power
with Respect to Elite Professional MMA Fighter Services**

154.    At all times relevant, PFL/Bellator has and continues to have monopsony power in the Relevant Input Market, *i.e.*, the market for Elite Professional MMA Fighter services, whether that market includes only the Relevant Geographic Market or, alternatively, the entire world.

155.    The market for elite MMA fighter services is highly concentrated.

156.    Along with the UFC, PFL/Bellator controls the vast majority of the market for Elite Professional MMA Fighter services in the Relevant Geographic Market.

157.    PFL/Bellator thereby possesses the ability to reduce the demand of, and compensation for, Elite Professional MMA Fighter services without losing so much revenue as to make its conduct unprofitable.

158.    The only alternative MMA Promoter at the level of PFL/Bellator is the UFC, and the UFC appears to engage in the same monopsony practices complained of here (see *Le v. Zuffa, LLC*, 2023 WL 5085064, at *48 (D. Nev. Aug. 9, 2023), and is therefore not a solution to the problems faced by the Bellator/PFL Elite MMA Fighters.

159.    In addition, as more specifically outlined below, the Bellator/PFL Elite MMA Fighters are subject to exclusivity and so-called "matching clauses" restricting their ability to move to the UFC even if it did present a better alternative.

160.    As a result of PFL/Bellator's monopsony power in the Relevant Input Market, Elite Professional MMA Fighters therefore do not have the ability to turn to MMA Promoters other than PFL/Bellator or the UFC to earn competitive compensation in response to PFL/Bellator's artificial suppression of demand and compensation for Elite Professional MMA Fighter services.

161.    PFL/Bellator's control of the Relevant Input Market affords it the ability to, *inter alia*, (i) compensate Elite Professional MMA Fighters below competitive levels profitably for a

substantial period of time, (ii) artificially suppress demand for Elite Professional MMA Fighter services below competitive levels, (iii) require Bellator/PFL Fighters to enter into restrictive contracts, (iv) impair or preclude Bellator/PFL Fighters from engaging in their profession or working with would-be rival promoters; (v) expropriate the rights to Bellator/PFL Fighters NIL in perpetuity for little or no compensation (which is below competitive levels), and (vi) expropriate the NIL and deprive Bellator/PFL Fighters of competitive levels of payment for the exploitation of their NIL in Bellator/PFL Licensed Merchandise and/or Promotional Materials licensed or sold by PFL/Bellator or their licensees.

162.    PFL/Bellator has systematically warehoused elite fighters, including Plaintiff Gegard Mousasi, by signing them to exclusive contracts while failing to schedule them for fights. These diminished opportunities, reflect PFL/Bellator's monopsony power, or alternatively its duopsony role with UFC, to artificially restrict competition, suppress wages, and harm fighters' marketability market-wide, not merely Plaintiff's contract.

163.    Prominent fighters such as Patricio "Pitbull" Freire, Corey Anderson, and Patchy Mix have been sidelined despite their readiness to compete. In the article "Patricio Pitbull Asks For Bellator Release Due to Inactivity: 'They Know They Are In The Wrong'", Patricio Freire, a veteran Bellator champion, stated, "I need to stay active. We know I'm not getting any younger," yet he has faced prolonged inactivity.[11] This warehousing deprives fighters of earning opportunities and diminishes their market visibility, reinforcing PFL/Bellator's control over the fighter market.

---

[11] https://www.mmafighting.com/2024/12/4/24313296/patricio-pitbull-asks-bellator-release-inactivity-they-know-wrong-ufc

164.    Plaintiff Gegard Mousasi has been directly impacted by this warehousing practice. Despite his status as a two-time Bellator champion and one of the promotion's most accomplished fighters, Plaintiff's fight frequency dropped to once per year post-merger, far below the industry standard of two to three bouts annually.

165.    Whether the relevant market is the Relevant Geographic Market only, or the entire World, PFL/Bellator are capable of artificially reducing compensation—and have in fact artificially reduced compensation—of Elite Professional MMA Fighters without causing so many Elite Professional MMA Fighters to switch to other sports or professions so as to make that compensation reduction unprofitable.

166.    Barriers to entry in the Relevant Input Market are high. To become an Elite Professional MMA Fighter, one needs to be highly skilled and spend many years under specialized training in multiple martial arts disciplines. Because MMA is a unique blend of various martial arts disciplines, including boxing, Muay Thai (kick-boxing), judo, wrestling, BJJ, taekwondo and karate, a high level of proficiency in any one discipline alone is not sufficient to achieve elite level status as an Elite Professional MMA Fighter. For example, while a professional boxer may possess the mental and athletic skill to box and take blows in the form of punches, if he does not possess expert ability to grapple, wrestle or engage in other martial arts, he will not succeed as an Elite Professional MMA Fighter. Elite Professional MMA Fighters are rare multidisciplinary athletes who can perform at very high levels in more than one discipline. Also, training is costly and time consuming. PFL/Bellator exploits this scarcity thus foreclosing competition in the Relevant Input Market, whether as a standalone monopsonist or within a duopsony with UFC.

167.    To achieve elite status, Professional MMA Fighters train daily, making alternative simultaneous full-time employment nearly impossible. Training also requires the services of

professional trainers and the relevant space and training equipment. To rise to the level of a fighter capable of being promoted by PFL/Bellator, i.e., an Elite Professional MMA Fighter, a Professional MMA Fighter typically needs to work his or her way up the ranks in local and regional promotions, often earning very little money in the process.

**Use of Onerous and Exclusionary Contractual Terms for Anticompetitive Goals**

168.    As more fully set forth below, due to the anticompetitive scheme alleged herein, PFL/Bellator has been able to suppress Elite Professional MMA Fighters' compensation to a very low percentage of the revenues generated from Bouts.

169.    Athletes in sports such as boxing and the "Big 4," i.e., football, baseball, basketball and hockey in the United States, generally earn more than 50% of league revenue, which is, upon information and belief, a significantly higher percentage of revenues than those paid to Bellator/PFL Fighters.

170.    PFL/Bellator has illegally acquired, maintained, and exercised monopsony power in the market for Elite Professional MMA Fighter services, i.e., the Relevant Input Market, through an aggressive series of exclusionary and anticompetitive acts. The anticompetitive effects associated with this ill-gotten monopsony power manifest themselves as artificially suppressed compensation for Elite Professional MMA Fighters and the improper expropriation of Elite Professional MMA Fighters' NIL resulting in artificial underpayments (including non-payment) to Bellator/PFL Fighters.

171.    PFL/Bellator has illegally obtained and maintained its monopsony position in the Relevant Input Market (i.e., the market for Elite Professional MMA Fighter services), through an anticompetitive scheme to exclude and impair actual or potential rival MMA Promoters such that they do not have access to the Elite Professional MMA Fighters necessary to sustain and grow a

profitable rival promotion company. As a result, Elite Professional MMA Fighters have no effective alternative promoter with whom to contract for live Elite Professional MMA Bouts.

172.    PFL/Bellator's illegal monopsony position is sustained, in part, through the use of exclusive dealing agreements with Bellator/PFL Fighters that lock in Elite Professional MMA Fighter services perpetually and exclusively for PFL/Bellator. PFL/Bellator's exclusive contracts foreclose would-be rival promoters from vital inputs—namely Elite Professional MMA Fighter services with the notoriety needed to sustain a successful live Elite Professional MMA promotion.

173.    Through the anticompetitive scheme alleged herein, PFL/Bellator has garnered and maintained unrivaled bargaining power vis-à-vis Elite Professional MMA Fighters. PFL/Bellator uses its monopsony power to extract exclusionary and restrictive concessions from all of its MMA Fighters.

174.    All Bellator/PFL Fighters are classified as independent contractors that are compensated based on the number of fights in which they participate. But PFL/Bellator uses standard form agreements with all or nearly all of the Bellator/PFL Fighters that require, inter alia, exclusivity and assignments of the rights to Fighters' Identities. Given that, through the alleged scheme, PFL/Bellator dominates the Relevant Output Market, i.e., the market for promoting live Elite Professional MMA events, Elite Professional MMA Fighters have little choice but to accept PFL/Bellator's exclusionary terms if they want to try to earn a living as Elite Professional MMA Fighters.

