IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| GEGARD MOUSASI,<br><br>        Plaintiff,<br><br>v.<br><br>BELLATOR SPORT WORLDWIDE, LLC,<br>NEW BELLATOR, LLC, et al.,<br><br>        Defendants. | Case No. 2:24-cv-09844 |

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION TO DISMISS PLAINTIFF'S SHERMAN ACT CLAIM**

DUANE MORRIS LLP

Eric R. Breslin
Sarah Fehm Stewart
200 Campus Drive, Suite 300
Florham Park, NJ 07932
Telephone: (973) 424-2063
erbreslin@duanemorris.com
sfstewart@duanemorris.com

Sean P. McConnell
30 S. 17th Street
Philadelphia, PA 19103
Telephone: (215) 979-1947
spmcconnell@duanemorris.com

*Attorneys for Defendants*

# **TABLE OF CONTENTS**

                                                             **Page**

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ..................................................................................................................1

ALLEGED FACTUAL BACKGROUND AND PROCEDURAL HISTORY .............................2

LEGAL ARGUMENT .............................................................................................................5

I.      STANDARD OF REVIEW ...........................................................................................5

II.     PLAINTIFF FAILS TO ALLEGE A PLAUSIBLE MONOPSONIZATION CLAIM ........................................................................................................................6

A.     PLAINTIFF FAILS TO PLEAD MONOPSONY POWER ..............................................7

B.     PLAINTIFF FAILS TO PLEAD EXCLUSIONARY CONDUCT ..................................11

III.    PLAINTIFF FAILS TO PLEAD ANTITRUST STANDING ........................................12

CONCLUSION....................................................................................................................15

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Alin v. Am. Honda Motor Co.*, No. 08-4825, 2010 U.S. Dist. LEXIS 32584 (D.N.J. Mar. 31, 2010) ................................................................................................................... 6

*Alston v. Parker*, 363 F.3d 229 (3d Cir. 2004) ............................................................... 6

*Amos v. Franklin Fin. Servs. Corp.*, 509 F. App'x 165 (3d Cir. 2013) ........................... 5

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................................... 5

*Assoc. Gen. Contractors, Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983) ............ 12

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ................................................... 5

*Bell v. KA Indus. Servs., LLC*, 567 F. Supp. 2d 701 (D.N.J. 2008) ................................ 6

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977) ............................ 13

*Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256 (3d Cir. 2006) .................................... 2

*Bull Int'l, Inc. v. MTD Consumer Grp, Inc.*, 654 F. App'x 80 (3d Cir. 2016) ................ 5

*Cable Line, Inc. v. Comcast Cable Commc'ns of Pennsylvania, Inc.*, 767 F. App'x 348 (3d Cir. 2019) ................................................................................................. 6, 8, 10

*Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104 (1986) ........................................ 13

*Castleberry v. STI Grp.*, 863 F.3d 259 (3d Cir. 2017) .................................................... 6

*City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256 (3d Cir. 1998) ................... 12

*Desai v. Impacta, S.A.*, No. 89-4817, 1990 U.S. Dist. LEXIS 11892 (D.N.J. Sep. 7, 1990) ........... 9

*Host Int'l, Inc. v. MarketPlace, PHL, LLC*, 32 F.4th 242 (3d Cir. 2022) ................. 13-15

*ID Sec. Sys. Can., Inc. v. Checkpoint Sys., Inc.*, 249 F. Supp. 2d 622 (E.D. Pa. 2003) ... 9

*Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737 (3d Cir. 1996) ...................... 8

*LePage's, Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003) .................................................... 7, 11

*Miller Indstries Towing Equip. Inc. v. NRC Indus.*, 659 F. Supp. 3d 451 (D.N.J. 2023) ...... 7

*Pa. Dental Ass'n v. Med. Serv. Ass'n*, 745 F.2d 248 (3d Cir. 1984) ............................... 7

*Phillips v. Cty. of Allegheny*, 515 F.3d 224 (3d Cir. 2008) ............................................................. 6

*Premier Comp Sols. LLC v. UPMC*, 377 F. Supp. 3d 506 (W.D. Pa. 2019) ................................. 9

*Presque Isle Colon & Rectal Surgery v. Highmark Health*, 391 F. Supp. 3d 485 (W.D. Pa. 2019) ................................................................................................................................... 7-8

*Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57 (3d Cir. 2010) ..................... 11, 14

*SEI Glob. Servs., Inc. v. SS&C Advent*, 496 F. Supp. 3d 883 (E.D. Pa. 2020), *aff'd*, No. 20-3386, 2022 U.S. App. LEXIS 18121 (3d Cir. June 30, 2022) ............................................ 14