175.    PFL/Bellator's Agreement with Gegard, and upon information and belief, with all the Bellator/PFL Fighters, contains, at least the following restrictive provisions:

a.    The "**Exclusivity Clause**" which binds Bellator/PFL Fighters into a restricted relationship with PFL/Bellator and prohibits them from appearing in Bouts

televised or organized by actual or potential competing or rival MMA Promotions unless approved by PFL/Bellator, thus preventing Bellator/PFL Fighters from receiving competitive purses from co-promoted or competitor MMA events. This clause blocks actual or potential competing or rival MMA Promoters from having access to Elite Professional MMA Fighters under contract with PFL/Bellator for protracted periods of time.

b.      The "**Champion's Clause**" which, if the Bellator/PFL Fighter is the current champion of any weight class at the end of the initial contract term, allows PFL/Bellator to extend the Bellator/PFL Fighter's contract for at least an additional year, preventing the Bellator/PFL Fighter from financially benefiting from his or her "championship" status by soliciting competing bids from other MMA Promoters even after the end of his or her original contract term with PFL/Bellator. This clause specifically blocks actual or potential competing or rival MMA Promoters from having access to Elite Professional MMA Fighters, which are needed for actual or potential competing or rival MMA Promoters to hold events that would be commercially successful. This clause also denies Bellator/PFL Fighters free agency—despite their allegedly being independent contractors.

c.      The "**Right to First Offer**" and "**Right to Match**" clauses which grant PFL/Bellator the option to match the financial terms and conditions of any offer made to a Bellator/PFL Fighter during the term of their existing contract by any other MMA Promoter(s). Because PFL/Bellator's contracts typically require fighters to assign the Bellator/PFL Fighter's name, image, likeness, voice, persona, and other identifying information ("**NIL**") exclusively to PFL/Bellator in

perpetuity, any offers from actual or potential competing or rival MMA Promoters would likely be less attractive since they wouldn't include compensation for the Bellator/PFL Fighter's NIL rights, thus artificially suppressing competition and potentially forcing actual or potential competing or rival MMA Promoters to make significantly higher bids to secure the Bellator/PFL Fighter.

d.      The "**Ancillary Rights Clause**" which grants PFL/Bellator exclusive and perpetual worldwide rights to the Bellator/PFL Fighter's NIL, as well as the NIL of all "persons associated or affiliated with the Fighter [the Bellator/PFL Fighter] such as Fighter's trainers, corners, seconds, or assistants". These "Ancillary Rights" extend to any medium, including merchandising, video games, and broadcasts, for all commercial purposes, in perpetuity. This prevents the Bellator/PFL Fighter from profiting from their established reputation and restricts their post-contract career opportunities.

e.      The "**IP Clause**" which prohibits the PFL/Bellator Fighter from using any of PFL/Bellator's names, marks, logos, pictures, or even the championship belt(s) from PFL/Bellator, which thereby restricts the Bellator/PFL Fighter from referring to themselves as a "Bellator or PFL fighter" and from promoting their championship history with PFL/Bellator, without PFL/Bellator's express written permission. This restricts the Bellator/PFL Fighters' ability to promote themselves and limits the appeal to any actual or potential competing or rival MMA Promoters of contracting with the Bellator/PFL Fighter. As a result, actual or potential competing or rival MMA Promoters might be at a disadvantage when trying to contract with former Bellator/PFL Fighters or simply not want to, including former

champions, since those Bellator/PFL Fighters are restricted from promoting their championship history with PFL/Bellator.

f.    The "**Promotion Clause**" which obligates Bellator/PFL Fighters to participate in promotional activities for Bouts in which they are scheduled to fight, including but not limited to, participating in press conferences, interviews, appearances, media shoots, and other sponsorship and promotional activities (any of which may be telecast, broadcast, recorded and/or filmed) and also requires cooperation with PFL/Bellator's promotional efforts for any other Bouts, events, and broadcasts as reasonably required by PFL/Bellator. By contrast, **according to PFL/Bellator**, no affirmative obligation exists for PFL/Bellator to promote the Bellator/PFL Fighter and PFL/Bellator regularly punishes athletes who do not bow to their whims by warehousing them.

g.    The "**Retirement Clause**" which gives PFL/Bellator the power to "suspend the Term for the full and entire period of such retirement, regardless of its length" thereby effectively extending the Term of the agreements into perpetuity.

h.    Tolling provisions, which extend the term of the Bellator/PFL Fighter's contract during periods when he or she is injured, retired, or otherwise declines to compete, thus virtually prohibiting even disgruntled athletes from sitting out the term and signing with actual or potential competing or rival MMA Promoters. Gegard's Agreement provides that: "Should any Bout be postponed or unable to be scheduled due to retirement, incarceration, loss of travel authorization or inability to obtain same, suspension by a Commission, positive drug test, unwillingness to compete, or any other similar reason, of Fighter, the obligation of the Promoter relating to

the Bouts, timing of the Bouts, required offers of Bouts and the Term of this Agreement shall, upon written notice from the Promoter to Fighter, be extended by the period of time necessary to reschedule and hold the postponed Bout (if a Bout was scheduled) or, if no bout was scheduled, the time necessary for Fighter to be able to participate in a bout to be thereafter scheduled and held."

i.  The "**Sponsorship and Endorsement Clause**" which grants PFL/Bellator sole discretion over all sponsorship and endorsement approvals. In effect, the Sponsorship and Endorsement Clause requires the approval of PFL/Bellator before an entity can contract with a Bellator/PFL Fighter to sponsor or endorse the entity's product or service during any PFL/Bellator's events. This gives PFL/Bellator control over sponsors and Fighters and allows PFL/Bellator to block opportunities for sponsors where: (i) PFL/Bellator has decided to boycott the sponsor in retaliation for the sponsor having endorsed non-Bellator/PFL Fighters or otherwise worked with actual or potential rival MMA Promoters; (ii) the sponsors have refused to pay PFL/Bellator a fee for the right to sponsor a Bellator/PFL Fighter; or (iii) the sponsors are engaged in ancillary business endeavors that compete with PFL/Bellator in any segment of the MMA Industry that PFL/Bellator intends to dominate, such as, e.g., MMA publications, MMA video games, gyms, online MMA stores, energy drinks, online gaming sites, fan festivals and apparel providers. This clause gives substantial power to PFL/Bellator to block sponsors from working with actual or potential competing or rival MMA Promoters and to deprive them of key revenue opportunities for themselves and their fighters, making

actual or potential competing or rival MMA Promoters less profitable and a less attractive option for Elite Professional MMA Fighters.

176.    All of PFL/Bellator's contracts with Bellator/PFL Fighters—and the exclusionary provisions therein—taken together form part of PFL/Bellator's anticompetitive scheme to impair actual or potential rivals and enhance its monopsony power in the Relevant Input Market. Cumulatively, the exclusionary contractual provisions deprive PFL/Bellator's would-be rivals of all or virtually all the critical input necessary to compete in the MMA Industry, that is, Elite Professional MMA Fighter services.

177.    As part of its exclusionary scheme, PFL/Bellator's exclusive contracts make it impossible for Bellator/PFL Fighters who might someday wish to compete in the UFC to do so. As a result, Bellator/PFL Fighters have refused offers to fight for actual or potential rival promoters, even those that offer higher compensation, out of fear that PFL/Bellator would retaliate against both the promoter and the Fighter. Professional MMA Fighters are deterred by PFL/Bellator because Professional MMA Fighters recognize that being banned from future opportunities to fight for PFL/Bellator if they breach contracts will substantially diminish their ability to earn income as Elite Professional MMA Fighters. Moreover, PFL/Bellator has control over key sponsors that PFL/Bellator threatens to never work with if they contract with an Elite Professional MMA Fighter against PFL/Bellator's wishes.

178.    Indeed, as demonstrated by PFL/Bellator's actions towards Gegard, PFL/Bellator are capable of artificially reducing compensation – and have in fact artificially reduced compensation – of fighters without causing so many fighters to switch to other sports or professions so as to make that compensation reduction unprofitable.

179.    Indeed, Gegard's treatment by PFL/Bellator is a perfect encapsulation of PFL/Bellator's monopsony power. Knowing that Gegard's only other option is the UFC, PFL/Bellator warehoused Gegard and diminished Gegard's brand to the point the audience believed he was retired, and then, with his brand tarnished, UFC was not even an option for Gegard.

180.    Then PFL/Bellator leveraged its market position and monopsony to try to force Gegard to agree to less than what he was contractually owed.