*SEI Glob. Servs., Inc. v. SS&C Advent*, No. 20-3386, 2022 U.S. App. LEXIS 18121 (3d Cir. June 30, 2022) ................................................................................................................ 13

*St. Clair v. Citizens Fin. Grp.*, No. 08-1257, 2008 U.S. Dist. LEXIS 92135 (D.N.J. Nov. 12, 2008) ................................................................................................................................ 8

*Storis v. GERS Retail Sys.*, No. 94-4400, 1995 U.S. Dist. LEXIS 7614 (D.N.J. May 31, 1995) ....................................................................................................................................... 9

*Tekman v. Berkowitz*, 639 F. App'x 801 (3d Cir. 2016) ................................................................. 6

*Todd v. Exxon Corp.*, 275 F.3d 191 (2d Cir. 2001) ....................................................................... 11

*W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85 (3d Cir. 2010) ............................ 7, 13

*Weyerhaeuser Co. v. Ross–Simmons Hardwood Lumber Co.*, 549 U.S. 312 (2007) .................. 6-7

*Yeager's Fuel v. Pa. Power & Light Co.*, 953 F. Supp. 617 (E.D. Pa. 1997) ................................. 8

*ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012) ..................................................... 7

**Statutes**

Section 2 of the Sherman Act, 15 U.S.C. § 2 ........................................................................ *Passim*

**Court Rules**

Fed. R. Civ. P. 12(b)(6) ...................................................................................................... 5, 12, 15

Local Civil Rule 12.2 .................................................................................................................... 15

**INTRODUCTION**

This case is about a contract dispute between a professional fighter and his promoters. Am. Compl. (Doc. 27). Plaintiff Gegard Mousasi ("*Plaintiff*") is a seasoned mixed martial arts ("*MMA*") fighter from the Netherlands that has fought nearly sixty bouts for various MMA promoters throughout the world. *Id.* at ¶¶ 19-28. His contract dispute is with his former promoters, Defendants Bellator Sport Worldwide, LLC ("*Bellator*") and New Bellator, LLC ("*New Bellator*," a subsidiary of Professional Fighters League ("*PFL*")) (Bellator, New Bellator and PFL are collectively referred to as the "*Promoter Defendants*").[1] *Id.* at ¶ 1.

Despite the fact that this case is a straightforward contract dispute, Plaintiff attempts to unnecessarily expand this case by characterizing the contract dispute as a federal antitrust claim under Section 2 of the Sherman Act, 15 U.S.C. § 2 (Fourth Cause of Action). Upset with his decision to sign with Promoter Defendants for a third time and looking for an excuse to justify his contractual breaches, Plaintiff alleges that the Promoter Defendants engaged "in an anticompetitive scheme to maintain and enhance their monopsony power in the market for live Elite Professional MMA Fighter services." *Id.* at ¶ 287. But this is not an antitrust case and, even assuming the Amended Complaint's facts are true for purposes of this Motion, Plaintiff has not plausibly pleaded a legally sufficient monopsony claim under Section 2. Plaintiff fails to allege that Promoter Defendants have market power or that they engaged in anticompetitive conduct. Plaintiff also fails to adequately plead antitrust standing. Even having been amended, the antitrust claim fails on its face and should be dismissed with prejudice.

---

[1] The Amended Complaint also identifies Peter Murray, Donn Davis, Ray Sefo, Mike Kogan, Jim Bramson, and George Pineda as defendants (collectively, the "*Individual Defendants*" and, together with the Promoter Defendants, the "*Defendants*").

## ALLEGED FACTUAL BACKGROUND AND PROCEDURAL HISTORY

In his long professional MMA fighting career, Plaintiff has fought for numerous promoters throughout the world, including Pride Fighting, Dream Fighting, Strikeforce, Ultimate Fighting Championship ("*UFC*"), Bellator, and, most recently, Global Fight League ("*GFL*").[2] *Id.* at ¶¶ 19-28. Plaintiff has fought professionally for these promoters throughout the world. His next scheduled professional MMA fight is in June 2025 for the GFL.[3]

After fighting for several other promoters, Plaintiff rejected an offer to rejoin UFC and chose to sign with Bellator in 2017. *Id.* at ¶¶ 24, 31. After fighting for Bellator for three years, Plaintiff re-signed with Bellator in 2020 and then again in 2023. *Id.* Plaintiff continued to re-sign with Bellator even though Bellator required an exclusivity provision as follows: "Fighter hereby grants to Promoter the exclusive unrestricted, worldwide rights to secure, promote, arrange, present, coordinate, create and produce all MMA, martial arts, and unarmed contests … during the Term of this Agreement." *Id.* at ¶ 25. Plaintiff also continued to re-sign with Bellator despite concerns that he was being "warehoused" after May 2022 following an apparent injury and a bout loss in June 2023 because of that injury. *Id.* at ¶¶ 37-39.