181.    Such conduct is not limited to Gegard. PFL/Bellator has relentlessly exercised its monopsony power to depress fighter wages across PFL/Bellator's men's and women's rosters.

182.    One example of PFL/Bellator's abuse of its monopsony power is Douglas Lima, a three-time champion for PFL/Bellator who PFL/Bellator warehoused because Douglas Lima was being paid a high amount as a three-time champion, with Lima stating on the social media platform X that:



183.    Notably, another prominent fighter, Cris Cyborg, replied "I'm having a hard time getting a bout agreement sent to me too!"

184.    Indeed, in response to posts on Instagram® about Gegard's situation, multiple fighters responded stating that they too were being treated the same way by PFL/Bellator.

185.    The Bellator/PFL Fighter Julia Budd commented:



186.    The Bellator/PFL Fighter Joao Zeferino commented:



187.    Douglas Lima further commented:



188.    Patricio "Pitbull" Freire commented that:



189. PFL/Bellator has exploited its market dominance to coerce fighters into accepting unfavorable contract terms including substantial pay cuts. As reported in "Patricio Pitbull 'Worried About the Future" With Lack Of Fights Under PFL Banner: 'This Is Wrong'" published by MMA Fighting on November 25, 2024, Patricio "Pitbull" Freire stated :"this merger has been a disaster for the sport of MMA" and "I am very worried about the future of Bellator and MMA in general…I feel very sorry for all the fighters who didn't even get to fight this year or were cut because they just don't make shows or thing they're expensive, **and all the fighters that were forced to take pay cuts**." [Emphasis Supplied].[12]

190. Plaintiff Gegard Mousasi endured similar coercion. As alleged in the original complaint, PFL executive Mike Kogan informed Plaintiff that he was "too expensive" and would need to accept less than his contracted $850,000 per bout to fight, despite his contractual rights. This mirrors the broader wage suppression strategy where fighters reported being pressured into unfavorable terms or facing indefinite inactivity.

191. PFL/Bellator's ability to impose such conditions stems from its post-Merger market power, eliminating meaningful competition for elite fighter services.

192. PFL/Bellator has clearly engaged in a pattern of warehousing elite fighters, keeping them under contract without providing adequate fight opportunities.

193. In addition to the examples cited above, Corey Anderson and Patchy Mix have been warehoused as well since the Merger as reported in the article "Frustration Growing for PFL Fighters Patchy Mix, Corey Anderson Since Takeover", published by Ringside Intel on November 24, 2024, which Patching Mix stating on X® that: I've been training my ass off for the last half of

---

[12] https://www.mmafighting.com/2024/11/25/24304707/patricio-pitbull-worried-about-the-future-with-lack-of-fights-under-pfl-banner-this-is-wrong

year for nothing….This is frustrating in the prime of my career and I've had my fight in November canceled? Then now again I'm behind told I'm off January Dubai card? I am the best in the world and I want to fight to prove it" and Corey Anderson stating: "Aging like warm cheese over here waiting for PFL to give me a call."[13]

194.    The Merger detrimentally impacted competition within the Relevant Input Market, as demonstrated by the diminished fight opportunities for prominent fighters like Plaintiff.

195.    This consolidation has enabled PFL/Bellator to dominate fight scheduling, artificially restricting opportunities for elite fighters and weakening their leverage to secure equitable contract terms. By failing to offer a sufficient number of fight opportunities, PFL/Bellator has breached its contractual duties and engaged in anticompetitive practices that suppress fighter compensation, limit competition, and jeopardize the professional livelihoods and earning capacity of fighters like Plaintiff.

196.    As detailed in the article "Patricio Pitbull asks for Bellator release due to inactivity" published by MMA Fighting on November 25, 2024, Patricio Freire stated: "We lost rhythm, we lost part of our careers waiting for something that never came. It's bad for me as a champion. I need to stay active. We know I'm not getting any younger, too. So I spoke with my managers and since my contract is not that long, it's close to the end, we'll ask to leave. I need to work."[14]

197.    This inactivity has disrupted fighters' career momentum (including Plaintiff's) and diminished their earning potential, as consistent competition is critical for maintaining marketability and negotiating power.

---

[13] https://ringsideintel.com/mma/pfl/pfl-news/frustration-growing-for-pfl-fighters-patchy-mix-corey-anderson/
[14] https://www.mmafighting.com/2024/12/4/24313296/patricio-pitbull-asks-bellator-release-inactivity-they-know-wrong-ufc

198.    Moreover, in the same article, Patricio Freire highlighted the pay cuts – e.g. wage suppression – forced on fighters by PFL/Bellator's monopsonist tactics: "Basically, Douglas Lima and my brother [Patricky Pitbull], the high-caliber guys of the organization, they either re-signed with their purse cut in half or they would be cut…That was basically forced, you know? [PFL co-owner] Donn Davis said early in the merge that that would not happen, but it happened."[15]

199.    PFL fighter Kai Kamaka III publicly demanded his release from the promotion, citing significant grievances that mirror the Plaintiff's own experiences. In the article "PFL Fighter Kai Kamaka III Follows Patricio Pitbull's Lead, Asks For Release From Promotion," published by MMA Fighting on January 17, 2025, Kamaka stated on X®, "PFL doesn't respect or value any of their fighters. I'm done being quiet about it. Let me go too. You want to strip us of our dignity imprison us to your ever changing terms and drown our future potential. Let me go. I don't ever want to wear your gloves again. @PFLMMA."[16]

200.    PFL/Bellator's anticompetitive conduct has drastically reduced the opportunities for Elite MMA Fighters. This reduction in opportunities limits Elite MMA Fighters' opportunities to compete and earn income, a direct consequence of the Merger and PFL/Bellator's consolidation of market power.

201.    This diminished output reflects the concentrated structure of the Relevant Input Market where PFL/Bellator operates as a monopsonist, or alternatively, in conjunction with UFC, in a duopsony, to dominate the Relevant Input Market. With fewer promotions offering viable

---

[15] https://www.mmafighting.com/2024/12/4/24313296/patricio-pitbull-asks-bellator-release-inactivity-they-know-wrong-ufc
[16] https://www.mmafighting.com/2025/1/17/24346040/i-dont-ever-want-to-wear-your-gloves-again-kai-kamaka-iii-asks-for-release-from-promotion; https://x.com/kaiboikamaka/status/1880288286532575540

platforms, PFL/Bellator's control over event production limits opportunities for fighters like the Plaintiff, harming competition in the market for elite MMA fighter services.

202.    With fewer promotions offering viable platforms, fighters face reduced bargaining power, enabling PFL/Bellator to suppress wages and impose restrictive terms. This scarcity of events has stalled careers, including Plaintiff's, as PFL/Bellator refuses to promote him in bouts despite his contractual entitlement.

203.    This warehousing deprives fighters of earning opportunities and diminishes their market visibility, constituting anticompetitive conduct.

204.    PFL/Bellator has clearly engaged in a broad scheme among Bellator/PFL Fighters to depress their wages and compensation.

205.    Post-Merger, PFL/Bellator has pressured fighters to accept reduced compensation under threat of continued inactivity. For example, offers have been made to lower $100,000 show/$100,000 win deals to a flat $100,000 for more fights.

206.    Indeed, Plaintiff was presented with a 'renegotiate or sit' ultimatum by PFL/Bellator, coercing him into unfavorable terms. This conduct directly suppresses fighter compensation below competitive levels.

207.    Furthermore, PFL/Bellator's contractual rules and industry norms prevent fighters like Plaintiff from negotiating with other promoters. Despite his desire to compete elsewhere, Plaintiff remains bound by his contract, and rival promoters are deterred from engaging due to fears of tortious interference lawsuits. This effectively blocks Plaintiff's ability to seek better opportunities, reinforcing PFL/Bellator's monopsony power.

208.    PFL/Bellator has an almost completely captive labor market, with each Bellator/PFL Fighter having invested so much time, energy, and money to get to the level of an

Elite MMA Professional Fighter, they are forced to adhere to PFL/Bellator's coercive tactics, including one-sided exclusive contracts and assigning their NIL in perpetuity to PFL/Bellator.

209. And then, if a Bellator/PFL Fighter, such as Gegard, simply wants to enforce their own contract and get promoted to fight Bouts for the wages PFL/Bellator has agreed to pay, PFL/Bellator exercises its monopsony power and warehouses them, forcing them to either fight for less, or not fight at all.