---

[2] Gegard Mousasi signed with GFL in late 2024. Meshew, Jed, *Global Fight League announces new team-based organization, huge list of signings including 8 former UFC champions*, MMA FIGHTING (Dec. 11, 2024), available at: https://www.mmafighting.com/2024/12/11/24319086/global-fight-league-new-team-based-organization-huge-list-of-signings-eight-former-ufc-champions. The Court may take judicial notice of this fact, which is integral to Plaintiff's antitrust allegations. *See, e.g.*, *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006). Plaintiff makes similar citations to MMA trade press in his Amended Complaint. *See, e.g.*, Am. Compl. ¶ 78.

[3] Markey, Ross, *Yoel Romero reveals fight with Gegard Mousasi set for GFL New York in June, Shogun Rua out*, LOWKICKMMA (Mar. 19, 2025), available at: https://www.lowkickmma.com/yoel-romero-fight-gegard-mousasi-gfl-new-york/.

Relevant here, before entering into the October 2023 Addendum, Bellator was clear that Plaintiff was no longer a pay-per-view draw or a champion; therefore, Bellator was prioritizing other fighters. *Id.* at ¶ 49. Plaintiff still entered into the Addendum, which was only eighteen months in duration. *Id.* at ¶¶ 41-43. Bellator completed its well-publicized merger with PFL in November 2023 (it had been announced in January 2023, long before Plaintiff entered into the Addendum). *Id.* at ¶¶ 41-44.

When Plaintiff belatedly complained about his level of promotion, Bellator offered Plaintiff the opportunity to renegotiate the Addendum. *Id.* at ¶¶ 53, 61. Plaintiff declined. *Id*. Bellator also offered to let Plaintiff out of the Addendum before terminating it in 2024. *Id.* at ¶¶ 84, 86, 90. Plaintiff did not accept this offer. *Id.* In late 2024, Plaintiff signed with the GFL.[4]

Plaintiff filed this case on October 16, 2024. Compl. (Doc. 1). The Fourth Count of Plaintiffs' Complaint alleges monopsonization under Section 2 of the Sherman Act (15 U.S.C. § 2) against the Promoter Defendants. *Id*. On February 21, 2025, Promoter Defendants moved to dismiss Count Four. MTD 1 (Doc. 19). Thereafter, Plaintiff amended his Complaint. Am. Compl. (Doc. 27).

With respect to competition in the MMA industry, Plaintiff alleges that he competes with other professional MMA fighters in a "Relevant Input Market" for "live Elite Professional MMA Fighter services."[5] *Id.* at ¶¶ 95-107. By Plaintiff's definition, a "Professional MMA Fighter" in this market is an athlete who has trained in "multiple martial arts disciplines—wrestling, judo,

---

[4] Head, Simon, *Global Fight League reveals star-studded talent list ahead of inaugural draft*, RDX Sports (Dec. 16, 2024), available at: https://blogs.rdxsports.com/global-fight-league-reveals-star-studded-talent-list-ahead-of-inaugural-draft/.

[5] Relatedly, Plaintiff defines the "Relevant Output Market" as "the market for promoting live Elite Professional MMA events" but does not allege any anticompetitive conduct in that market. *Id.* at ¶ 174.

jiu-jitsu, Muay Thai, karate, taekwondo and boxing—to compete in sanctioned Bouts under athletic commission rules." *Id.* at ¶¶ 95-96. An "Elite Professional MMA Fighter" is a Professional MMA Fighter "who has demonstrated success through competition in local and/or regional MMA promotions, or who has developed significant public notoriety amongst MMA Industry media and the consuming audience through demonstrated success in athletic competition who can command a guaranteed purse of at least $100,000.00 per Bout." *Id.* at ¶ 95. Plaintiff concludes that Elite Professional MMA Fighters are not substitutes for other Professional MMA Fighters that garner purses less than $100,000 or for other athletes who are only trained in a single martial art, or alternative forms of competitive fighting, such as karate, boxing or wrestling. *Id.* a ¶¶ 95-107.