210. There are no legitimate procompetitive justifications for the anticompetitive conduct alleged in this Complaint, or for any aspect of the anticompetitive conduct standing alone. Even if, *arguendo*, such justifications existed, there are less restrictive means of achieving those purported procompetitive effects. To the extent the anticompetitive conduct or any aspect of the anticompetitive conduct has any cognizable procompetitive effects, they are substantially outweighed by the anticompetitive effects.

211. This anticompetitive conduct has clearly harmed and damaged Gegard.

212. Gegard was locked into an exclusive Agreement, which prevented him from fighting for the only realistic alternative MMA Promoter, the UFC.

213. PFL/Bellator leveraged that exclusivity by exploiting the Agreement in bad faith to warehouse Gegard, unless he agreed to fight for far less than what he was contractually owed, thereby leveraging PFL/Bellator's monopsony power over Gegard to lower his wages.

214. PFL/Bellator's monopsony power was so great in fact, that, after they were done warehousing Gegard, his career and reputation had been damaged to such a degree, his wages are permanently depressed, and he cannot find Bouts for anything close to what he was contractually owed, whether for PFL/Bellator or any other promotion.

215.    Accordingly, this monopsony perpetrated by PFL/Bellator is such that it cost Gegard the $2,550,000.00 in wages Gegard should have been paid by PFL/Bellator for the three Bouts that Gegard was contractually owed, which wages were lost because PFL/Bellator tried to illegally depress his wages by warehousing him unless he agreed to reduce his contractually owed wages.

216.    This monopsony has further cost Gegard significant compensation as his reputation has been so damaged he can only find Bouts for a fraction of what he would have earned.

217.    This monopsony has further lost Gegard numerous sponsorship opportunities due to being warehoused and wrongfully considered a "retired" fighter.

218.    In total, the monopsony has damaged Gegard for millions of dollars in addition to the $2,550,000.00 in wages Gegard should have been paid by PFL/Bellator for his three Bouts as the enforced inactivity damaged Plaintiff's legacy and marketability, as evidenced by reduced visibility and fan engagement. This constitutes a unique antitrust injury beyond the contractual wages he was owed.

219.    PFL/Bellator's warehousing and coercive tactics have inflicted irreparable harm on Plaintiff Gegard Mousasi's career and reputation.

220.    Prolonged inactivity has eroded his marketability, with media and fans speculating about his retirement. The lack of activity for high-profile fighters like Plaintiff prompted questions about his status, despite his willingness to compete. This reputational damage has curtailed Plaintiff's earning potential, both in fight purses and sponsorships critical to elite fighters.

221.    By failing to honor Plaintiff's contract for three bouts, PFL/Bellator has also deprived him of opportunities to secure future contracts with other promotions. Successful performances in those fights could have positioned Plaintiff for lucrative deals, potentially with

the UFC. The warehousing and resulting reputational harm have left Plaintiff with limited options, a direct outcome of PFL/Bellator's anticompetitive practices.

222.    Expert analysis will demonstrate that, absent the anticompetitive scheme, Plaintiff would have been able to compete in the marketplace in his prime where his earnings would have been significantly higher. Instead, he was warehoused under the Promoter's Defendants' monopsonist behavior to try and suppress his wages, thereby robbing him of his prime and ability compete in the marketplace during his prime.

## VI.    ALLEGATIONS COMMON TO THE MISCLASSIFICATION CLAIMS

223.    PFL/Bellator purports to classify Gegard as an independent contractor rather than an employee.

224.    PFL/Bellator has misclassified Gegard as an independent contractor rather than an employee.

225.    Under New Jersey law (which PFL/Bellator, not Gegard, chose to govern this Agreement) an individual is presumed to be an employee unless the employer can demonstrate the following – known as the "ABC Test":

A.    Such individual has been and will continue to be free from control or direction over the performance of such service, both under his contract of service and in fact; *and*

B.    Such service is either outside the usual course of the business for which such service is performed, or that such service is performed outside of all the places of business of the enterprise for which such service is performed; *and*

C.     Such individual is customarily engaged in an independently established trade, occupation, profession or business.

See *N.J.S.A.* 43:21–19(i)(6); *Hargrove v. Sleepy's, LLC* (2015) 220 N.J. 289, 305.

226.    "[T]he failure to satisfy **any one** of the three criteria results in an 'employment' classification." *Carpet Remnant Warehouse, Inc. v. N.J. Dep't of Labor*, 125 N.J. 567, 581 (1991) (emphasis supplied).

227.    PFL/Bellator clearly fails the ABC Test.

228.    Regarding prong A, to satisfy this prong, the worker must operate without the direct supervision or control of the hiring entity. This includes freedom in deciding how, when, and where the work is performed, and the hiring entity should not dictate the worker's methods or schedule.

229.    Here, the opposite is true, as PFL/Bellator holds Gegard to an **exclusive** contract, he cannot fight for anyone other than PFL/Bellator, and PFL/Bellator has total control over where, when and how Gegard fights, with the Agreement expressly stating that: "All Bouts shall be on dates and at sites to be designated by Bellator/PFL, in its sole and absolute discretion."

230.    PFL/Bellator further exercised control over Gegard's conduct, requiring that Gegard: (a) conduct himself with "decency, social conventions and morals"; (b) "not commit any act, become involved in any situation or occurrence, or make any statement which will reflect negatively upon or bring disrepute, contempt, scandal, ridicule or disdain to [various persons and entities including PFL/Bellator]; (c) prohibiting Gegard from making any statements "demeaning to any race, religion, ethnic group, women, any group based upon sexual preference, and/or which encourage or glorify illegal acts"; (d) prohibiting Gegard from any conduct that would "shock, insult, or offend the public or reflect unfavorably upon any current or potential sponsor [and other related persons and entities]; (e) not to "authorize or be involved with any advertising material or

publicity statements that contain language or material generally considered to be obscene, libelous, slanderous, or defamatory; (f) "refrain from making any public statement or remark (whether spoken or in writing) that may damage or otherwise negatively affect [various persons or entities including PFL/Bellator]; (g) "not engage in any criminal conduct"; (vii) that Gegard stay "in good physical and mental health and will do nothing during the Term to potentially impair his health, including, but not limited to, the use of any illegal, prohibited, controlled or banned substances"; (h) "not engage in any abnormally dangerous activity having a potential for injury that could conceivably prevent Fighter [Gegard] from engaging in bouts"; (i) "not engage in any combat sports without the express written approval of [PFL/Bellator], including any and all martial arts, boxing, kickboxing, wrestling, or MMA (except as necessary for training activities); **and** (j) Gegard "will remain in good physical shape and within the designated weight class Fighter competed in when Fighter first entered into this Agreement, as set forth in Exhibit A, unless otherwise agreement in writing by [PFL/Bellator]".

231.    PFL/Bellator further controlled Gegard by controlling his attire during his work, requiring that Gegard agree that: (a) "no wording, symbol, picture, design, name, advertising, or informational material shall appear on his person, trunks, robe, shoes, or other items worn by Fighter, his trainers, seconds, or assistants without prior written approval of [PFL/Bellator] during any Bout Events hereunder"; (b) that Gegard "shall not display any wording, symbol, picture, design, name, advertising, or informational material on Fighter's person, trunks, robe, shoes, or other items worn by Fighter, his trainers, seconds, or assistants during any Bout Events hereunder or at any [PFL/Bellator]-sponsored activity which is: (i) in conflict or competition with [PFL/Bellator] or the sponsors of [PFL/Bellator], ViacomCBS, Paramount Network or its successors; (ii) in conflict with the requirements of any telecaster; (ii) may cause injury to the

reputation or business of [PFL/Bellator], ViacomCBS, Paramount Network or its successors, or their respective sponsors; or (iv) is considered by [PFL/Bellator], in its sole discretion, to be in bad taste".

232.    PFL/Bellator further controlled Gegard by requiring that Gegard undergo medical testing, requiring him to: "complete a full physical medical examination and undergo testing and receive affirmative clearance therefrom, including, but not limited to, the following tests and examinations: CBC, Hepatitis B, Hepatitis C, HIV, RH and Blood Type, RPR, PT, PTT, Urinalysis with drug screening, EKG, CT Scan, MRI, Dilated Ophthalmological exam, and such other testing as [PFL/Bellator] or the applicable Commission may require."