Plaintiff alleges a geographic submarket for Elite MMA bouts in the United States, United Kingdom, the European Union, Saudi Arabia, and the United Arab Emirates. *Id.* at ¶ 108. Current Elite MMA promoters in this alleged submarket include UFC, PFL/Bellator, GFL, KSW, and Oktagon. *Id.* at ¶ 113. Other Elite MMA promoters include ONE Championship and RIZIN located in Asia, but Plaintiff concludes that they are not options for him and on that basis alone excludes them from his supposed relevant market. *Id.* at ¶¶ 116-119.

Plaintiff uses number of rostered fighters as a proxy for market share and significance. *Id.* at ¶¶132-137. In Plaintiff's proposed relevant market, UFC is the dominant market participant with approximately 700 total fighters and around 140 being characterized by Plaintiff as Elite MMA Fighters. *Id.* at ¶¶ 132-133. PFL/Bellator has a much smaller position with approximately 200 total fighters and 30 Elite MMA Fighters. *Id.* KSW and Oktagon also have a handful of Elite MMA Fighters. *Id.* at ¶ 133. Based on publicly available information, GFL has

a roster of 300 fighters with approximately 50 appearing to be Elite MMA Fighters, which makes it the next most significant league to UFC in Plaintiff's proposed relevant market.[6]

## LEGAL ARGUMENT

### I. STANDARD OF REVIEW

Rule 12(b)(6) provides for the dismissal of a complaint, in whole or in part, where it fails to state a claim upon which relief can be granted. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id*. (*quoting Twombly*, 550 U.S. at 555).

Thus, the complaint's factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level. *Twombly*, 550 U.S. at 570. Moreover, the plaintiff's well-pleaded factual allegations must state the elements of a claim. *See Amos v. Franklin Fin. Servs. Corp.*, 509 F. App'x 165, 167 (3d Cir. 2013) (explaining that a plaintiff "must, of course, allege each of these elements to state a claim" (internal citation and quotation omitted)); *Bull Int'l, Inc. v. MTD Consumer Grp, Inc.*, 654 F. App'x 80, 97-98 (3d Cir. 2016) (affirming dismissal of claim where complaint "failed to allege even the basic elements" of the claim as defined by

---

[6] According to numerous industry publications, GFL has a 300-fighter roster with many fighters considered "Elite" using Plaintiff's definition. Riggs, Drake *Global Fight League reveals massive list of signings, including 8 ex-UFC champs, for new team-based MMA organization,* Yahoo! Sports (Dec. 11 2024), available at: https://sports.yahoo.com/global-fight-league-reveals-massive-list-of-signings-including-8-ex-ufc-champs-for-new-team-based-mma-organization-201248109.html.

statute); *Tekman v. Berkowitz*, 639 F. App'x 801, 806 (3d Cir. 2016) (affirming dismissal of breach of contract claim where complaint did not allege "basic elements" of a contract).

This is a "stricter pleading requirement" obligating a plaintiff to "plead more than the possibility of relief to survive a motion to dismiss." *Alin v. Am. Honda Motor Co.*, No. 08-4825, 2010 U.S. Dist. LEXIS 32584, at *5 (D.N.J. Mar. 31, 2010) (*quoting Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009)).  The court is **not** required to accept as true "unwarranted inferences, or a legal conclusion couched as a factual allegation." *Castleberry v. STI Grp.*, 863 F.3d 259, 263 (3d Cir. 2017) (quotation marks omitted).

Relevant here, where a plaintiff has had the opportunity to amend his or her complaint and remedy deficiencies highlighted by a prior motion to dismiss, but failed to do so, the amended complaint should be dismissed with prejudice.  *See Bell v. KA Indus. Servs., LLC,* 567 F. Supp. 2d 701, 711 (D.N.J. 2008); *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 245-46 (3d Cir. 2008).  Relatedly, a District Court may dismiss a claim without leave to amend when such an amendment would be futile.  *Alston v. Parker*, 363 F.3d 229, 236 (3d Cir. 2004).

## II. PLAINTIFF FAILS TO ALLEGE A PLAUSIBLE MONOPSONIZATION CLAIM

The Supreme Court has characterized a monopsony as follows: "Monopsony power is market power on the buy side of the market.  As such, a monopsony is to the buy side of the market what a monopoly is to the sell side and is sometimes colloquially called a 'buyer's monopoly.'" *Weyerhaeuser Co. v. Ross–Simmons Hardwood Lumber Co.*, 549 U.S. 312, 320 (2007); *see also Cable Line, Inc. v. Comcast Cable Commc'ns of Pennsylvania, Inc.*, 767 F. App'x 348, 351 (3d Cir. 2019) ("A 'monopsony' exists when a market is controlled by one buyer.").