233.    PFL/Bellator further controlled Gegard by not allowing him to assign his services under the Agreement, expressly requiring that his services were personal to PFL/Bellator under the Agreement: "The rights and obligations of Fighter arising from this Agreement are personal to Fighter and may not be assigned, licensed, pledged, or transferred for any reason."

234.    PFL/Bellator clearly fails prong A of the ABC Test, and fail the ABC Test as a whole, as it must satisfy all three prongs to properly categorize Gegard as an independent contractor. See *Carpet Remnant Warehouse, Inc. v. N.J. Dep't of Labor,* 125 *N.J.* 567, 581 (1991).

235.    PFL/Bellator also clearly fails prongs B and C as well, failing all three prongs of the ABC Test.

236.    Prong B of the ABC Test is that the employer must show that service is performed either outside the usual course of the business for which the service is performed or is performed outside all the places of business of the enterprise for which the service is performed.

237.    To satisfy this prong, the worker's services must be distinct from the usual business activities of the hiring entity, or the work must be done outside of the hiring entity's places of

business. For example, if a bakery hires a plumber to fix a leak, this would meet criterion B because plumbing is outside the bakery's usual course of business.

238.    Here, the entire business of PFL/Bellator is promoting MMA fights, and Gegard is a Bellator/PFL MMA fighter who fights exclusively for PFL/Bellator. PFL/Bellator hence clearly fails prong B of the ABC Test.

239.    Prong C of the ABC Test is that the employer must show that the worker is customarily engaged in an independently established trade, occupation, profession, or business to demonstrate the worker is independent and not an employee.

240.    This prong requires that the worker has their own business, advertises their services to the public, or works for multiple clients. This criterion ensures that the worker is operating an independent business rather than being economically dependent on the hiring entity.

241.    Here, PFL/Bellator required that Gegard "grants to Bellator/PFL the exclusive unrestricted, worldwide rights to secure, promote, arrange, present, coordinate, create, and produce all MMA, martial arts, and unarmed combatant contests."

242.    PFL/Bellator improperly and illegally misclassified Gegard as an independent contractor when he was really an employee.

## VII.    <u>CONCLUSION</u>

243.    PFL/Bellator breached its Agreement with Gegard and breached the implied covenant of good faith and fair dealing as well.

244.    PFL/Bellator has also engaged in anti-competitive monopsony conduct in violation of the Sherman Act, and have further misclassified Gegard as an independent contractor when he was in actuality an employee.

245.    Gegard has been damaged in a variety of harmful ways. He was not paid the earnings from the three Bouts he would have received had PFL/Bellator honored the Agreement and promoted those Bouts, which earnings would have been $2,550,000.00.

246.    He was further warehoused for such long periods of time that his career suffered immensely, including by putting him in a situation where any other options he may have had, such as with the UFC, were no longer viable. Indeed, multiple media sources and other fighters were publicly asking if Gegard was in fact "retired," harming his reputation and career.

247.    Based on his history as a two-time champion and a fighter touted by such luminaries of the sport as Khabib Nurmagomedov, Gegard would very likely have received substantial additional offers after completing the three Bouts under his Agreement, whether with UFC or elsewhere.

248.    However, due to PFL/Bellator's conduct, including its warehousing of Gegard, Gegard lost any such opportunities.

249.    In turn, having been warehoused for so long that figures in the industry and relevant market were openly asking if Gegard was "retired," Gegard lost out on lucrative sponsorship opportunities as well.

250.    Gegard accordingly asserts the below causes of action.

251.    All conditions precedent to the bringing of this action have occurred, been waived, or been performed.

///

## FIRST CAUSE OF ACTION
### (For Breach of Contract Against PFL/Bellator)

252.    In Plaintiff's first ground for relief, Plaintiff alleges breach of contract to promote Plaintiff under the Agreement. Plaintiff repeats and re-alleges the allegations of paragraphs 1 through 251 as though fully set forth herein.

253.    The Agreement is a valid and binding agreement between the parties.

254.    Plaintiff has performed his obligations under the Agreement.

255.    The fundamental benefit of the bargain under the Agreement was that: (1) PFL/Bellator would promote Plaintiff: "Promoter **shall** promote and Fighter [Mr. Mousasi] shall participate in Bouts as set forth elsewhere in the Term of this Agreement" [emphasis supplied] ***and*** (2) Plaintiff would **exclusively** fight for PFL/Bellator: "Fighter [Gegard] hereby grants to Promoter the exclusive unrestricted, worldwide rights to secure, promote, arrange, present, coordinate, create and produce all MMA, martial arts, and unarmed contests (individually, a "Bout" and collectively, the "Bouts" to be engaged in by Fighter during the Term of this Agreement …"

256.    Although Plaintiff strictly honored his side of the bargain and fully performed all of his obligations under the Agreement, including by remaining ready, willing and able to fight and remaining exclusive to PFL/Bellator even while being warehoused and even when directly encouraged by Kogan to explore other promotions, PFL/Bellator failed to perform its fundamental obligations under the Agreement.

257.    Indeed, instead of promoting Plaintiff, PFL/Bellator punitively warehoused Plaintiff and did not promote him in Bouts, including failing to promote him in any of the three (3) Bouts provided for in the Addendum, in a bad faith attempt to force Plaintiff to accept less than his contractually agreed fees for his services.

258.    This is a material breach of the Agreement.

259.    Further, the Agreement required that PFL/Bellator "offer standard long-term promotional contracts to one (1) Team Mousasi fighter during each full year of the Term".

260.    Despite Plaintiff proposing an appropriate number of recruits for this purpose, PFL/Bellator did not offer contracts to Team Mousasi fighters in breach of the Agreement.

261.    Plaintiff gave PFL/Bellator notice of breach and an opportunity to cure as required under the Agreement.

262.    PFL/Bellator remains in material breach of the Agreement and did not cure its breaches within the time period allotted for a cure.

263.    PFL/Bellator's breaches have cost Plaintiff at least $2,550,000.00 in compensation under the Agreement for the three (3) Bouts (Plaintiff would have earned $850,000.00 per Bout) he should have been promoted for under the Addendum, and cost Plaintiff further compensation that Plaintiff would have earned in other Bouts and from sponsorship opportunities.

264.    As a direct and proximate result of PFL/Bellator' numerous breaches of the parties' Agreement, Plaintiff has suffered significant and extensive damages and financial injury, and has been, and will continue to be, harmed.

## <u>SECOND CAUSE OF ACTION</u>
### (For Breach of the Covenant of Good Faith and Fair Dealing Against PFL/Bellator)

265.    In Plaintiff's second ground for relief, Plaintiff alleges that PFL/Bellator breached the implied covenant of good faith and fair dealing. Plaintiff repeats and re-alleges the allegations of paragraphs 1 through 251, as though fully set forth herein.

266.    Plaintiff and PFL/Bellator entered into a valid and binding agreement – the Agreement.

267.    In every contract between parties, there is an implied covenant imposed upon both parties to deal in good faith and fairly as to not frustrate the other party's expectation of benefits under the contract.

268.    The Agreement contained an implied covenant of good faith and fair dealing.

269.    PFL/Bellator has taken the position that the Agreement does not expressly obligate them to promote Plaintiff for any particular number of Bouts, thereby claiming they are not in breach of the Agreement (a position that Plaintiff disputes).

270.    However, the fundamental benefit of the bargain under the Agreement was that PFL/Bellator would promote Plaintiff in Bouts and Plaintiff would in turn fight exclusively for PFL/Bellator in Bouts.

271.    PFL/Bellator warehoused Plaintiff and refused to promote him for Bouts in the prime of his career in an intentional and bad faith scheme to attempt to force the Plaintiff to accept less than the wages he was owed under the Agreement.

272.    PFL/Bellator refused to properly promote Plaintiff in Bouts, despite multiple written requests by Plaintiff and his representative to be promoted in Bouts along with numerous other requests by Plaintiff and his representative to be promoted in Bouts.

273.    PFL/Bellator refused to promote Plaintiff in Bouts based on the bad faith motive that PFL/Bellator wanted to force Plaintiff to accept less than what he was contractually owed for Bouts.

274.    PFL/Bellator intentionally warehoused Plaintiff and refused to promote him for Bouts with a conscious disregard for Plaintiffs right to receive his fundamental benefit under the Agreement.

275.    By warehousing Plaintiff and refusing to promote him for Bouts PFL/Bellator has frustrated Plaintiff's reasonable expectation of receiving the fundamental benefit of the Agreement – that PFL/Bellator promote Plaintiff for Bouts.