To plead a monopsony claim under Section 2 of the Sherman Act, "a plaintiff must allege monopsony power and conduct by the monopsonist that excludes its rivals—i.e., other buyers in

- 6 -

the same market." *Id.*; *see also LePage's, Inc. v. 3M,* 324 F.3d 141, 149 (3d Cir. 2003) (explaining that plaintiff must show, as with a monopoly claim, (1) the possession of monopsony power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident). "A firm that has substantial power on the buy side of the market (i.e., monopsony power) is generally free to bargain aggressively when negotiating the prices it will pay for goods and services. […] This reflects the general hesitance of courts to condemn unilateral behavior, lest vigorous competition be chilled." *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 103 (3d Cir. 2010).

### A. PLAINTIFF FAILS TO PLEAD MONOPSONY POWER

As to the first element, a plaintiff must plead that the defendant possesses "substantial monopsony power." *Id.* Typically, "the size of market share is a primary determinant of whether monopoly power exists."[7] *Pa. Dental Ass'n v. Med. Serv. Ass'n*, 745 F.2d 248, 260 (3d Cir. 1984). Though there is no perfect formula for determining market power, courts have found that a "60%-80%" share of the geographic market for services, "with significant entry barriers" to the market, and with "very few alternatives" in the market, will sufficiently establish monopsony power. *W. Penn.*, 627 F.3d at 103–04; *Miller Indstries Towing Equip. Inc. v. NRC*

---

[7] There is limited precedent on monopsony claims within the Third Circuit, though courts generally apply the same Section 2 standards to monopsonization claims as monopolization claims. *See, e.g.*, *Presque Isle Colon & Rectal Surgery v. Highmark Health*, 391 F. Supp. 3d 485, 502 (W.D. Pa. 2019) ("The Court applies the same standard as a claim of monopoly to this situation of an allege monopsony based on the close "kinship between monopoly and monopsony," which suggests that "similar legal standards should apply to claims of monopolization and to claims of monopsonization." (internal citations omitted)); *see also ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 280 (3d Cir. 2012) ("[The Supreme Court] in *Weyerhaeuser* established the straightforward principle that the exercise of market power on prices for the purpose of driving out competitors should be judged by the same standard, whether such power is exercised on the input [buy] or output [sell] side of the market."). Therefore, cases addressing monopolies in similar alleged factual circumstances are applicable.

*Indus.*, 659 F. Supp. 3d 451, 466 (D.N.J. 2023) ("Courts within the Third Circuit have held a defendant has significant market share supporting an inference of monopoly power if the defendant possesses sixty percent or more market share in the relevant market." (internal quotation and citation omitted); *Presque Isle*, 391 F. Supp. 3d at 502 (defendant had monopsony power when it possessed "in excess of" 65-75% of all health insurance market in Western Pennsylvania); *see also Yeager's Fuel v. Pa. Power & Light Co.*, 953 F. Supp. 617, 651 (E.D. Pa. 1997) (explaining that, in the context of monopoly claims, a market share of 90% is generally sufficient to establish monopoly power, while 60% can suffice with other factors, and 31% is insufficient). *Cf. Cable Line, Inc.*, 767 F. App'x at 351–52 ("Plaintiffs acknowledge that Comcast is not the only buyer of cable installation services in the Regions. Notwithstanding that concession, the Complaint does not allege any facts concerning those other companies and how, if at all, Comcast unlawfully excluded them from the market for cable installation. Absent those allegations [to support a monopsony], the Complaint does not adequately allege the relevant market, which is fatal to their claim.").

Plaintiff has failed to allege facts plausibly supporting an inference that Promoter Defendants had market power in any relevant market. To the contrary, the Amended Complaint concludes that PFL/Bellator had at most a 20% share of the relevant market, even excluding the newly formed GFL and its roster of Elite MMA Fighters and the fact that during the time relevant to this claim PFL and Bellator were separate entities. Am. Compl. at ¶ 137 (using number of rostered Elite MMA Fighters as a proxy for market share). These allegations are clearly insufficient as a matter of law. *See, e.g., Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 749-50 (3d Cir. 1996) (finding that control of 47% of the New Jersey milk market, "without concrete evidence of anticompetitive behavior," did not show monopoly power); *St.*