276.    By warehousing Plaintiff and refusing to promote him for Bouts PFL/Bellator frustrated Plaintiff's receipt of compensation under the Agreement, as well as damaging his career and reputation to the point where others in the MMA Industry openly question if Plaintiff was "retired" when Plaintiff was in fact not retied and was actively seeking Bouts through PFL/Bellator.

277.    This in turn has cost Plaintiff at least $2,550,000.00 in compensation under the Agreement for the three (3) Bouts (Plaintiff would have earned $850,000.00 per Bout) he should have been promoted for under the Addendum, and cost Plaintiff further compensation that Plaintiff would have earned in other Bouts and from sponsorship opportunities.

278.    As a direct and proximate result of PFL/Bellator' numerous breaches of the covenant of good faith and fair dealing, Plaintiff has suffered significant and extensive damages and financial injury, and has been, and will continue to be, harmed.

### THIRD CAUSE OF ACTION
**(Unjust Enrichment Against PFL/Bellator)**

279.    Plaintiff repeats and re-alleges the allegations of paragraphs 1 through 251, as though fully set forth herein.

280.    PFL/Bellator has been unjustly enriched at Plaintiff's expense.

281.    Specifically, Plaintiff conferred a substantial benefit to PFL/Bellator by fighting exclusively for PFL/Bellator allowing them, among other things, to identify the two time champion Plaintiff as an MMA fighter on its roster, PFL/Bellator knew of and appreciated that Plaintiff was providing these benefits, and PFL/Bellator retained these benefits without compensating Plaintiff

by retaining the benefits of holding Plaintiff as an exclusive MMA fighter on its roster without promoting him for Bouts or paying him.

282.    As a direct and proximate result of PFL/Bellator's unjust enrichment, Plaintiff has lost at least $2,550,000.00 in compensation under the Agreement for the three (3) Bouts (Plaintiff would have earned $850,000.00 per Bout) he should have been promoted for under the Addendum, and cost Plaintiff further compensation that Plaintiff would have earned in other Bouts and from sponsorship opportunities.

283.    Instead, PFL/Bellator refused to promote those Bouts, warehousing Plaintiff while retaining the benefit of having the Plaintiff locked into an exclusive contract with PFL/Bellator.

284.    Defendants have been unjustly enriched to Plaintiff's substantial detriment.

285.    Plaintiff is entitled to recover the monetary amount representing the unjust enrichment from PFL/Bellator.

**FOURTH CAUSE OF ACTION**
**(For Monopsonization Under Section 2 of the Sherman Act (15 U.S.C. § 2)**
**Against PFL/Bellator)**

286.    Plaintiff repeats and re-alleges the allegations of paragraphs 1 through 251, as though fully set forth herein.

287.    In Plaintiff's third cause of action, Plaintiff alleges that PFL/Bellator has violated 15 U.S.C. § 2, the Sherman Act, by engaging in an anticompetitive scheme to maintain and enhance its monopsony power in the market for live Elite Professional MMA Fighter services.

288.    The Relevant Geographic Market is United States based MMA Promotion companies that promote fights in the United States, the U.K., the European Union, Saudi Arabia and the United Arab Emirates.

289.    The Relevant Input Market is the market for live Elite Professional MMA Fighter services

290.    PFL/Bellator possesses monopsony power in the Relevant Input Market, whether the geographic market includes the Relevant Geographic Market or the entire world.

291.    PFL/Bellator has obtained, enhanced, and maintained dominance in both the Relevant Input Market and the Relevant Geographic Market through the exclusionary scheme alleged herein.

292.    PFL/Bellator has abused and continue to abuse the power to maintain and enhance its market dominance in the market for Elite Professional MMA Fighter services through an exclusionary scheme to impair and foreclose competition by depriving actual and potential competitors in the Relevant Output Market of necessary inputs (*e.g.*, Elite Professional MMA Fighters).

293.    PFL/Bellator's exclusionary scheme includes, but is not limited to, leveraging its monopsony power in the Relevant Input Market and the Relevant Geographic Market through the use of exclusive agreements with Elite Professional MMA Fighters, and, upon information and belief, with venues, and sponsors.

294.    As a direct and proximate result of PFL/Bellator's unlawful monopsonization in continuing violation of Section 2 of the Sherman Act (15 U.S.C. § 2), Plaintiff has suffered injury and damages in the form of artificially suppressed compensation in amounts to be proven at trial.

295.    Alternatively, even if PFL/Bellator does not possess full monopsony power, its conduct in a highly concentrated duopsony market violates Section 2 of the Sherman Act. In markets with few dominant buyers, anticompetitive effects can arise from a single firm's actions exploiting the market structure. As recognized in *Todd v. Exxon Corp.*, 275 F.3d 191 (2d Cir.

2001), a small number of buyers can suppress wages without explicit collusion. Here, PFL/Bellator's practices, such as warehousing and restrictive contracts, harm competition by reducing fighter mobility and compensation in a market dominated by just two major players.

296.    Plaintiffs seeks money damages from PFL/Bellator for these violations, including the $2,550,000.00 in compensation under the Agreement for the three (3) Bouts (Plaintiff would have earned $850,000.00 per Bout) he should have been promoted for under the Addendum, and further compensation that Plaintiff would have earned in other Bouts and from sponsorship opportunities, all of which was lost due to PFL/Bellator's monopsony and anti-competitive behavior. These damages represent the additional compensation Plaintiff would have received for his Elite Professional MMA Fighter services absent the anticompetitive scheme alleged herein, and the additional compensation Plaintiff would have received for exploitation of his NIL in the absence of the violations alleged.

297.    Pursuant to 15 U.S.C. § 15, the Clayton Act, Plaintiff's actual damages should be trebled. Plaintiff's injuries directly result from the Defendants' unlawful conduct and are of the type the antitrust laws are designed to prevent.

298.    Plaintiff further seeks injunctive relief barring PFL/Bellator from engaging in the anticompetitive scheme alleged herein. The violations set forth above, and the effects thereof, are continuing and will continue unless injunctive relief is granted. Plaintiff's injuries are of the type the antitrust laws were designed to prevent, and flow directly from the Defendant's unlawful conduct.

///

///

///

**FIFTH CAUSE OF ACTION**
**(Violation of New Jersey Wage and Hour Law (N.J.S.A. 34:11-4.1 *et seq*.)**
**Against All Defendants)**

299.    Plaintiff repeats and re-alleges the allegations of paragraphs 1 through 251, as though fully set forth herein.

300.    During extended periods of inactivity ("warehousing"), Plaintiff, despite being contractually obligated to maintain full-time training and fight readiness, received no compensation from Defendants for work performed from May 2023 to May 2024, despite repeatedly demanding payment by demanding Bouts to fight where he would be paid.

301.    This constitutes a violation of New Jersey's Wage and Hour Law, N.J.S.A. 34:11-4.1 et seq.

302.    Plaintiff fully performed all duties and responsibilities as required by his employment with the Defendant.

303.    Yet, during the time periods in which Defendants warehoused Plaintiff and Plaintiff continued training full time and meeting all his other employment obligations, the Defendants' paid Plaintiff nothing, despite Plaintiff's full-time employment for Defendants and despite Plaintiff completing all work required of him.

304.    Plaintiff has failed to pay Plaintiff regular wages totaling at least $2,550,000.00 (the wages he would have received for the three Bouts that he should have been promoted to fight in) for work performed during the period of May 2023 to May 2024. Plaintiff has made multiple demands for payment, but Defendants have refused and continue to refuse to make such payments.

305.    As a result of Defendants' failure to pay regular wages, Plaintiff has suffered financial loss.

306.    Defendants' failure to pay Plaintiff his earned wages is a violation of New Jersey Wage and Hour Law.

307.    Under N.J.S.A. 34:11-4.7, every employer shall pay all wages due to its employees in full at least twice during each calendar month.

308.    Defendants, acting through its officers and agents, including but not limited to Peter Murray (CEO), Donn Davis (Founder, Chairman, and Co-owner), Ray Sefo (President of MMA Promotion), Mike Kogan (Executive), Jim Bramson (Executive Vice President and General Counsel), and George Pineda (Vice President and Deputy General Counsel), willfully failed to pay Plaintiff the wages due to him in violation of N.J.S.A. 34:11-4.7, which requires that wages be paid at least twice per calendar month.