*Clair v. Citizens Fin. Grp.*, No. 08-1257, 2008 U.S. Dist. LEXIS 92135, at *21 (D.N.J. Nov. 12, 2008) (quoting *Brunson Commc'ns, Inc. v. Arbitron, Inc.*, 239 F. Supp. 2d 550, 568 (E.D. Pa. 2002) for the proposition that "Courts are reluctant to find monopoly power where the defendant business controls less than fifty percent of the given market."); *Desai v. Impacta, S.A.*, No. 89-4817, 1990 U.S. Dist. LEXIS 11892, at *28 (D.N.J. Sep. 7, 1990) (explaining that "absent special circumstances, a defendant must have a market share of at least fifty percent before he can be found guilty of monopolization").

When considered in conjunction with the monopsony market power allegations brought against the UFC in *Le*—cited in Plaintiff's Complaint, *see* Am. Compl. ¶¶ 153, 158—it is all the more unlikely that the Promoter Defendants could be considered a monopsony. In *Le*, the plaintiff claimed that UFC possessed 90% of the market share in the United States. *See* 216 F. Supp. 3d at 1159. Taking as true that allegation, as well as Plaintiff's allegation that the Promoter Defendants and the UFC make up a 95% majority of the market, that would mean the UFC possesses a 90% share, and the Promoter Defendants only possess a 5% share. And even if Plaintiff could show additional anticompetitive factors, a 5% share of market power is not sufficient to demonstrate a monopsony. *See Storis v. GERS Retail Sys.*, No. 94-4400, 1995 U.S. Dist. LEXIS 7614, at *12 (D.N.J. May 31, 1995) (holding that "less than a 40% market share is insufficient, as a matter [of] law, to establish market power"); *Desai*, 1990 U.S. Dist. LEXIS 11892, at *28-29 (approximate market share of 5% was "too small, as a matter of law, to enable [defendant] to commit the offense of monopolization"); *Premier Comp Sols. LLC v. UPMC*, 377 F. Supp. 3d 506, 535 (W.D. Pa. 2019) (finding that a market share of 6.1% was "too low" to establish a monopoly); *ID Sec. Sys. Can., Inc. v. Checkpoint Sys., Inc.*, 249 F. Supp. 2d 622, 648 (E.D. Pa. 2003) ("As a matter of law, a market share of less than 30 percent is presumptively

insufficient to establish the market power that is a prerequisite to a defendant's enjoying a dangerous probability of achieving monopoly power.").

Plaintiff also concludes that PFL/Bellator has market power based on "[s]ignficant barriers [that] prevent new promotions from entering the market." Am. Compl., ¶ 138. This legal conclusion is directly contrary to the factual allegation regarding the existence of promotional leagues beyond the UFC and the Promoter Defendants within the relevant market, including new entrant GFL. *Id.* at ¶ 139.

Plaintiff's conclusion that Promoter Defendants possess monopsony power is also dependent on a fatally flawed market definition that excludes MMA Promoters in Saudia Arabia, the UAE, Africa, Asia, Oceania, Latin America, and the European Union, including KSW and Oktagon, on grounds that very few of their fighters are considered "Elite" without providing any economic rationale for why those promoters do not compete with UFC, PFL/Bellator and GFL for fighters. *Id.* at ¶¶ 108-130. Plaintiff's conclusory relevant market definition is directly contrary to several of his own factual allegations, including (i) that Plaintiff fought for promoters throughout the world, including in Japan; (ii) that Plaintiff's exclusivity provision with Bellator was "worldwide" in nature; and (iii) that MMA promoters roster multiple MMA Fighters that earn more or less than $100,00 per bout. *Id.* Plaintiff acknowledges that he was free to contract with any of these options prior to contracting with Promoter Defendants, while alleging no facts to support an inference that these competitors were not viable substitutes. *Id.* This failure is fatal. *See, e.g.*, *Cable Line, Inc.*, 767 F. App'x at 351–52 ("[T]he Complaint does not allege any facts concerning those other companies and how, if at all, Comcast unlawfully excluded them from the market for cable installation.").