309.    Each of Peter Murray (CEO), Donn Davis (Founder, Chairman, and Co-owner), Ray Sefo (President of MMA Promotion), Mike Kogan (Executive), Jim Bramson (Executive Vice President and General Counsel), and George Pineda (Vice President and Deputy General Counsel) had the power to hire and fire Plaintiff, supervised and controlled employee work schedules or conditions of employment, determined the rate and method of payment, and maintained employment records (or consciously chose not to maintain such records or direct that they not be maintained).

310.    Yet, Peter Murray (CEO), Donn Davis (Founder, Chairman, and Co-owner), Ray Sefo (President of MMA Promotion), Mike Kogan (Executive), Jim Bramson (Executive Vice President and General Counsel), and George Pineda (Vice President and Deputy General Counsel), each of whom have direction and control over PFL/Bellator, directed PFL/Bellator not to give Plaintiff any further Bouts, which meant that Plaintiff, who was an employee of PFL/Bellator, was not paid the wages employee Plaintiff was due, in direct violation of N.J.S.A. 34:11-4.7.

311.    Plaintiff is entitled to recover the unpaid wages, along with interest and costs of the suit, under the New Jersey Wage Payment Law from all Defendants.

312.    The Individual Defendants exercised significant control over PFL/Bellator's operations, including decisions related to employee classification, payroll, and working conditions. Their actions and/or inactions, as detailed above, directly contributed to the NJWHL violations. These individuals are therefore personally liable for the unpaid wages under established principles of agency and corporate law in New Jersey. (*See Liu v. New Dickson Trading, LLC*, No. CV2115779ESJRA, 2023 WL 3736351, at *4 (D.N.J. May 30, 2023)).

## SIXTH CAUSE OF ACTION
**(Fair Labor Standards Act: Unpaid Overtime Wages Against All Defendants)**

313.    Plaintiff repeats and re-alleges the allegations of paragraphs 1 through 251 and 300 through 312 as though fully set forth herein.

314.    At all relevant times, PFL/Bellator, as directed by the Individual Defendants, were employers engaged in interstate commerce under the Fair Labor Standards Act ("**FLSA**"), 29 U.S.C. § 201 et seq.

315.    Plaintiff was employed by PFL/Bellator, as directed by the Individual Defendants, as an employee, not as an independent contractor, as will be further detailed below.

316.    PFL/Bellator, as directed by the Individual Defendants, employed Plaintiff within the meaning of FLSA.

317.    PFL/Bellator, as directed by the Individual Defendants, engaged in a pattern and practice of violating the FLSA by failing to compensate Plaintiff for overtime work exceeding 40 hours per workweek.

318.    Plaintiff has consented in writing to be party to this action, pursuant to 29 U.S.C. § 216(b).

319. The overtime wage provisions set forth in 29 U.S.C. §§ 201, *et seq*., apply to Defendants.

320. At all relevant times and continuing to the present time, Defendants had a policy, pattern and/or practice of failing to pay overtime compensation to misclassified employees for hours that they had worked in excess of 40 hours per workweek.

321. This failure constitutes a willful violation or reckless disregard of the FLSA, specifically 29 U.S.C. §§ 207(a)(1) and 215(a).

322. Plaintiff's regularly scheduled workweek included training, media appearances, and fight preparation, all essential to his performance and under the exclusive control of the Defendants.

323. PFL/Bellator's willful failure to pay, or reckless disregard of the obligation to pay, overtime compensation is directly attributable to the actions and/or inactions of the Individual Defendants.

324. Each of Peter Murray (CEO), Donn Davis (Founder, Chairman, and Co-owner), Ray Sefo (President of MMA Promotion), Mike Kogan (Executive), Jim Bramson (Executive Vice President and General Counsel), and George Pineda (Vice President and Deputy General Counsel) had the power to hire and fire Plaintiff, supervised and controlled employee work schedules or conditions of employment, determined the rate and method of payment, and maintained employment records (or consciously chose not to maintain such records or direct that they not be maintained).

325. Yet, Defendants Peter Murray (CEO), Donn Davis (Founder, Chairman, and Co-owner), Ray Sefo (President of MMA Promotion), Mike Kogan (Executive), Jim Bramson (Executive Vice President and General Counsel), and George Pineda (Vice President and Deputy

General Counsel), each of whom have direction and control over PFL/Bellator, directed PFL/Bellator not to pay Plaintiff any overtime compensation, or recklessly disregarded the obligation to pay Plaintiff overtime compensation, resulting in Plaintiff, who was an employee of PFL/Bellator, not receiving the overtime compensation he was due, in direct violation of FLSA.

326.    As a result of Defendants' willful failure to compensate their employees, including Plaintiff, at a rate of not less than one and one-half times the regular rate of pay for work performed in excess of 40 hours in a workweek, Defendants have violated and continues to violate the FLSA, 29 U.S.C. §§ 201, et seq., including 29 U.S.C. §§ 207(a)(1) and 215(a).

327.    Defendants also violated the FLSA's record-keeping requirements under 29 U.S.C. §§ 211(c) and 215(a) by failing to accurately record, report, and compensate Plaintiff for all hours worked.

328.    As a result of Defendants' FLSA violations, Plaintiff, is entitled (a) to recover from Defendants his unpaid wages for all of the hours worked by him, as overtime compensation, (b) to recover an additional, equal amount as liquidated damages, and (c) to recover his unreasonably delayed payment of wages, reasonable attorneys' fees, and costs and disbursements of this action, pursuant to 29 U.S.C. § 216(b).

329.    Because Defendants' violations of the FLSA have been willful, a three-year statute of limitations applies, pursuant to 29 U.S.C. § 255.

330.    During the last three (3) years, Gegard worked at least 1,248 hours in total overtime.

331.    The Individual Defendants exercised significant control over PFL/Bellator' operations, including decisions related to employee classification, payroll, and working conditions.

332.    Their actions and/or inactions, as detailed above, directly contributed to the FLSA violations. These individuals are therefore personally liable for the unpaid wages under established

principles of agency and corporate law in New Jersey. (*See Liu v. New Dickson Trading, LLC*, No. CV2115779ESJRA, 2023 WL 3736351, at *4 (D.N.J. May 30, 2023)).

<u>**SEVENTH CAUSE OF ACTION**</u>
**(New Jersey Wage and Hour Law: Unpaid Overtime Wages Against All Defendants)**

333.    Plaintiff repeats and re-alleges the allegations of paragraphs 1 through 251, 300 through 312, and 314 through 332, as though fully set forth herein.

334.    At all relevant times, Plaintiff was employed by Defendants within the meaning of the New Jersey State Wage and Hour Laws, N.J.S.A 34:11-56a et seq. (the "**NJWHL**") and each of the Defendants was an employer within the meaning of NJWHL.

335.    The overtime wage provision of the NJWHL and its supporting regulations apply to Defendants.

336.    Defendants willfully violated Plaintiff's rights by failing to pay him the legally required amount of overtime compensation at rates not less than one and one-half times their regular rate of pay for all hours worked by them in excess of 40 hours in a workweek, in violation of the NJWHL and its regulations.

337.    During the last three (3) years, Gegard worked at least 1,248 hours in total overtime.

338.    PFL/Bellator's willful failure to pay, or reckless disregard of the obligation to pay, overtime compensation is directly attributable to the actions and/or inactions of the Individual Defendants.

339.    Specifically, PFL/Bellator, acting through their officers and agents, including but not limited to Peter Murray (CEO), Donn Davis (Founder, Chairman, and Co-owner), Ray Sefo (President of MMA Promotion), Mike Kogan (Executive), Jim Bramson (Executive Vice President and General Counsel), and George Pineda (Vice President and Deputy General Counsel), knew, or should have known, of the requirements under the NJWHL to pay Plaintiff his overtime

compensation, and willfully failed to pay Plaintiff the overtime compensation due to him in violation of NJWHL or recklessly disregarded the obligation to pay Plaintiff the overtime compensation due to him in violation of NJWHL.

340. Each of Peter Murray (CEO), Donn Davis (Founder, Chairman, and Co-owner), Ray Sefo (President of MMA Promotion), Mike Kogan (Executive), Jim Bramson (Executive Vice President and General Counsel), and George Pineda (Vice President and Deputy General Counsel) had the power to hire and fire Plaintiff, supervised and controlled employee work schedules or conditions of employment, determined the rate and method of payment, and maintained employment records (or consciously chose not to maintain such records or direct that they not be maintained).