### B.  PLAINTIFF FAILS TO PLEAD EXCLUSIONARY CONDUCT

Plaintiff fails to allege facts plausibly suggesting that PFL/Bellator engaged in exclusionary conduct under well-settled law, and on this basis alone, Plaintiff's monopsonization claim should be dismissed.  Plaintiff's only basis for exclusionary conduct is the fact that PFL/Bellator asked Plaintiff to agree to an exclusivity provision; however, such provisions are only potentially problematic under the Sherman Act when a dominant firm uses them to force market participants to make an all-or-nothing choice.  *See LePage's Inc. v. 3M*, 324 F.3d 141, 158-59 (3d Cir. 2002) (providing history of Section 2 exclusionary conduct analysis).  PFL/Bellator is not the dominant firm in this market; therefore, its use of an exclusivity provision, alone, cannot constitute exclusionary conduct as a matter of law.  *Id.*

Plaintiff attempts to avoid this deficiency by citing *Todd v. Exxon Corp.*, 275 F.3d 191 (2d Cir. 2001) for the proposition that Promoter Defendants and UFC participate in a duopsony and collectively engage in exclusionary conduct.  Am. Compl. at ¶ 29.  Plaintiff's reliance on *Todd* is inapt.  *Todd* was a Sherman Act Section 1 conspiracy case where plaintiff alleged that multiple defendants (comprising 90% of the relevant market) shared competitively sensitive information, participated in multiple meetings discussing such information, and engaged in parallel business conduct to exclude competition.  *See* 275 F.3d at 195-197.  None of those facts are alleged here.  Promoter Defendants are alleged to have acted unilaterally, and there are no allegations of conspiratorial conduct between Promoter Defendants and UFC (or any other promoter, for that matter).  The use of exclusive dealing arrangements is common and integral to the sports and entertainment business and have many procompetitive benefits.  *See, e.g.*, *LePage's*, 325 F3d. at 158-59; *see also Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 76 (3d Cir. 2010) ("[I]t is widely recognized that in many circumstances [exclusive dealing arrangements] may be highly efficient—to assure supply, price stability, outlets,

investment, best efforts or the like—and pose no competitive threat at all."). Plaintiff was free to choose any number of options before repeatedly agreeing to such restrictions with Bellator, and Plaintiff has agreed to a similar arrangement with GFL. Am. Compl. at ¶ 24. There are no allegations that Bellator threatened or intimidated Plaintiff into agreeing to exclusivity, and there are no allegations that Bellator maintained unrivaled bargaining power relative to other Elite MMA promoters. *Id*. Bellator's merger with PFL also is a red herring because Plaintiff signed with Bellator on three separate occasions, each before the merger was consummated. *Id.* at ¶ 44. There are no plausible allegations that the merger had any anticompetitive effect on competition for MMA fighters.

### III.     PLAINTIFF FAILS TO PLEAD ANTITRUST STANDING

In addition to the failures above, Plaintiff's antitrust claim must also be dismissed because he fails to establish antitrust standing to pursue his claim. Courts, including those in this Circuit, have imposed a rigorous, sensible standing requirement, referred to as "antitrust standing" to determine whether the plaintiff is the proper party to bring a private antitrust action. *City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256, 264 (3d Cir. 1998). To survive a Rule 12(b)(6) motion, a plaintiff must allege that he has antitrust standing, which the United States Supreme Court held in *Assoc. Gen. Contractors, Inc. v. Cal. State Council of Carpenters ("**AGC**")*, 459 U.S. 519, 540-44 (1983) requires that the plaintiff suffer an antitrust injury and be an appropriate plaintiff to bring the antitrust case. The Third Circuit refines the AGC factors to five:

> (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of

> more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages.

*Host Int'l, Inc. v. MarketPlace, PHL, LLC*, 32 F.4th 242, 249 (3d Cir. 2022).

The antitrust injury requirement is the most important factor. *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 110 n.5 (1986). With respect to antitrust injury, plaintiff must allege more than conclusory statements and must provide specific facts to plausibly suggest injury to competition, not just to a particular competitor. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). The injury "must reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *W. Penn*, 627 F.3d at 101. "Put differently, an antitrust injury must have an 'anti-competitive effect on the competitive market.'" *SEI Glob. Servs., Inc. v. SS&C Advent*, No. 20-3386, 2022 U.S. App. LEXIS 18121, at *6 (3d Cir. June 30, 2022) (quoting *Eichorn v. AT&T Corp.,* 248 F.3d 131, 140 (3d Cir. 2001)). The doctrine of antitrust injury requires every plaintiff to show that the challenged conduct "affected the prices, quantity or quality of goods or services, not just [the plaintiff's] own welfare." *Host Int'l, Inc. v. MarketPlace, PHL, LLC*, 32 F.4th 242, 251 (3d Cir. 2022) (quoting *Mathews v. Lancaster Gen. Hosp.*, 87 F.3d 624, 641 (3d Cir. 1996)). Plaintiff must allege either: "(1) harm to the competitive market or (2) that its harm 'flows from' any supposed anticompetitive effects of [the defendant's actions]." *SEI Glob. Servs.*, 2022 U.S. App. LEXIS 18121, at *7.