341. Yet, Defendants Peter Murray (CEO), Donn Davis (Founder, Chairman, and Co-owner), Ray Sefo (President of MMA Promotion), Mike Kogan (Executive), Jim Bramson (Executive Vice President and General Counsel), and George Pineda (Vice President and Deputy General Counsel), each of whom have direction and control over PFL/Bellator, directed PFL/Bellator not to pay Plaintiff any overtime compensation, or recklessly disregarded the obligation to pay Plaintiff overtime compensation, resulting in Plaintiff, who was an employee of PFL/Bellator, not receiving the overtime compensation he was due, in direct violation of NJWHL.

342. Defendants knew and/or showed reckless disregard that their conduct was prohibited by the NJWHL.

343. As a result of Defendant's willful violations of the NJWHL, Plaintiff is entitled to recover from Defendants his unpaid overtime wages, reasonable attorneys' fees and costs of this action and pre-judgment and post-judgment interest, including the employer's share of FICA,

FUTA, state unemployment insurance, and any other required employment taxes, reasonable attorneys' fees and costs and costs of this action, pursuant to N.J.S.A. § 34:11-56a.

344.    The Individual Defendants exercised significant control over PFL/Bellator's operations, including decisions related to employee classification, payroll, and working conditions. Their actions and/or inactions, as detailed above, directly contributed to the NJWHL violations. These individuals are therefore personally liable for the unpaid wages under established principles of agency and corporate law in New Jersey. (*See Liu v. New Dickson Trading, LLC*, No. CV2115779ESJRA, 2023 WL 3736351, at *4 (D.N.J. May 30, 2023)).

<u>**EIGHTH CAUSE OF ACTION**</u>
**(Failure to Maintain Records Against All Defendants in Violation of FLSA and NJWHL)**

345.    Plaintiff repeats and re-alleges the allegations of paragraphs 1 through 251, 300 through 312,  314 through 332 and 334 through 344 as though fully set forth herein.

346.    Under the FLSA and NJWHL, the Defendants are required to keep and maintain accurate records setting forth the total hours worked each day by Plaintiff for each workweek and other employment information.

347.    The Defendants have failed to maintain true, accurate and complete records containing this required information, including the total hours worked each day and each workweek by Plaintiff.

348.    Specifically, PFL/Bellator, acting through its officers and agents, including but not limited to Peter Murray (CEO), Donn Davis (Founder, Chairman, and Co-owner), Ray Sefo (President of MMA Promotion), Mike Kogan (Executive), Jim Bramson (Executive Vice President and General Counsel), and George Pineda (Vice President and Deputy General Counsel), knew, or should have known, of the requirements under the FLSA and NJWHL to keep and maintain accurate records setting forth the total hours worked each day by Plaintiff for each workweek and

other employment information, and willfully failed to keep those records or recklessly disregarded the obligation to keep those records in violation of FLSA and NJWHL.

349.    Each of Peter Murray (CEO), Donn Davis (Founder, Chairman, and Co-owner), Ray Sefo (President of MMA Promotion), Mike Kogan (Executive), Jim Bramson (Executive Vice President and General Counsel), and George Pineda (Vice President and Deputy General Counsel) had the power to hire and fire Plaintiff, supervised and controlled employee work schedules or conditions of employment, determined the rate and method of payment, and maintained employment records (or consciously chose not to maintain such records or direct that they not be maintained).

350.    Yet, Defendants Peter Murray (CEO), Donn Davis (Founder, Chairman, and Co-owner), Ray Sefo (President of MMA Promotion), Mike Kogan (Executive), Jim Bramson (Executive Vice President and General Counsel), and George Pineda (Vice President and Deputy General Counsel), each of whom have direction and control over PFL/Bellator, directed PFL/Bellator not to keep and maintain accurate records setting forth the total hours worked each day by Plaintiff for each workweek and other employment information and willfully failed to keep those records or recklessly disregarded the obligation to keep those records in violation of FLSA and NJWHL.

351.    The aforementioned conduct is in violation of, *inter alia*, the FLSA and the NJWHL and is otherwise unlawful.

352.    As a direct and proximate cause of the aforementioned conduct, Plaintiff has suffered damages.

///

///

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38 (b), Plaintiff demands a trial by jury.

## DEMAND FOR JUDGMENT

**WHEREFORE**, Plaintiff Gegard Mousasi respectfully requests that this Court enter Judgment in his favor and against Defendants Bellator Sport Worldwide, LLC, New Bellator, LLC (a subsidiary of Professional Fighters League), Peter Murray, Donn Davis, Ray Sefo, Mike Kogan, Jim Bramson, and George Pineda, jointly and severally, as follows:

**On Plaintiff's First, Second and Third Causes of Action Against PFL/Bellator**

    (a)    Awarding compensatory, consequential and/or equitable monetary damages in an amount to be determined at trial, but not less than $15,000,000.00 and additionally awarding applicable pre-judgment interest;

    (b)    Awarding punitive damages;

    (c)    An award of prejudgment and post-judgment interest; ***and***

    (d)    Such further and other relief as the Court may deems just and proper;

**On Plaintiff's Fourth Cause of Action Against PFL/Bellator**

    (a)    Entering judgment against Defendants, holding Defendant liable for the antitrust violations alleged;

    (b)    Awarding Plaintiff treble the amount of damages actually sustained by reason of the antitrust violations alleged herein Pursuant to 15 U.S.C. § 15 (the Clayton Act) plus the reasonable costs of this action including attorneys' fees;

    (c)    Orders such equitable relief as is necessary to correct for the anticompetitive market effects caused by the unlawful conduct of PFL/Bellator;

    (d)    Awarding Plaintiff the costs of his suit, including reasonable attorneys' fees as provided by law;

    (e)    An award of prejudgment and post-judgment interest; ***and***

    (f)    Such further and other relief as the Court may deems just and proper.

///

**On Plaintiff's Fifth, Sixth, Seventh, and Eighth Causes of Action Against All Defendants**

(a)    An injunction requiring Defendants to: (i) cease their unlawful practices under the NJWHL and FLSA and comply with the law; (ii) pay on behalf of Plaintiff to the Internal Revenue Service of the United States of America the combined work-employee contribution under the Federal Insurance Contributions Act (FICA) comprised of both social security and Medicare taxes (15.3%), federal income tax not withheld, federal unemployment insurance tax act (FUTA) payments, as well as any penalties and interest; (iii) pay on behalf of Plaintiff any state income taxes, state disability insurance payments, state unemployment compensation payments, and any other amounts that Defendants were required to withhold from Plaintiff's wages, plus any interest and penalties; ***and*** (iv) keep and maintain true, accurate and complete records as required by the FLSA and NJWHL;

(b)    A declaratory judgment that the practices complained of herein are unlawful under the FLSA and the NJWHL;

(c)    An award of unpaid wages for all hours worked in excess of 40 in a workweek at a rate of one and one-half the regular rate of pay under the FLSA and the NJWHL;

(d)    An award of liquidated damages pursuant to 20 U.S.C. § 21 and the NJWHL;

(e)    An award of damages representing the employer's share of FICA, FUTA, state unemployment insurance, and any other required employment taxes;

(f)    An award of prejudgment and post-judgment interest;

(g)    An award of costs and expenses of this action together with reasonable attorneys' fees; ***and***

(h)    Such further and other relief as the Court may deems just and proper.

**CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2**

I hereby certify under penalty of perjury under the laws of the United States of America that to the best of my knowledge, this matter is not the subject to any other action pending in any court, or of any pending arbitration or administrative proceeding. I understand that if the foregoing statement is willful false, I am subject to punishment.

Date: March 24, 2025

JEFFREY I. WASSERMAN, ESQ.
WASSERMAN LITTLE LLC
1200 Route 22 East, Suite 2000, #2238
Bridgewater, New Jersey 08807
jwasserman@wassermanlittle.com
(973) 486-4801

&

**SINGH, SINGH & TRAUBEN, LLP**
**THOMAS K. RICHARDS**
trichards@singhtraubenlaw.com
400 S. Beverly Drive, Suite 240
Beverly Hills, California 90212
Tel: 310.856.9705 | Fax: 888.734.3555
(*pro hac vice* motion to be filed)

By: _____*/s/ Jeffrey I. Wasserman*_____
        *Attorneys for Plaintiff*
        Gegard Mousasi