Plaintiff improperly seeks to elevate an ordinary contractual dispute into an alleged "anticompetitive scheme" involving the Promoter Defendants. The gravamen of Plaintiff's Amended Complaint centers on his dissatisfaction with the terms of his agreement, including his compensation and his promotion as a fighter within the Promoter Defendants' league. *See* Am. Compl., ¶¶ 19-93. But Plaintiff's agreement with Promoter Defendants has since been

- 13 -

terminated (a fact that precipitated this very suit), and Plaintiff was free to contract with UFC or any other promoter. Indeed, Plaintiff has since contracted with the GFL.

Aside from Plaintiff's sole antitrust claim, the majority of Plaintiff's claims are based in tort or contract. *Id.* at ¶¶ 201-300. But "not every business tort or breach of contract that has an adverse impact on a competitor can form the basis of an antitrust claim." *SEI Glob. Servs., Inc. v. SS&C Advent*, 496 F. Supp. 3d 883, 901 (E.D. Pa. 2020), *aff'd*, No. 20-3386, 2022 U.S. App. LEXIS 18121 (3d Cir. June 30, 2022). Plaintiff specifically complains of the Promoter Defendants' use of exclusive agreements, and argues that restrictive contracts have deprived Elite Professional MMA Fighters of signing with rival MMA promoters. *See* Am. Compl., ¶¶ 241, 242. It is well-established, however, that an "[a]n objectionable term in a commercial agreement, without more, is not an antitrust violation." *Host Int'l, Inc.* 32 F.4th at 250. Although a plaintiff may personally find exclusive agreements "undesirable," he must also show how they are "unreasonable restraints" on the market. *Id.*; *see also Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 76 (3d Cir. 2010) ("[I]t is widely recognized that in many circumstances [exclusive dealing arrangements] may be highly efficient—to assure supply, price stability, outlets, investment, best efforts or the like—and pose no competitive threat at all.").

In this regard, Plaintiff cannot overcome the allegations in his own Amended Complaint. Despite Plaintiff's broad theory that the Promoter Defendants' use of exclusive agreements is preventing competition, he also alleges that the largest promoter in the industry, UFC, uses similar agreements. *See* Am. Compl., ¶ 126. And yet, Plaintiff reports that he almost signed an agreement with UFC before signing with the Promoter Defendants, and that he has previously signed with at least four other MMA promoters (including UFC) his career. *Id.* at ¶¶ 21-24. Not

only does the use of exclusive agreements appear to be standard industry practice, but it has not prevented Plaintiff from signing with different promoters in the past. He has not demonstrated that the use of exclusive agreements by the Promoter Defendants has pervasively chilled competition or depressed wages in the market—it has only prevented him, in this sole instance, from leaving an unsatisfactory promoter relationship early. Plaintiff attempts to cite "examples" of other Elite Professional MMA Fighters having difficulty getting fight promotions with the Promoter Defendants but does no more than allege that warehousing is a common practice, especially for fighters like Plaintiff, who were injured and consistently losing bouts. *See id.* at ¶¶ 33-39, 154-159. As relevant here, when the only harm alleged is harm to the plaintiff, and not to competition, the antitrust claims should be dismissed. *Host Int'l, Inc.*, 32 F.4th at 252.

## CONCLUSION

For the foregoing reasons, Count Four[8] of Plaintiff's Amended Complaint, raising a claim under Section 2 of the Sherman Act, should be dismissed under Fed. R. Civ. P. 12(b)(6), with prejudice, for failure to state a claim upon which relief can be granted.

Dated: April 21, 2025

        DUANE MORRIS LLP

By:    */s/ Sarah Fehm Stewart*
Eric R. Breslin
Sarah Fehm Stewart
200 Campus Drive, Suite 300
Florham Park, NJ 07932
Telephone: (973) 424-2063
erbreslin@duanemorris.com
sfstewart@duanemorris.com

---

[8] Pursuant to Local Civil Rule 12.2, Defendants will answer the remaining Counts of the Complaint within 14 days after entry of the Court's order resolving this Motion.

                                                            Sean P. McConnell
                                                            30 S. 17th Street
                                                            Philadelphia, PA 19103
                                                            Telephone: (215) 979-1947
                                                            spmcconnell@duanemorris.com

                                                            *Attorneys for Defendants*